**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WARDMAN HOTEL OWNER, L.L.C., [1] | ) | Case No. 21-10023 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF JAMES D. DECKER IN SUPPORT OF THE
DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF**

I, James D. Decker, hereby declare under penalty of perjury:

1.    I am the sole and independent manager (the "<u>Manager</u>") of the above-captioned debtor and debtor in possession (the "<u>Debtor</u>" or the "<u>Company</u>"). I have served as the Debtor's Manager since October 1, 2020. I am generally familiar with the Debtor's business and financial affairs, and books and records. I am above 18 years of age and I am competent to testify.

2.    I am authorized to submit this Declaration on behalf of the Debtor. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information I have received from the Debtor's advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

---

[1]    The last four digits of the Debtor's U.S. tax identification number are 9717.  The Debtor's mailing address is 5035 Riverview Road, NW, Atlanta, GA 30327.

**Preliminary Statement**

3.      The Debtor is the sole owner of the real property located in Woodley Park,

Washington, D.C. The property was formerly operated as the Washington Marriott Wardman Park

Hotel (the "Hotel"), a convention hotel.  The Debtor has now permanently closed the Hotel.

4.      The Hotel has a long and storied history.  It opened in 1918, just days after the end

of World War I and in the midst of the Spanish flu pandemic.  Over the last century, the Hotel has

been home to former presidents Herbert Hoover, Dwight Eisenhower and Lyndon Johnson, former

U.S. Senators Barry Goldwater and Bob Dole, plus many other politicians and dignitaries.

5.      Since 1998, and until immediately before the filing of this Chapter 11 Case, the

Hotel was managed by Marriott Hotel Services, Inc. ("Marriott") pursuant to a long-term

management agreement. Despite its history and prime location in our nation's capital, the Hotel

has struggled to remain profitable due to a number of factors, including consistent and growing

competition in the greater Washington area, including competition generated by other Marriott

properties, and Marriott's failure to act as a reasonable and prudent operator of the Hotel. As a

result, under Marriott's stewardship, the Hotel's net operating income dropped from $24.77 million

in 2010 to $5.02 million in 2018, an 80% drop. Throughout this same period, the Hotel owners

continued to make capital investments in the Hotel to improve the property and make up for the

revenue shortfall.

6.      This year, the Debtor's financial condition has been exacerbated by the COVID-19

pandemic, which has resulted in a cessation of all revenues from Hotel operation.  On March 25,

2020, Marriott closed the Hotel, furloughed most of its staff, and issued notices under the WARN

Act to substantially all employees.  Despite the termination of operations and furlough of employees, the Hotel continued to lose approximately $1.5 million per month.[2]

7.       At the same time revenues dried-up due to COVID-19, Marriott began to send repeated calls for working capital to the Debtor.  On March 16, 2020, with no warning, Marriott demanded that Owner fund $10 million in working capital pursuant to the hotel management agreement between the Debtor and Marriott.  Further demands followed in the months after the shutdown. The Debtor rejected each of these demands, in part, because Marriott failed to demonstrate that these vast sums were reasonably necessary for the operation of a shuttered, inoperative Hotel. After months of unproductive negotiation, Marriott filed a complaint against the Debtor in Maryland state court alleging breach of contract. Marriott also sought an injunction to compel the Debtor to pay its pending demands for working capital. On December 8, 2020, the Maryland state court entered an order compelling the Debtor to pay money to Marriott upon Marriott's issuance of unilateral, future capital call notices.

8.       In light of the injunction from the Maryland state court, and with no cash or available source of funding to pay ongoing capital calls, prior to the Petition Date the Debtor permanently closed the Hotel and terminated the hotel management agreement with Marriott. Through this Chapter 11 case, the Debtor intends to conduct an orderly sale of substantially all of its assets, distribute the proceeds of such sale to creditors, and wind down its remaining business.

9.       To familiarize the Court with the Debtor and the relief the Debtor seeks on the first day of this chapter 11 case, this Declaration is organized into three sections. The first section provides background information with respect to the Debtor's business and corporate history, as well as its prepetition capital structure. The second section describes the circumstances

_____

[2]  All Hotel profit and loss information is provided upon information and belief based upon Marriott reporting.

surrounding the commencement of this chapter 11 case. The last section sets forth the relevant facts in support of each of the pleadings filed in connection with this chapter 11 case (collectively, the "First Day Motions").

## General Background

### I.    The Company's Business

10.    The Company owns real property located at 2600 Woodley Road NW, in the Woodley Park neighborhood of Washington, D.C; a prime location adjacent to the Woodley Park station of the Washington Metro. The real property was previously operated as Washington Marriott Wardman Park, a convention hotel. The 1,152-room Hotel contained 195,000 square feet of total event space and 95,000 square feet of exhibit space, and was the third largest hotel by room count in Greater Washington. The Debtor permanently closed the Hotel prior to the Petition Date and intends to market the real property to potentially interested parties during this Chapter 11 case.

### B.    History

11.    Built between 1917 and 1918 by local developer Harry Wardman and designed by local architect Frank Russell White, the Wardman Park Hotel opened on November 23, 1918. The hotel was hugely successful, due to the housing shortage caused by Washington's growth during World War I.  In 1928, the hotel was expanded with an eight-story, 350-room residential-hotel annex (the "Wardman Tower"). That building is listed on the National Register of Historic Places, the only surviving portion of the original Wardman Park.

12.    In 1953, the original owners sold the hotel to Sheraton Hotels. Renamed the Sheraton-Park Hotel, the largely residential hotel was gradually converted to house mainly overnight guests. Substantial additions were made to the property, transforming it into a full-scale convention hotel, including large new ballrooms and the 1965 addition known as the Motor Inn

4

and later known as the Park Tower.  By the late 1970s, it was decided that the 1918 main building was outdated and unable to be modernized.

13.    Construction began in 1977 on a modern replacement hotel, immediately adjacent on the property. When it opened in 1980, as the Sheraton Washington Hotel, the original building closed and was demolished. In 1998, following a protracted lawsuit against Sheraton by the hotel's then owners, John Hancock Insurance and the Sumitomo Corporation, Marriott International took over management of the property, renaming the hotel the Marriott Wardman Park Hotel.

14.    In 1998, Thayer Lodging Group of Annapolis, Maryland purchased the hotel for $227 million and spent another $100 million on renovations. In 2005, Thayer Lodging Group sold the hotel to JBG Smith ("JBG") and CIM Group ("CIM") for $300 million.

15.    In 2014, JBG redeveloped the largely unoccupied western portion of the hotel's property, constructing an apartment building designed to mirror the historic Wardman Tower. It was first named Wardman West, but was later renamed The Woodley. The Woodley units were sold for a record-breaking $920K each.

16.    In 2015, JBG renovated floors 3-8 of the Wardman Tower into 32 luxury condominiums. The first and second floors remain part of the Hotel. The condominiums are separate from the hotel and do not share an entrance or connecting interior passageways.

17.    In January 2018, JBG and CIM, which had owned roughly equal interests in the Hotel, sold a controlling interest in the property (66.67%) to PL Wardman Member, LLC, an affiliate of Pacific Life Insurance Company ("Pacific Life"), with JBG and CIM each retaining 16.67% in connection with the restructuring of the then-existing secured financing. In February 2020, CIM Group surrendered its interest in the hotel to JBG, leaving affiliates of Pacific Life and

DOCS_DE:232251.11 92203/001

JBG as the sole owners (with PL Wardman Member, LLC owning 80% and the JBG affiliate owning 20%).

18.    On September 3, 2020, PL Wardman Member, LLC filed a petition for dissolution of the Debtor in Delaware court citing a deadlock with JBG regarding a plan to address the deteriorating financial condition of the Hotel. On October 2, 2020, PL Wardman Member, LLC dismissed the complaint. As of the Petition Date, Pacific Life indirectly owns 100% of the interests in Debtor as a result of its ownership of PL Wardman Member, LLC, the Debtor's sole member.

### C.    Property Description

19.    The Debtor's real property is comprised of three contiguous parcels, irregular in shape, and generally bound by Connecticut Ave. and 24th Street to the east; Woodley Road to the north; multi-family residential to the west; and Calvert St. and multi-family residential to the south. The site is considered to be fully improved and no excess or surplus land exist. The land is gently rolling, but it is generally above the grade of the surrounding roadways.

20.    The primary improvements on the Debtor's real property include a convention style hotel with significant meeting space. The Hotel contains 1,152 guest rooms, lobby, registration area, lobby restaurant, pub, full-service restaurant, health center, business center, jewelry shop, car rental shop, gift/sundry shop, hair salon, and all necessary back of house and mechanical space to operate the Hotel. Additionally, the Hotel contains 196,222 sq. ft. of meeting space that is divided between pre function space, ballrooms, break out rooms, and exhibition space. All public spaces are located on the lower levels of the property.  The guest rooms are arranged in three towers:

- Wardman Tower (built 1928): 8 floors (floors 1-2 belong to Hotel)

- Center Tower (built 1978): 11 floors and a basement

- Park Tower (built 1965): 10 floors

21.     Other improvements to the site include an outdoor pool, 665 striped parking spaces divided between three garages and surface parking, landscaping, signage, property driveways, sidewalks, curbing, etc.

**D.     Operations**

22.     Prior to the termination of operations, the Hotel's day to day hotel operations had been managed by Marriott since 1998. The Company and Marriott were parties to a Hotel Management Agreement (the "HMA") governing Marriott's services. The HMA was set to expire on December 28, 2029, but would have automatically extended for three ten-year periods unless Marriott gave notice of its intent not to renew the HMA a year before each of the ten-year periods expired.

23.     Under the HMA, Marriott—among other things—recruits, employs, supervises, directs, and discharges its employees; books group and transient business; arranges for and supervises the Hotel's public relations and advertising; prepares the Hotel's marketing plans; procures all inventory and replacement dining ware, uniforms, and other supplies used in the Hotel's public spaces and guest rooms; and plans, executes, and supervises Hotel repairs and management, and purchases of Hotel furniture, fixtures, appliances, computers, and other equipment. (HMA § 1.02(A)).

24.     Pursuant to the negotiated terms of the HMA, Marriott was given broad discretion "in all matters relating to the management and operation of the Hotel," including all employment decisions, account, marketing and promoting the Hotel.  (HMA § 1.02(A).)  At the same time, Marriott agreed to "act as a reasonable and prudent operator of the Hotel" and "be responsible for the proper and efficient operation of the Hotel."  (HMA § 1.02(B).)

25.     While the parties contemplated that revenues from bookings would cover the operational expenses of the Hotel, the HMA provides that the Debtor shall "advance any additional

funds necessary to maintain Working Capital at levels determined by Manager to be reasonably necessary to satisfy the needs of the Hotel as its operation may from time to time require consistent with the Annual Operating Projection or as a result of 'unforeseen circumstances'[.]". (HMA § 4.05.).   Any request by Marriott for working capital from the Debtor must be (1) "reasonably necessary" to satisfy the Hotel's needs, (2) consistent with the annual budget, and (3) consistent with Marriott's standard of performance. (HMA § 1.02(B), 4.04, 4.05).

26.     On March 11, 2020, Mayor Bowser of the District of Columbia issued a declaration of public emergency due to the onset of the COVID-19 pandemic. Days later, on March 24, 2020, Mayor Bowser issued an order declaring the closure of all non-essential businesses and a prohibition on all gatherings of ten or more persons.   On March 25, 2020, the hotel ceased operations save for a limited staff to handle building maintenance and other basic functions.

27.     Just prior to the Petition Date, and based on my sole and independent authority, the Debtor made the final decision to close the Hotel permanently.   On January 11, 2021, prior to filing the Chapter 11 petition, the Debtor terminated the HMA with Marriott.   At the same time, the Debtor entered into a custodial agreement with PDSI (the "Property Custodian") to provide security and limited maintenance for the property.

## II.     The Company's Corporate Structure

28.     The Debtor was incorporated as a Delaware limited liability company in January 2018.   The current Debtor has operated through one or more predecessor companies. The equity interests of the Debtor is currently owned by PL Wardman Member, LLC, a wholly owned subsidiary of Pacific Life.

### III.      The Debtor's Capital Structure and Debt

29.      As described in greater detail below, as of the Petition Date, the principal amount of the Debtor's funded debt obligations totaled approximately $130 million under the Term Loan Credit Facility described in greater detail herein.

#### A.      The Term Loan Credit Facility

30.      On January 19, 2018, the Debtor obtained a loan from Pacific Life, in the principal sum One Hundred Twenty-Two Million Five Hundred Thousand and 00/100 Dollars ($122,500,000.00) (the "Prepetition Loan") pursuant to the terms of that certain Term Loan Agreement (the "Prepetition Loan Agreement" and, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Loan Documents") to facilitate Debtor's purchase of the Hotel and related real and personal property. As of December 21, 2020, the Debtor was indebted to Pacific Life in respect of the Prepetition Loan in an aggregate principal amount, not less than $130,537,383 (collectively, together with accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, plus all interest, fees, costs, and other charges thereunder, the "Prepetition Loan Obligations").

31.      The Prepetition Loan was obtained in connection with a recapitalization through which a previously issued loan from Pacific Life (the "Old Loan") was satisfied through (i) the proceeds of a new loan from Pacific Life (the Prepetition Loan), (ii) new equity from the prior owners of the Hotel, and (iii) a conversion of a portion of the Old Loan (totaling $40 million) into equity in the Debtor, a newly-formed joint venture.

9

32.     In connection with the Prepetition Loan Obligations, the Debtor granted to Pacific Life a first-priority security interest in and continuing lien (the "Prepetition Secured Party Liens") on "Collateral" and "Secured Property" (the "Prepetition Secured Party Collateral"), as the term "Collateral" is defined in the Prepetition Loan Agreement and that certain Security Agreement dated January 19, 2018 between Debtor and Pacific Life and as the term "Secured Property" is defined in that certain Deed of Trust, Financing Statement and Security Agreement (with Assignment of Rents and Fixture Filing) dated January 19, 2018 between Debtor, Pacific Life and the Trustee (as defined therein).

### B.     The Debtor's Other Obligations

33.     The Debtor's main potential unsecured obligation is to its former Hotel manager, Marriott. That obligation is disputed, and the Debtor has asserted significant claims against Marriott in the pending litigation. Pursuant to the terms of the HMA, all vendors and service suppliers for Hotel operations entered into contracts with Marriott. As a result, the Debtor has few (if any) direct obligations to satisfy the claims of Marriott's creditors. Moreover, the Debtor has no employees. As of November 30, 2020, based on information provided by Marriott, the Debtor estimates the outstanding obligations to the Hotel vendors and other unsecured creditors at approximately $1.3 million, the vast majority of which are paid by, and the responsibility of, Marriott.[3]

---

[3]     Out of abundance of caution, the Debtor has included in its creditor matrix all known vendors and service providers who previously provided services to Marriott as Hotel manager.  Any obligations to these vendors and service provides are obligations of Marriott, and the Debtor reserves all rights related to claims of such vendors filed in this case.

<u>**Events Leading to these Chapter 11 Cases**</u>

## I.   Declining Operations

34.   Over the last decade, well before the COVID-19 pandemic upended the Hotel's operations and the hospitality industry more broadly, the Hotel languished relative to its peers under Marriott's management. From 2010 to 2018 alone, the Hotel's net operating income plunged from $24.77 million to $5.02 million, an 80% drop.  Marriott repeatedly failed to live up to its required standards of performance and to fulfill its contractual obligations as set forth in the HMA, causing this consistent and material decline in the Hotel's performance.

35.   The Hotel was designed to cater to and attract group business, and historically derived the substantial portion of its revenue from large group events. However, since 2011, the Hotel attracted less and less group business, and significantly trailed its competitors during the last several years.  At peak, the Hotel had 225,000 group room nights annually.  In the last full year of operations (2019), the Hotel failed to achieve 200,000 group room nights.  The Hotel has not only attracted less group business, but the groups that Marriott booked became less profitable.  For instance, after 2013 the Group Revenue per Available Room Index declined by over 15% as a result of the groups booked at the Hotel by Marriott spending less than other "premium" groups on other items, such as food and beverage and/or catering.  The decline in group bookings was the subject of constant complaints from the Debtor.

36.   The central reason for this decline was that Marriott stopped booking premium groups for the Hotel, instead directing such groups to other Marriott-managed and owned properties in the D.C. area. In 2012, a Marriott affiliate acquired the Gaylord Hotels brand and began to manage the 2000-room Gaylord National Resort & Convention Center in Washington, D.C.'s National Harbor. In 2014, a Marriott affiliate opened the 1100-room Marriott Marquis Washington, D.C., which has since been labeled as Marriott's "flagship" in D.C. Following these

two events, Marriott actively promoted these two hotels for premium group events and conventions over, and at the expense of, the Hotel.

37.     Marriott's failure to secure premium groups was further exacerbated by its failures in other ways. Marriott was unable (or unwilling) to replace these group bookings with traditional overnight bookings. Instead of securing either group or traditional overnight reservations itself, Marriott over-relied on online travel agencies such as Expedia or booking.com, which charge a high commission for each reservation, further hurting profitability.  In addition, Marriott let costs at the Hotel spiral out of control.  The Hotel's expenses significantly exceeded those of its competitors, including inflated labor costs well in excess of the agreed collective bargaining agreement levels.

38.     Thus, notwithstanding the Hotel's prominent location and its sizeable convention and meeting space within Washington, D.C., the Hotel failed to meet operational and performance goals and, thus, failed to meet financial goals and anticipated profitability.

## II.     Shutdown Due to COVID-19

39.     The Company's dire financial condition was exacerbated by the COVID-19 pandemic, which resulted in a sharp decline in tourism, the elimination of essentially all business travel, and the cancelation of all conventions.

40.     Local ordinances enacted in Washington, D.C during the early days of the pandemic further restricted the Hotel's ability to welcome guests. On March 11, 2020, Mayor Bowser of the District of Columbia issued a declaration of public emergency due to the onset of the COVID-19 pandemic.  Two days later, on March 24, 2020, Mayor Bowser issued an order declaring the closure of all non-essential businesses and a prohibition on all gatherings often or more persons.

41.     On March 25, 2020, Marriott closed the Hotel. Between March and December of 2020, the Hotel continued to lose approximately $1.5 million per month. Since the start of 2020, the Hotel had losses totaling more than $19.3 million (through November), and it is projecting 2020 annual losses totaling more than $21 million.

### III.     Litigation with Marriott

42.     On or about March 16, 2020, just as large parts of the country were shutting down as a result of the COVID-19 pandemic, Marriott served the first of several working capital demands on the Debtor. Without any legitimate basis or justification, Marriott demanded that the Debtor fund $10 million of working capital. Marriott made no effort to justify its demand, rotely stating in a one-page letter only that there would be "insufficient funds necessary to operate the Hotel in accordance with the requirements of the Management Agreement" due to "the substantial decline in Hotel performance caused by the recent outbreak of the coronavirus (COVID-19)." Only later did Marriott claim that this $10 million demand was intended to cover over four months of anticipated cash flow needs. This figure was not only many times more than what was historically necessary to operate the Hotel, but was also contradicted by Marriott's own on-property employees who admitted the actual amount needed was no more $2.5 million.

43.     On or about March 19, 2020, the Debtor informed Marriott that it would not fund $10 million as Marriott did not show such amount was "reasonably necessary to satisfy the needs of the Hotel" as required by the HMA.  Nevertheless, the Debtor agreed that Marriott could use $5 million out of the Hotel's Furniture, Fixtures and Equipment Reserve ("FF&E Reserve") account for working capital needs.

44.     On May 15, 2020 and June 11, 2020, Marriott and the Debtor, respectively, issued notices of default to each other under the HMA. In its notice, Marriott demanded, among other things, that the Company remit $10 million, and agreed to take lesser sums for the month of May

to fund the ongoing operations of the Hotel. Even at the reduced amount, the Debtor lacked the funds to satisfy Marriott's demands.

45.     Marriott issued additional working capital demands in May 2020 (for $1 million), May 26, 2020 (for $1.5 million), June 25, 2020 (for $1.3 million), July 24, 2020 (for $2.7 million) and September 4, 2020 (for $2.2 million). The Debtor rejected each demand because they were sent expressly in furtherance of Marriott's baseless March 16 demand for $10 million, they were procedurally improper under the HMA, and/or because Marriott failed to demonstrate that the funds were reasonably necessary for the operation of Debtor's shuttered, inoperative Hotel.

46.     On September 8, 2020, Marriott sued the Debtor and Pacific Life (as lender) in the Circuit Court for Montgomery County, Maryland (the "Maryland Court") for breach of contract and tortious interference.  Marriott's complaint alleged that the Debtor's failure to fund the Hotel's working capital breached the HMA, and further alleged that Pacific Life's failure to fund the same obligations breached the *Subordination, Non-Disturbance and Attornment Agreement* (the "SNDA") between Pacific Life and Marriott.

47.     Marriott's lawsuit sought, among other things, specific performance requiring the Debtor to make the demanded working capital payments, or damages in the same amount. On September 23, 2020, Marriott also filed a motion seeking mandatory preliminary injunctive relief to force the Debtor to make working capital payments immediately, even though Marriott requested the same relief through its original complaint.

48.     On December 8, 2020, the Maryland Court entered an order preliminarily and mandatorily compelling the Debtor to pay money to Marriott upon Marriott's issuance of unilateral, future capital call notices (the "Mandatory Injunction"). Before the Mandatory Injunction was even entered, Marriott noticed a $2 million capital call. Additional calls from Marriott may be

forthcoming - the Mandatory Injunction does not limit Marriott's ability to make capital calls, and it compels the Debtor to pay each of them as they are issued, under pain of a potential contempt citation. The Debtor has appealed the Mandatory Injunction.[4] The Debtor has also filed significant counterclaims against Marriott in response to the complaint in the Maryland Court.

49.     The Debtor has only limited amounts of operating cash, and no viable means to satisfy Marriott's capital call (let alone more future calls), and, consequently, no lawful or practically effective means to abide by the Mandatory Injunction.  While the Debtor believes that there is approximately $4.7 million remaining in the FF&E Reserve, and the Debtor had agreed to previously use certain of these funds to temporarily satisfy the Marriott capital calls, those funds are the Debtor's property and were designated for the specific purpose of upgrading the furnishings of the hotel.

## IV.    Termination of HMA with Marriott

50.     The Mandatory Injunction issued by the Maryland Court placed the Debtor in an untenable position: it required the Debtor to risk contempt by not paying Marriott's capital calls with available cash it didn't have.  Moreover, the Debtor had reason to believe that Marriott's capital calls would continue.  Marriott maintained in its budget and capital plan that the Hotel would need a substantial cash infusion nearing $90 million over the next two years, including $63 million in capital expenditures plus $25 million to cover 2020 operational losses.

51.     The Debtor had no other source of funding for the current and future capital calls. The Debtor's sole equity holder and secured lender, Pacific Life, refused to make additional capital contributions to fund Marriott's capital calls or provide further needed lending other than through

---

[4]     On December 9, 2020, the Debtor filed a motion to stay the Mandatory Injunction in lieu of the appeal. The motion was denied by the Maryland Court.

DOCS_DE:232251.11 92203/001

a debtor in possession financing facility, reasoning that additional funding to meet Marriott's demands made no economic sense given (a) Marriott's refusal to provide financial information in support of its capital calls and (b) the current shutdown of the Hotel. Further, and separate from its ability to pay Marriott's capital calls, the Debtor had no independent resources to pay for the ongoing security and maintenance obligations other than the cash provided to Marriott pursuant to the HMA.

52.     Consequently, even considering the reduced expenses due to the closed state, the Company lacked the funds to continue to maintain the Hotel. Left with little cash and no other option to respond to Marriott's continuing capital calls or fund Debtor's other obligations outside of a bankruptcy (including those incurred to maintain and secure the property upon termination of Marriott), the Debtor was compelled to seek relief from the Bankruptcy Court.[5] To support and finance its operations in Chapter 11, including the payment of security and maintenance obligations to the Property Custodian, the Debtor negotiated a debtor-in-possession financing facility with its prepetition lender, Pacific Life.

53.     The Debtor believes that a sale of the real property will provide the highest and best recovery to its creditors and stakeholders. The Debtor intends, through this Chapter 11 case, to market its assets in a thorough and exhaustive process, and ultimately obtain this Court's approval of a sale to a buyer providing the highest and best value to the estate. During the marketing process, the Debtor will seek to keep its property and facilities safe, secure and maintained in order to maximize value obtained by the sale. Upon closing of the sale, the Debtor shall distribute the

---

[5]     In its reply seeking an injunction against the Debtor to compel payment of capital calls, Marriott itself suggested that "[i]f the Owner does not have the funds to pay its bills, it could pursue a bankruptcy." Marriot v. Wardman Hotel Owner, L.L.C., Civil Action No. 483406-V, Circuit Court for Montgomery County, Maryland, *Reply Memorandum by Plaintiff Marriott Hotel Services, Inc. in Support of its Motion for a Preliminary Injunction and Other Appropriate Relief*, p. 2.

16

proceeds to its creditors according to the priorities provided by the Bankruptcy Code, and then complete a wind down of its estate.

## Relief Sought in the Debtors' First Day Motions

54.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions[6] in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtor's limited operations, facilitate the efficient administration of this chapter 11 case, and meet the Debtor's funding needs in this case.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtor to operate with minimal disruption during the pendency of this chapter 11 case.  A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

I.      **Operational Motions Requesting Immediate Relief**

   A.      **Debtor's Motion for Entry of Order Authorizing the Debtor to (A) Continue Operating the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Granting Related Relief ("Cash Management Motion")**

55.     Pursuant to the Cash Management Motion, the Debtor seeks to continue to operate its Cash Management System and obtain certain limited relief from the United States Trustee's operating guidelines for debtors in possession.

56.     The Debtor's Cash Management System is similar to the centralized cash management systems used by other comparably sized companies to manage cash flow.  The Debtor uses its Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.  The Debtor maintains daily oversight over

---

[6]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

DOCS_DE:232251.11 92203/001

the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with United States Trustee fees.

57.     Because of the disruption that would result if the Debtor was forced to close its existing bank account, I believe that it is critical that the existing Cash Management System remain in place.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to maintain its property in chapter 11.  Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

**B.      Debtor's Motion for Entry of Interim and Final Orders (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtor's Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief ("<u>Utilities Motion</u>")**

58.     Pursuant to the Utilities Motion, the Debtor seeks entry of interim and final orders: (a) determining adequate assurance of payment for future utility services; (b) prohibiting utility providers from altering, refusing, or discontinuing services; (c) establishing procedures for determining adequate assurance of payment; and (d) granting related relief.

59.     In connection with the management of its property and facilities, the Debtor obtains water, waste management, electricity, natural gas, telecommunications, internet, and other similar services from a number of utility providers.  Uninterrupted Utility Services are essential to the safety and security of the Debtor's real property and, thus, the overall success of this chapter 11 case.  Should any Utility Provider refuse or discontinue service, even for a brief period, the operation of the Debtor's property and facilities would be disrupted.  Such disruption would jeopardize the Debtor's ability to administer their chapter 11 cases and adversely affect the

Debtor's sale efforts.  Accordingly, I believe that it is essential that the Utility Services continue uninterrupted during the chapter 11 case.

60.     The Debtor intends to pay postpetition obligations to the Utility Providers in a timely manner in the ordinary course of business.  The Debtor's cash, including cash provided by the Debtor's DIP financing and access to cash collateral, will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.  To provide additional assurance of payment, the Debtor proposes to deposit into a segregated account $87,405, which represents an amount equal to approximately one-half of the Debtor's expected average monthly cost of Utility Services in the postpetition period, calculated based on average utility expenses during the period after the shutdown of Hotel operations due to the Pandemic.

61.     Therefore, on behalf of the Debtor, I respectfully submit that the Court should approve the Utilities Motion.

C.     **Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Party, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief ("DIP Financing Motion")**

62.     Pursuant to the DIP Financing Motion, the Debtor seeks interim and final orders (a) authorizing the Debtor to obtain secured postpetition financing on a superpriority basis and to borrow from time to time, up to $8.0 million (the "DIP Loan") from Pacific Life (in its capacity as the lender under the DIP Loan, the "DIP Lender") pursuant to the terms and conditions of that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "DIP Loan Agreement") attached to the Motion and the ancillary documents thereto (the "DIP Loan Documents"), (b) granting liens and superpriority administrative expense claims, (c) authorizing the use of Cash Collateral, (d) modifying the automatic stay, and (e) granting related relief.

63. The Debtor has an urgent and immediate need for access to funds available under the DIP Loan and the use of the Cash Collateral. Such funding is necessary in order for the Debtor to have sufficient liquidity to satisfy accruing administrative obligations and to maintain its assets, consisting primarily of the Hotel. Without immediate access to the DIP Loan and Cash Collateral, the Debtor would be forced to convert to chapter 7 and liquidate its assets, which would eliminate any possibility of maximizing the value of this estate. Accordingly, the Debtor strongly urges the Court to authorize the DIP Loan and continued use of Cash Collateral on the terms contemplated herein, initially on an interim basis and, following a final hearing, on a final basis.

64. Prior to the Petition Date, given the closure of the Hotel and the need to fund ongoing maintenance and tax obligations relating thereto, the Debtor recognized a need for further outside financing and began the process of negotiating additional new money advances from the Prepetition Secured Party. Although the Debtor considered other financing options, none were available to the Debtor on a subordinate basis to the Prepetition Loan. Only the Prepetition Secured Party was willing to provide a junior DIP Loan to the Debtor. After extended arms' length and good faith negotiations, the Debtor, in an exercise of its sound business judgment, determined that the terms of the proposed DIP Loan represent a fair and reasonable outcome for the estate and should be approved by this Court. Notably, there is no roll-up of the Prepetition Loan through the DIP Loan Documents. The DIP Loan accrues interest at a non-default rate of only 5.00% per annum and has no commitment fees, prepayment fees, exit fees, administration fees, or unused line fees of any kind. The DIP Loan has a maturity date that is July 1, 2021, approximately six months from the Petition Date. The DIP Loan is also junior to the existing Prepetition Loan with respect to the Prepetition Secured Party Collateral.

65.     After careful review of available financing options, the Debtor has further concluded that the DIP Lender's proposed terms would allow the Debtor to meet its goals and provide the Debtor with sufficient liquidity on the best available economic terms.  Through the DIP Loan Documents, the Debtor will have access to sufficient liquidity for its ordinary course operations and accruing administrative expenses pending a sale or reorganization of its affairs.  All negotiations with the DIP Lender were conducted at arms' length and in good faith.  The outcome of such negotiations is the DIP Loan Agreement pending before this Court.

66.     The Debtor now seeks to move forward with the proposed DIP Loan on the terms set forth in the DIP Loan Documents.  Subject to this Court's approval, the Debtor intends to draw on the DIP Loan in order to satisfy the Debtor's ongoing working capital needs through this restructuring process.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  January 11, 2021

*/s/ James D. Decker*
James D. Decker
Manager
Wardman Hotel Owner L.L.C.