# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------- x
:
In re: : Chapter 11
:
WARDMAN HOTEL OWNER, L.L.C., : Case No. 21-10023 (JTD)
:
Debtor.[1] :
:
---------------------------------------------------- x

## DECLARATION OF JULIE BOWEN

I, Julie Bowen, hereby declare under the penalty of perjury:

1. I am Vice President, Americas Asset Management for Marriott Hotel Services, Inc. ("Marriott").

2. I submit this declaration (the "Declaration") in support of Marriott's *Motion for the Authority to Exercise Rights of Recoupment or, in the Alternative, Relief from the Automatic Stay to Exercise Rights to Setoff* (the "Motion").[2]

3. I am personally familiar with the facts stated in this Declaration and submit this Declaration based on my personal knowledge, unless stated otherwise.

4. Due to the COVID-19 pandemic, the Hotel was temporarily closed on March 27, 2020. Although the Hotel was temporality closed, Marriott required funds to pay for a considerable number of significant, but essential, expenses, the most substantial of which were salary and benefits for the Hotel's employees. Even with the Hotel temporarily closed, some

---

[1] The last four digits of the taxpayer identification number for the Debtor are 9717. The mailing address for the Debtor is 5035 Riverview Road, NW, Atlanta, Georgia 30327.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

- 1 -

employees were needed at the Hotel. Such essential employees included building security, engineering personnel, accounting personnel, and sales and marketing employees.

5. Other employees—in fact, the vast majority of the Hotel's workforce—were furloughed, but remained entitled to certain benefits under either their collective bargaining agreement or Marriott's severance plan. Plus, terminating rather than furloughing those employees would have triggered expensive severance obligations and significantly delayed the Hotel's ability to reopen.

6. Marriott also needed working capital to pay Hotel vendors. Some funds were needed to pay vendor bills that accrued before the Hotel closed. Other funds were required to pay vendors for services that remained crucial during closure, such as the costs for utilities, chemicals to treat the Hotel's water systems, services to maintain and repair the Hotel's elevators, and other costs related to repairs, security, and the maintenance of the systems used to operate the Hotel and to prepare for its reopening.

7. The Debtor's decision to starve the Hotel of capital and increasingly incur unpaid bills has caused and continues to cause Marriott significant harm. Among other things, rather than letting employees go without pay, by November 2020, Marriott had advanced more than $5.5 million of its own money to cover costs that are the sole obligation of the Debtor, including in large part employee-related costs. This money was advanced solely to cover the Debtor's costs and to benefit the Debtor's Hotel.

8. On September 8, 2020, Marriott filed suit against the Debtor and Pacific Life Insurance Company ("Pacific Life"), Marriott's senior secured lender in the Circuit Court for Montgomery County in Maryland. The suit asserted that the Debtor's refusal to fund Working Capital breached the HMA. Marriott also brought claims for breach of contract and tortious

interference with contract against Pacific Life as lender, based on its encouragement of the Debtor to breach its duty to fund Marriott's Working Capital requests and based on the conflict of interest shared by Pacific Life in acting as both lender and owner.

9. Marriott alleged that that Pacific Life, as lender, was attempting to force Marriott to walk away from the HMA because Pacific Life did not want to honor its obligations under its own Subordination, Non-Disturbance and Attornment Agreement ("SNDA") with Marriott. If Pacific Life could get Marriott to walk away from the HMA, Pacific Life would no longer need to honor its SNDA, which obligated it not to disturb Marriott's rights under the HMA and to ensure that if the Hotel were sold, that a subsequent owner would honor those rights as well.

10. On January 11, 2021, at approximately 1:47 p.m., immediately before the chapter 11 bankruptcy petition was filed, the Debtor served a termination notice on Marriott and almost simultaneously appeared at the property with armed security guards to attempt a hostile takeover of the Hotel. The Debtor's termination notice purported to terminate the HMA based on a Notice of Default that the Debtor served more than six months ago, on June 11, 2020, and purported to do so immediately.

11. The HMA does not allow the Debtor to terminate the HMA immediately. It requires, at minimum, seventy-five days before termination can be effective. *See* HMA §§ 9.02. The HMA also may not be terminated by a party that is itself in default. Termination rights are expressly limited to non-defaulting parties, which the Debtor was not. As the Maryland Circuit Court found, the Debtor was in breach of its obligation to fund Working Capital, for which Marriott had served the Debtor with a Notice of Default.

12. As of January 23, 2021, Marriott is owed an estimated $5.4 million for amounts advanced by Marriott for Hotel costs plus estimated severance costs of $11 million for the

terminated Hotel employees.  These amounts do not include unpaid management fees from the Petition Date through the expiration of the HMA on December 28, 2059.

Dated: January 26, 2021

_____
Julie Bowen