**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| WARDMAN HOTEL OWNER, L.L.C., | ) | Case No. 21-10023 (JTD) |
| | ) | |
| Debtor.[1] | ) | **Hearing Date: April 13, 2021 at 2:00 p.m. (ET)** |
| | ) | **Objection Deadline: March 26, 2021 at 4:00 p.m. (ET)** |
| | ) | |

**JOINT MOTION OF UNITE HERE LOCAL 25 AND LOCAL 99, INTERNATIONAL UNION OF OPERATING ENGINEERS, TO COMPEL DEBTOR'S COMPLIANCE WITH ITS OBLIGATIONS UNDER SECTION 1113 OR, IN THE ALTERNATIVE, FOR RELIEF FROM STAY TO PURSUE ARBITRATION TO DETERMINE DEBTOR'S CONTRACTUAL OBLIGATIONS TO THE MOVANTS**

UNITE HERE Local 25 ("Local 25") and Local 99, International Union of Operating Engineers ("Local 99") (collectively, "the Unions") are each labor organizations representing approximately 575 employees of the Wardman Park Hotel ("the Hotel"), the property owned by Debtor-in-Possession Wardman Hotel Owner, L.L.C. ("the Debtor"). The Debtor is party to agreements with each of the Unions and, as part of those agreements, committed to resolve any disputes arising thereunder through a grievance and arbitration process. The Hotel property constitutes the sole asset at issue in this bankruptcy, and the Debtor has made clear that its intention is to market and sell that property—indeed, that sale process is both the first and the final step in the reorganization sought by the Debtor through its petition. The Debtor's marketing efforts continue to gather steam, with great interest expressed by hundreds of potential buyers. But even as the sale process enters a crucial stage, however, the Debtor has unilaterally repudiated its obligation to arbitrate its disputes with the Unions—thereby denying the Unions

---

[1] The last four digits of the taxpayer identification number for the Debtor are 9717. The mailing address for the Debtor is 5035 Riverview Road, NW, Atlanta, Georgia 30327.

and their members both their contractual rights and their rights under Section 1113 of the

Bankruptcy Code, 11 U.S.C. § 1113.  Accordingly, the Unions petition this Court to enter an

order compelling the Debtor to comply with its obligations under Section 1113 and arbitrate the

Unions' disputes in accordance with the contract, or, in the alternative, to provide relief from the

automatic stay to permit the Unions and the Debtor to proceed with the contractually-agreed

arbitration process.  The reasons supporting this motion are set forth below.

## INTRODUCTION

1.    The Unions have represented employees at the Hotel for decades, with Local 25 serving

as the representative for the approximately 535 bellstand, food and beverage, housekeeping, and

banquet workers, Declaration of John Boardman, Executive Secretary-Treasurer, Local 25

("Boardman Decl.") ¶ 5, and Local 99 representing approximately 40 maintenance and

engineering employees at the property, Declaration of Donald P. Havard, Business Manager,

Local 99 ("Havard Decl.") ¶ 5.  Over the years, the Unions have negotiated a series of collective

bargaining agreements ("CBAs") governing conditions of employment for their respective units.

These agreements set both economic terms—such as wages and rates of pay, benefits, vacation,

and leave—and non-economic terms, including scheduling, discipline, promotions, seniority,

layoff, and job security.  *See* Ex. 1 to Boardman Decl., Local 25 CBA; Ex. 1 to Havard Decl.,

Local 99 CBA.  The most recent Local 25 agreement, renegotiated in 2017, is scheduled to

expire on September 15, 2022; the Local 99 agreement, negotiated in 2019, does not expire until

October 31, 2023.

2.    Each of these agreements includes side letters and addenda addressing a variety of issues.

*See* Ex. 1 to Boardman Decl., at 45-83; Ex. 1 to Havard Decl., at 19-25.  One of these side

letters—and the one of particular importance in this proceeding—is incorporated as "Addendum

V" to the Local 25 agreement, and as "Exhibit B" to the Local 99 agreement, and is identified in each agreement as the "Owner's Letter."  This letter spells out the collectively-bargained obligations of the owner of the Hotel and is designed to ensure that, in circumstances where different entities own and operate the property, the rights and benefits of employees are continuously maintained and protected through any transitions in either the ownership entity or the operating entity.  The obligations imposed by the Owner's Letter are specific:

*First*, it expressly binds the Owner to the "successorship" provisions of the main agreement—Article 1.12 of the Local 25 agreement, and Article V, Section 5.22 of the Local 99 contract—which provide for the job security of the unit and maintenance of terms during a sale or transfer.  *See* Ex. 1 to Boardman Decl., at 76 (Addendum V) ("Owner agrees to be bound by the Leases and Sales provision (currently Art. 1.12) of the CBA.  Nothing herein shall limit the Leases and Sales provision.").[2]

*Second*, it requires the Owner to assume all provisions of the labor agreement if the operator is terminated and is not replaced.  *Id.* ("In the event that the Operator ceases to operate or manage the Hotel, . . . and the property continues to be operated as a hotel, or any use covered by the CBA, with or without hiatus, then any replacement operating entity (or, if there is no replacement operating entity, Owner) shall contemporaneously be bound by the CBA and its terms and conditions as a successor under the CBA.").

*Third*, it obligates the Owner to ensure, as a condition of sale, that any purchasers assume the CBA and the Owner's Letter.  *Id.* ("Owner shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management or

---

[2] Ex. 1 to Havard Decl., at 17 (Exhibit B).  The operative language in both the Local 25 and Local 99 Owner's Letters is identical; to avoid duplication, we cite to only the Local 25 agreement.

3

operational control of the Hotel that the entity assuming . . . must assume and be bound in writing (a) to the CBA, if the Transferee is an operator or manager of the Hotel, or (b) to the terms of this letter agreement, if the Transferee obtains an ownership interest in the Hotel.").

And *fourth*—and most relevant here—the Owner's Letter provides that all disputes concerning its terms be submitted to arbitration. *Id.* at 77 ("Any dispute arising from this letter agreement shall be subject to final and binding arbitration under the CBA as of the date signed in accordance with the scope and rules for arbitration set forth under the CBA.").

3. Those obligations apply to the Debtor, as owner of the Wardman Park. On January 11, Wardman Hotel Owner served notice upon Marriott of termination of its management agreement, Decl. James D. Decker Supp. Debtor's Ch. 11 Pet. & First Day Relief ¶ 27 (ECF No. 2) ("Decker First-Day Decl."), and took possession of the property. *See also* Termination Letter (attached as Ex. B to Debtor's Mot. Seeking Entry of an Order Rejecting Hotel Management Agreement, Effective as of Pet. Date) (ECF No. 6-2); Decl. Julie Bowen ¶ 19 (ECF No. 31) (noting that the termination letter was sent at approximately 1:47 PM). As provided in the Owner's Letter, at that moment Wardman Hotel Owner became "contemporaneously . . . bound" by all provisions of the CBA "as a successor," and "assume[d] all of the obligations under the CBA of [the operator] to the employees, the Union and/or to any of the funds to which the Hotel is required to contribute under the CBA." Ex. 1 to Boardman Decl., at 76 (Addendum V). Yet Debtor has denied that it assumed the full CBA terms, contending instead that because it intends to *sell*, rather than to *operate*, the property, the conditions requiring assumption were not triggered. Ex. 3 to Boardman Decl., Letter from J. Krupin to J. Boardman (Jan. 29, 2021); Ex. 3 to Havard Decl., Letter from J. Krupin to R. Paul (Mar. 5, 2021). The Unions disagree. However, when the Unions requested that the dispute be arbitrated, as expressly provided in the

terms of the Owner's Letter, Debtor refused, invoking the automatic stay.  Ex. 8 to Boardman

Decl., Email from T. Cairns to D. Virk (Mar. 11, 2021); Ex. 6 to Havard Decl., Email from T.

Cairns to R. Paul (Mar. 11, 2021)

4.    The Debtor's refusal to arbitrate violates its obligations under the Bankruptcy Code.

Section 1113 of the Code, enacted in 1984, provides broad protections for collectively-bargained

contracts, and specifically forbids Debtors from unilaterally modifying or rejecting any

collectively-bargained terms—including repudiating the parties' own dispute-resolution process.

11 U.S.C. § 1113(f).  The protections provided by Section 1113, as explained *infra* at 14-16, are

both procedural and substantive in nature.  Debtors who wish to alter collectively-bargained

terms may not do so unless the bankruptcy court finds that such alterations are "necessary"—and

may not even apply to the court for approval of such alterations without first exhausting

negotiation efforts with the union.

This Debtor has not begun this mandatory process, and has neither sought nor received

this Court's sanction to alter the collectively-bargained terms of the Owner's Letter.  Instead, the

Debtor has simply refused to comply with one of its express obligations—its obligation to

arbitrate.  Such a refusal to arbitrate is impermissible under Section 1113.

5.    Moreover, even if Section 1113 did not preclude the Debtor's refusal to arbitrate and—as

the Debtor has suggested in its correspondence—the automatic stay is implicated, good cause

exists to permit the Unions and the Debtor relief from the stay for the limited purpose of

arbitrating the scope and nature of the Debtor's obligations to the Unions.  That determination is

vital: if the Unions are correct that, by operation of the Owner's Letter, *all* of the CBA

provisions became binding upon the Debtor at the moment it terminated Marriott's management

agreement, then those provisions are *themselves* subject to Section 1113, and may not be altered

by the Debtor except in compliance with that statute.  The Debtor should not be permitted to avoid the Section 1113 process simply by denying that it is bound in the first instance and then refusing to resolve that dispute by the parties' chosen method.  The automatic stay is intended as a shield, not as a weapon to deprive the Unions of their ability to determine their rights.  An arbitration to resolve the scope of the Debtor's labor obligations to the Unions is warranted, under the totality of circumstances, to ensure that collectively-bargained rights receive timely and appropriate consideration in the bankruptcy process.

## JURISDICTION

6.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(1) and (b)(2)(G).

7.  The legal bases for the relief requested herein are Sections 105(a), 362(d)(1), and 1113(f) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001.

## FACTUAL BACKGROUND

**I.    The Unions' Collectively-Bargained Agreements**

8.  Local 25 represents approximately 8,000 hospitality industry workers, including dishwashers, housekeepers, bellmen, waitstaff, cooks, and many others, at properties both small and large throughout the Washington, D.C. region.  Boardman Decl. ¶ 4.  Local 99 represents approximately 3,000 workers, including the complement of maintenance and engineering workers at many of these same properties.  Havard Decl. ¶ 4.  Workers at the Wardman Park Hotel (formerly the Sheraton Washington), one of the city's larger properties, have been covered by Local 25 agreements since at least the 1960s, and the engineering and maintenance unit has been represented by Local 99 for a similarly lengthy period.  Boardman Decl. ¶ 5; Havard Decl. ¶ 5.  Major terms of these agreements are usually set by union and management negotiators on a

city-wide basis; specific provisions to accommodate the unique circumstances at an individual hotel are reached through discussion and negotiation at each property.  Boardman Decl. ¶ 6; Havard Decl. ¶ 6.  The agreements are enforced through contractual grievance procedures, culminating in arbitration.  Ex. 1 to Boardman Decl., at 37-41 (Art. XVII); Ex. 1 to Havard Decl., at 13-14 (Art. VI).

9.  The terms of these agreements, produced over decades of collective bargaining, reflect the interests of both hotel workers and the hotel industry.  Contractual provisions, both economic and non-economic, have created a stable foundation that has allowed thousands of members of both Unions to sustain their families, afford housing and transportation in the high-cost area of Washington, D.C., and educate their children.  And these same terms have also permitted the industry to thrive: in the years leading up to the pandemic, the sector experienced record earnings and growth in the region, with openings of several new properties, such as the Conrad DC and the MGM, at luxury price points. *See Opening of Conrad Washington, DC Marks the Brand's First Property in the Nation's Capital*, Hilton (Mar. 21, 2019), https://newsroom.hilton.com/conrad/news/opening-of-conrad-washington-dc-marks-the-brands-first-property-in-the-nations-capital; *Vegas On The Potomac: MGM National Harbor Opens Today Overlooking Nation's Capital*, MGM Resorts (Dec. 8, 2016), https://investors.mgmresorts.com/investors/news-releases/press-release-details/2016/Vegas-On-The-Potomac-MGM-National-Harbor-Opens-Today-Overlooking-Nations-Capital/default.aspx. Even as the pandemic persists, investors continue to show keen interest in the Washington, D.C. market, with newly built and renovated hotels slated to open across the District. *See*, *e.g.*, Jenn Goodman, *Developer unveils plans for Phase II of DC's The Yards,* Construction Dive, (Feb. 17, 2021), https://www.constructiondive.com/news/developer-unveils-plans-for-phase-ll-of-dcs-the-

yards/595184/ (describing a forthcoming hotel in Southwest D.C.); Marisa Kashino, *A Huge New Mixed-Use Development Is Coming to DC's Buzzard Point*, Washingtonian (Feb. 16, 2021), https://www.washingtonian.com/2021/02/16/a-huge-new-mixed-use-development-is-coming-to-dcs-buzzard-point/ (noting forthcoming hotels as part of a Buzzard Point redevelopment); Keith Loria, *DC Hotel Development Underway After $6M Crowdsourced Funding*, Commercial Observer (Feb. 10, 2021, 8:46 AM), https://commercialobserver.com/2021/02/dc-hotel-development-underway-after-6m-crowdsourced-funding/ (describing hotel under construction near Capitol Hill); *What's New in the Nation's Capital*: *Washington, DC is in the midst of a modern-day renaissance*, Destination DC, https://washington.org/meetings/whats-new-washington-dc (last visited Mar. 20, 2021) (listing nine hotel openings in 2020-22 across D.C.).

10. The collective bargaining agreements recognize that, in this industry, change is a constant. Work opportunity depends, to a significant degree, on occupancy. Occupancy levels at any given property fluctuate in response to multiple factors—events such as conferences or public gatherings, holidays, and days of the week, to name just a few—causing employment levels to rise and fall. Accordingly, workers commonly experience layoffs—partial or full reductions in hours—during their careers, and a number of provisions in each of the Unions' agreements address the process for implementing layoffs, as well as the process for recalling workers or increasing hours when business levels rise. Ex. 1 to Boardman Decl., at 25-27 (Art. XII); Ex. 1 to Havard Decl., at 10, 16 (Art. V § 5.2; Addendum § 1).

11. Also common are changes in the management or operation of a property. Such changes can include relatively simple transfers of management companies if the ownership decides to make a change in operators. Hotel properties also frequently change hands—at least ten Local 25-represented properties have been sold in the last five years. Owners and operators often

change the uses or "footprint" of the property, ranging from the repurposing of space inside the
hotel (such as adding a bar in the lobby, or converting a restaurant outlet to conference room
space), or partially or fully close the property during a renovation or following a sale.  Closure
may occur as new ownership considers rebranding or repositioning the property within the
market, or, in some cases, whether to operate as a hotel at all.  In many of these circumstances,
the property can remain dormant for years, as the owner considers the extent and timing of its
investment and the market as a whole.  Recent examples include the former L'Enfant Plaza
Hotel, which reopened after a change in ownership, a 6-year closure, and a multi-million dollar
renovation, *see* Rebecca Cooper, *First Look: Former L'Enfant Plaza Hotel to reopen in April*,
Washington Business Journal (Feb. 12, 2019, 4:46 PM), reprinted at
https://www.lenfantplaza.com/first-look-former-lenfant-plaza-hotel-reopen-april/, and the
Watergate Hotel, which reopened in 2016 following a 6-year shutdown and renovation, after a
foreclosure sale, *see* Edward Gunts, *Watergate Hotel reopens after a $125 million gut
renovation, with design nods to the 1960s*, The Architect's Newspaper (June 14, 2016),
https://www.archpaper.com/2016/06/watergate-hotel-renovation-reopens/.  *See also Historic
Hotel with Sexy Past Reopens*, NBC (Sept. 1, 2009, 1:08 AM),
https://www.nbcwashington.com/news/local/historic-hotel-with-sexy-past-reopens/1855856/
(describing reopening of Jefferson Hotel, a smaller luxury boutique property, after two and a half
years and a restoration).

12. Multiple provisions of the contract protect the Unions and their members during
transitions.  These include "successorship" commitments, binding on both the owner and the
operator, that require notice to the Union and continuity of the terms of the agreement whenever
a change in either the operator or the owner (or both) occurs.  *See* Ex. 1 to Boardman Decl., at 3-

4 (Art. 1.12) & 76-78 (Addendum V); *see also* Ex. 1 to Havard Decl., at 12-13 (Art. V § 5.22) & 17-19 (Exhibit B).  Continuity of the workforce is also preserved, through a combination of obligations of certain transferees to offer employment to bargaining unit members following a transition, Ex. 1 to Boardman Decl., at 4 (Art. 1.12(b)), and the maintenance of bargaining unit seniority rights during layoffs, obligating the hotel to recall workers when the property resumes operations and the volume of work increases. *Id.* at 26-27 (Arts. 12.8(d), 13.1(d), 13.2(c)); Ex. 1 to Havard Decl., at 10, 16 (Art. V § 5.2; Addendum § 1).  Importantly, given the frequency of hotel closures and the uncertainty in the industry, the Local 25 contract requires that seniority rights—and resulting rights of recall—be maintained even throughout complete closures of the property.  (Local 25, Art. 13.1(d), 12.8(d)).  And members affected by closures receive some payments to replace their income, and a period of health care coverage continuation to help cushion the economic blow for themselves and their families.  Ex. 1 to Boardman Decl., at 27 (Arts. 13.1, 13.2).[3]

13. The Unions' agreements recognize the unique powers that owners exercise in the operation and disposition of the property, and tailor owners' obligations under those agreements accordingly.  In the usual course, the owner holds title to the real estate, but selects a different entity—an operator—to manage the property as a hotel and generate revenue.  In such a case, the owner must ensure that the operator serves as signatory to the full terms of the CBA; and, in consideration of that arrangement, the Unions have agreed that the owner, in the usual course, is bound only to the "successorship" provisions (Article 1.12 of the Local 25 agreement, and Article V, Section 5.22 of the Local 99 agreement) and to the Owner's Letter (Addendum V of

---

[3] The Local 99 agreement likewise provides for payments and maintenance of health benefits to address the economic hardship caused by a layoff, Ex. 1 to Havard Decl., at 10 (Art. V § 5.2), and seniority rights for the Local 99 unit similarly do not expire during a layoff.

the Local 25 agreement and Exhibit B of the Local 99 agreement).  This discrete set of

obligations addresses the owner's exclusive powers—to select operators and to control the asset

—while the much more comprehensive obligations set out in the full CBA are addressed to the

operator.  However, if the owner deviates from the usual course—and chooses *not* to have an

operator in place—then the Owner's Letter requires the owner to assume all CBA terms itself.

That provision ensures continuity of the CBA throughout the owner's tenure—and, as the

Owner's Letter expressly states—even during an operational hiatus.  Further, to ensure

continuity of the CBA and preservation of terms *following* the owner's tenure, the Owner's

Letter obligates the owner to condition any transaction on the transferee's own assumption of the

Owner's Letter.  Ex. 1 to Boardman Decl., at 76-78 (Addendum V); Ex. 1 to Havard Decl., at 17-

19 (Exhibit B).

14. The crucial importance of these owner's obligations is obvious from the language of the

agreements.  Indeed, the terms of the Owner's Letter survive *two years* past the scheduled

expiration date for the rest of the contract.  *Id*.  And, the enforcement of these commitments

continues through the contractual grievance and arbitration procedures, irrespective of the status

of the rest of the CBA.  Thus, arbitration of Owner's Letter disputes remains mandatory even

when arbitration is unavailable to resolve disputes concerning other contract terms.

## II.    <u>The Wardman Park Hotel</u>

15. The COVID-19 pandemic had, and continues to have, a significant impact on the

hospitality industry.  Shortly after District of Columbia Mayor Muriel Bowser declared a public

health emergency in the District of Columbia, the Wardman Park, along with other area hotels,

stopped accepting guests.  *See* Decker First-Day Decl. ¶ 26.  Marriott, then the operator of the

Wardman Park Hotel, placed the entire Local 25 bargaining unit on layoff status.  Some Local

99-represented workers continued to service the Hotel's systems and perform maintenance at the property; however, the majority of the Local 99 unit also was laid off.

16. During this period, Marriott sued the owner seeking amounts it claimed were due under its management agreement and obtained an injunction ordering the ownership to pay. *See* Decker First-Day Decl. ¶ 46-48. The next month, the Debtor terminated its management agreement with Marriott, took possession of the Hotel, and subsequently filed this bankruptcy petition. Decker First-Day Decl. ¶ 27; Termination Letter (ECF No. 6-2).

**III.    The Debtor's Denial That it Assumed the Full CBAs and its Refusal to Arbitrate**

17. On January 22, John A. Boardman, Executive Secretary-Treasurer of Local 25, wrote to James Decker, Manager of the Debtor. Boardman notified Decker that, by operation of the Owner's Letter, the Debtor had assumed all of Marriott's obligations under the CBA when it terminated its management agreement with Marriott; Boardman also reminded Decker of Debtor's obligation to make assumption of the Owner's Letter a condition of any future sale. *See* Boardman Decl. ¶ 9; Ex. 2 to Boardman Decl., Letter from J. Boardman to J. Decker (Jan. 22, 2021).

18. Decker responded to Boardman through his counsel, Jay Krupin, on January 29. *See* Boardman Decl. ¶ 10; Ex. 3 to Boardman Decl., Letter from J. Krupin to J Boardman (Jan. 29, 2021). Krupin acknowledged the Owner's Letter, but denied that the Debtor had assumed all CBA terms upon Marriott's termination, on grounds that "[t]he Owner has not continued to operate the facility as a hotel [and] has no interest in doing so." *Id.* at 2. Additionally, when Local 25 suggested that prompt determination of this dispute was in the interest of all parties, *see* Ex. 4 to Boardman Decl., Email from D. Virk to J. Krupin (Feb. 16, 2021), Krupin suggested

that the automatic stay barred such a proceeding. *See* Ex. 5 to Boardman Decl., Email from J. Krupin to D. Virk (Feb. 18, 2021).

19. Counsel for Local 99 subsequently initiated an exchange with Decker and Krupin, and, on March 5, received a similar response. *See* Ex. 2 to Havard Decl., Letter from R. Paul to J. Decker (Feb. 24, 2021); Ex. 3 to Havard Decl., Letter from J. Krupin to R. Paul (Mar. 5, 2021).

20. Accordingly, on March 8, Local 25 and Local 99 wrote separately to Krupin to advise that arbitration could not be unilaterally suspended by the Debtor and, alternatively, to seek the Debtor's consent to arbitrate. *See* Ex. 6 to Boardman Decl., Email from D. Virk to J. Krupin (Mar. 8, 2021); Ex. 4 to Havard Decl., Email from R. Paul to J. Krupin (Mar. 8, 2021).

21. Krupin responded on March 10, stating that Debtor's bankruptcy counsel would respond. *See* Ex. 7 to Boardman Decl., Email from J. Krupin to D. Virk (Mar. 10, 2021); Ex. 5 to Havard Decl., Email from J Krupin to R. Paul (Mar. 10, 2021).

22. Debtor's bankruptcy counsel, Timothy Cairns, wrote separately to Local 25 and Local 99, refusing to consent to arbitration and asserting that any efforts to compel arbitration under the Owner's Letter would violate the automatic stay. Ex. 8 to Boardman Decl., Email from T. Cairns to D. Virk (Mar. 11, 2021); Ex. 6 to Havard Decl., Email from T. Cairns to R. Paul (Mar. 11, 2021).

## **RELIEF REQUESTED**

23. By this Motion, the Unions respectfully request that this Court enter an order, substantially in the form annexed hereto as Exhibit A, compelling the Debtor to comply with Section 1113 and honor its commitment to arbitrate or, alternatively, modifying the automatic stay to permit the Unions to proceed with arbitration pursuant to their agreements with the Debtor.

## BASIS OF RELIEF

I.   **Bankruptcy Code Protection for Collectively-Bargained Terms: the Purpose and Structure of Section 1113**

24. Prior to the enactment of Section 1113, collective bargaining agreements were considered "executory contracts" subject to rejection under § 365.  *See N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 522-23 (1984).  Through the years, courts increasingly recognized tension between application of that broad bankruptcy rule and settled federal labor law principles prohibiting unilateral modification of collectively-bargained terms.  National Labor Relations Act ("NLRA") § 8(d), 29 U.S.C. § 158(d); *N.L.R.B. v. Katz*, 369 U. S. 736, 743 (1962).

25. That tension was plainly on display in the Supreme Court's decision in *Bildisco*, the case that led to the enactment of Section 1113.  In that case, collectively-bargained terms "expressly provided that [the contract] was binding on the parties and their successors even though bankruptcy should supervene." 465 U.S. at 518. Nonetheless, after the employer filed for bankruptcy, it ceased payment to its employees' health and welfare benefits fund and refused to implement an agreed-upon wage increase. Subsequently, the employer sought and received permission from the Bankruptcy Court to reject the labor agreement, thus voiding the express provision—negotiated by the parties—that required adherence to terms even during the bankruptcy process.  *Id.*  The Union appealed; but it also filed an unfair labor practice charge with the National Labor Relations Board ("NLRB"), the federal agency overseeing most private-sector labor relations, and the NLRB found the company's failure to honor negotiated terms and bargain in good faith violated federal labor law.  *Id.* at 519.  The Supreme Court, while acknowledging "the special nature of a collective-bargaining contract," permitted rejection, but opined that "a somewhat stricter standard should govern the decision of the Bankruptcy Court" in cases involving collectively-bargained terms, *id.* at 524, including a showing by the debtor

that it had made some effort to negotiate, and express consideration by the Bankruptcy Court of the effects of rejection on the affected workers. *Id.* at 526-27.

26. Congress swiftly rejected the Supreme Court's approach in *Bildisco* as insufficiently protective of labor rights, and entertained multiple proposals for reform. Although they differed in their specifics, all of these proposals shared one common feature: they banned modification of collectively-bargained terms without judicial review and approval. *See, e.g.,* 130 Cong. Rec. S6083, S6126 (daily ed. May 21, 1984) (Thurmond/National Bankruptcy Conference Proposal); 130 Cong. Rec. S6181-82 (daily ed. May 22, 1984) (Packwood Amendment). "We are not purchasing 2 by 4's or grapes. We are talking about collective bargaining contracts involving men and women who may have worked for you for years and years," Sen. Packwood, sponsor of the more labor-protective proposal, reminded his colleagues. "In the midst of that contract, should the employer, without any prior court approval, just be able to go: 'Bang, bang, over, done; I'm breaching the contract, and that's it?' I do not think so. That is the amendment, in a nutshell." *Id.*

27. Ultimately, the final version of Section 1113 "was based on the substance of Senator Packwood's proposal." *Wheeling-Pittsburgh Steel Co. v. United Steelworkers*, 791 F.2d 1074, 1087 (3d. Cir. 1986). As he noted in the debate over the conference report of the legislation, "[t]his provision encourages the collective bargaining process, so basic to federal labor policy. The provision overrules the 5-4 portion of the Supreme Court's *Bildisco* decision and means that the labor *contract is enforceable and binding on both parties until a court-approved rejection or modification*." 130 Cong. Rec. S8898 (daily ed. June 29, 1984) (statement of Sen. Packwood) (emphasis added). Senator Moynihan, in support of the enacted provision, observed that "[l]abor contracts are different from other contracts and must be treated as such by Federal law," in that

the "human costs of . . . rejection of an existing labor contract," were of a different type than those incurred by rejection or modification of "other financial arrangements."  130 Cong. Rec. S8900 (daily ed. June 29, 1984).

28. The statute, as enacted, accordingly forbids all *unilateral* changes to collectively-bargained terms.  "[T]erminat[ion] or alter[ation of] any provisions of a collective bargaining agreement," 11 U.S.C. § 1113(f), may only be effected following strict adherence to a statutorily-prescribed negotiation and information-sharing process, 11 U.S.C. § 1113(b)(1)(B), (c), and then only following a judicial finding that the change is "necessary to permit the reorganization of the debtor and assure[] that . . . all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1)(A).  Even then, the court may approve rejection only if the union refused to accept Debtor's proposal "without good cause" and "the balance of the equities clearly favors rejection."  11 U.S.C.. § 1113(c)(2), (c)(3).

29. Section 1113 serves as a buffer, protecting the rights of employees "against uncontrolled inroads whenever financial distress drives an employer into the bankruptcy courts." *Am. Flint Glass Workers Union v. Anchor Resol. Corp*., 197 F.3d 76, 82 (3d Cir. 1999).  "[S]ensitive to the national policy favoring collective bargaining agreements," *Wheeling-Pittsburgh*, 791 F.2d at 1089, Section 1113 embodies a Congressional purpose to "ensure[] that a company's workers will not have to bear an undue burden to keep the company solvent."  *Id.* at 1088 (quoting 130 Cong. Rec. S8900 (daily ed. June 29, 1984) (statement of Sen. Moynihan)).

## II.   **Section 1113(f) Prohibits the Debtor from Repudiating its Obligation to Arbitrate its Disputes with the Unions**

30. As the Third Circuit has held, "[t]he intent behind section 1113 is to preclude debtors or trustees in bankruptcy from unilaterally terminating, altering, or modifying the terms of a collective bargaining agreement without following its strict mandate. . . . Moreover, the

16

provision operates to preclude the application of other bankruptcy code provisions to the advantage of debtors and trustees to permit them to escape the terms of a collective bargaining agreement without complying with the requirements of section 1113." *In re Cont'l Airlines,* 125 F.3d 120, 137 (3d Cir. 1997). Further, the "terms" protected from alteration under Section 1113 include the parties' negotiated grievance and arbitration procedures. These systems lie "at the very heart of the system of industrial self-government," *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581 (1960), and adherence to the process ensures not only that disputes will be resolved "in a way which will generally accord with the variant needs and desires of the parties," *id.*, but that such resolution may be reached without resort to the costly economic weapons of strikes and lockouts. *Id.* at 578. Accordingly, as stated in the leading case of *In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir. 1990), where parties have created arbitration procedures to resolve disputes under their agreement, a refusal to arbitrate constitutes a "unilateral[] . . . alter[ation]" of the agreement, and is impermissible without adherence to the Section 1113 process, *id.* at 992. Stated affirmatively, an arbitration proceeding required under a collectively-bargained term "is not subject to the automatic stay since [] application [of the automatic stay] would allow a debtor unilaterally to avoid its obligation to arbitrate." *Id.* at 993. To permit otherwise, the *Ionosphere* court found, would "nullify effectively the arbitration clause . . . and would substitute the court's judgment for that of the arbitrator." *Id.* at 992.

31. The Third Circuit has fully embraced this reasoning. In *Continental Airlines*, the court invalidated an injunction issued by the bankruptcy court that forbade a union from proceeding with arbitration, where the airline had admittedly not followed the requirements of Section 1113 to seek modification or rejection of any collectively-bargained terms. Citing *Ionosphere* with approval, the *Continental* court noted that because "enforcement of the injunction would have

the effect of permitting Continental to escape its duty to arbitrate under the collective bargaining agreement, we decline to enforce [it] in the absence of Continental's compliance with the requirements to reject the collective bargaining agreement." *Cont'l Airlines*, 125 F.3d at 137. Other courts have uniformly followed this rule, and have ordered debtors to submit disputes to arbitration where arbitration is the bargained-for method of resolution and the debtor has not invoked Section 1113. *E.g.*, *In re Pearl Cos.*, 435 B.R. 742 (Bankr. S.D. Fla. 2010) (holding that "once it is determined that a dispute is arbitrable, and that the debtor agreed to arbitrate the dispute . . . the arbitration proceeding is not subject to the automatic stay," and requiring debtor to arbitrate changes in health insurance benefits) (quoting *In re Chestnut Hill Rehab. Hosp. LLC*, 387 B.R. 285, 291 (Bankr. M.D. Fla. 2008)); *In re Fulton Bellows & Components, Inc.*, 307 B.R. 896 (Bankr. E.D. Tenn. 2004) (holding that debtor improperly invoked automatic stay to avoid arbitration of contract interpretation disputes); *id.* at 902-903 (citing cases).

32. These principles plainly require the Debtor to arbitrate its disputes with the Unions. Those disputes arise under the Owner's Letters, agreements that inarguably bind hotel owners generally—and the Debtor here specifically—to a discrete set of collectively-bargained obligations; which were negotiated by the Unions as part of the collective bargaining process; and which are expressly incorporated into the main collective bargaining agreements executed by the operator. *See L. O. Koven & Bro., Inc. v. Local Union No. 5767, United Steelworkers*, 381 F.2d 196, 204 (3d Cir. 1967) (agreements connected to a CBA, such as settlement agreements, are considered part of the CBA); *see also Uniontown Hosp. v. Chauffeurs, Teamsters & Helpers, Local Union No. 491*, 172 F. App'x. 442, 443-44 (3d Cir. 2006) (side letter to a CBA subject to enforcement as part of the CBA); *United Steelworkers v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 273 (6th Cir. 2007) (interpreting the arbitration clause of collective bargaining agreement,

18

as well as a "simultaneously executed . . . side letter"); *Chmiel v. Beverly Wilshire Hotel Co.*, 873 F.2d 1283, 1285 (9th Cir. 1989) (interpreting a "collective bargaining agreement as modified by [a] sideletter agreement"); *Commc'ns Workers v. AT&T Info. Sys., Inc.*, No. CIV. A. 89-8150, 1991 WL 170841, at *9 (E.D. Pa. Aug. 30, 1991) (finding that post-agreement settlements were incorporated into the contract).

33. The express terms of the Owner's Letters require disputes to be resolved by the grievance and arbitration procedures of the contract. *See* Ex. 1 to Boardman Decl., at 75; Ex. 1 to Havard Decl., at 19. The automatic stay provision does not suspend that obligation: to the contrary, the law is clear that the stay may *not* be applied to "allow a debtor unilaterally to avoid its obligation to arbitrate," unless that obligation has been modified or rejected in accordance with the mandates of Section 1113. "[I]f there exists a clear intent on the part of the parties to incorporate into a collective bargaining agreement other appurtenant agreements, those other agreements . . , will also be accorded with the protections provided for by § 1113." *In re Bunting Bearings*, 302 B.R. 210, 218 (Bankr. N.D. Ohio 2003) (refusing to apply the automatic stay to limit arbitration under a Pension Plan incorporated into a CBA); *see also Cont'l Airlines,* 125 F.3d at 137; *Ionosphere*, 922 F.2d at 993. "[T]o the extent the purpose of the automatic stay is to give the debtor a 'breathing spell,' it cannot be reconciled with § 1113, which provides the sole method by which a debtor may obtain a 'breathing spell' from its obligations under a collective bargaining agreement." *Id.* at 991. The Debtor's refusal here amounts to an attempt to "escape its duty" to arbitrate without complying with Section 1113, and should be rejected on that ground.

III.   **In the Alternative, the Totality of Circumstances Establishes Cause to Grant Relief from the Automatic Stay to Proceed with Arbitration**

34. Even if the terms of the Owner's Letters were not themselves subject to protection under Section 1113—and thus exempted from the automatic stay under the *Ionosphere* rule—the Unions should still be permitted to proceed with arbitration to resolve their disputes with the Debtor.

35. Section 362(d)(1) of the Federal Bankruptcy Code provides that "the court shall grant relief from the [automatic] stay . . . such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause."  In determining whether modification is proper, "the party opposing such relief has the burden of proof."  11 U.S.C. § 362(g)(2).  *In re Rexene Prods. Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992) (statute "plac[es] an initial burden on the moving party to establish its prima facie case which must then be rebutted by the party opposing such relief"). "[C]ourts . . . consider what constitutes cause based on the totality of the circumstances in each particular case."  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).  Courts weigh the equities, including "prejudice to either the bankrupt estate or the debtor" resulting from modifying the stay, "hardship to the [party seeking modification]" if the stay is maintained, and whether the party seeking modification "has a probability of prevailing on the merits," *Rexene Prods.*, 141 B.R. at 576, but "[c]ause under Section 362(d)(1) . . . is a flexible concept and not confined solely to" consideration of these factors.  *In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 121 (Bankr. D. Del. 2015).  *See id.* at 121, 125 (cause found to allow state-court litigation seeking to terminate trademark agreements to proceed, even where non-debtor failed to establish hardship from maintenance of stay, where maintenance of the stay would undermine operation of Section 365 and federal trademark law) (citing *In re West Elecs., Inc.*, 852 F.2d 79, 82-84 (3d Cir. 1988) (same)).  Relief from the stay is warranted here, regardless of which factors are considered, for

one basic reason: **_approving the Debtor's refusal to arbitrate would allow the Debtor to deprive the Unions and their members of their rights under Section 1113 simply by denying that it assumed the full collective bargaining agreements—and then invoking the automatic stay to prevent adjudication of the question on the merits_**.

36. Nothing in the Bankruptcy Code permits such a result. To the contrary, courts have uniformly held that the automatic stay should _not_ be used to permit debtors to end-run Section 1113 rights. _Cont'l Airlines_, 125 F.3d at 137, and cases cited _supra_ at 18. And, more generally, "where a party seeks to enforce a . . . pre-petition contract claim, a court does not have the discretion to deny enforcement of an otherwise applicable arbitration clause." _In re Mitnze_, 434 F.3d 222, 229 (3d Cir. 2006) (arbitration under the Federal Arbitration Act); _Hays & Co. v. Merrill Lynch_, 885 F.2d 1149, 1162 (3d Cir. 1989) (same). That principle has special force in labor relations matters, where arbitration is integral to federal labor policy, and indeed to the collective-bargaining process itself. _See Gulf Navigation_, 363 U.S. at 578-581.

37. That the Debtor's underlying disputes with the Unions involve only questions of non-bankruptcy law—the application of contract interpretation principles to the language of the Owner's Letters—further underscores the importance of permitting resolution of these questions in arbitration. Should the Unions prevail in establishing that the Debtor _did_ assume the full collective bargaining agreement terms upon its termination of Marriott, this Bankruptcy Court would rightly preside over any attempt by the Debtor to modify or reject those terms under Section 1113. But the threshold question as to whether the Debtor assumed those terms in the first instance is a question of pure contract interpretation, not of bankruptcy law. _Cont'l Airlines_, 125 F.3d 120, is illustrative of this point. There, the initial dispute concerned rights to "seniority integration," a process by which seniority lists are combined following an airline merger. The

threshold question was whether a "merger" had in fact occurred. *Id.* at 130. That determination, and the corresponding questions related to whether individual pilots could claim seniority integration rights, "depends on the meaning, interpretation and proper application" of the underlying agreements, and thus, the Third Circuit found the questions were "subject to the exclusive jurisdiction of the arbitrator." *Id.* In contrast, the court found that treatment of any resulting seniority integration claims in the bankruptcy process lay within the exclusive jurisdiction of the Bankruptcy Court. *Id.* Under *Continental Airlines*, "disposition of the merits" was reserved to arbitral authority, while disposition of any resulting *claims* was reserved to the Bankruptcy Court. *Id.*; *see also L.O. Koven*, 381 F.2d at 205 ("[Q]uestions involving an interpretation of the Bankruptcy Act should be decided by the court, while questions involving an interpretation of the collective bargaining agreement should if feasible be decided by the arbitrator."). The same is true here: the merits of the dispute—whether the Debtor assumed the full collective bargaining agreement terms upon its termination of Marriott—are subject to arbitration; if assumption is found by the arbitrator—as the Unions firmly believe will be the case—those terms will be subject to the Section 1113 process, should the Debtor wish to modify or reject them.

38. A court's inquiry into the merits of a dispute reserved for arbitral determination is necessarily limited, *see Cont'l Airlines*, 125 F.3d at 130; however, should this Court consider probability of prevailing as a factor in determining whether modification of the stay is warranted, *see Rexene*, 141 B.R. 574, that factor, like the others, weighs heavily in favor of permitting the Unions to proceed.

39. The express language of the assumption provision "contemporaneously . . . b[inds]" the owner to all collectively-bargained terms whenever three conditions are met: (1) the operator

"ceases to operate or manage the Hotel"; (2) "the property continues to be operated as a hotel, or any use covered by the CBA, with or without hiatus"; and (3) "there is no replacement operating entity." Ex. 1 to Boardman Decl., at 76. The first condition is not in dispute: Marriott "cease[d] to operate or manage" the property due to the Debtor's termination of its management agreement. As to the third condition, the Debtor has asserted that it has not hired a replacement operating entity—although the Unions note that it appears the Debtor has expanded Hotel AVE's role to encompass some of the functions previously performed by Marriott. The Debtor's challenge centers on the second factor, and contends that assumption was not triggered by its termination of Marriott here because the Debtor is not currently operating, and has no intention of operating, the property itself. But this contention ignores the language of the assumption provision, which explicitly binds the owner *even during a hiatus* in operations. Further, the question of hiatus does not turn on how the Debtor itself intends to use the property. The Debtor's intentions are clear: it filed this bankruptcy petition with the intent not to use the property, but to sell it. The question is thus not whether the *Debtor* will operate the property as a hotel: it is whether a future purchaser may do so.

40. The evidence firmly supports an affirmative conclusion. The property remains intact, and is maintained as a hotel. It is zoned and taxed as a hotel. And it is being marketed as a hotel—in fact, the Debtor's broker, Eastdil Secured, L.L.C., has a professional specifically assigned to field inquiries concerning hotel uses *See* Ex. B to Debtor's Notice of Application for Entry of an Order, ECF No. 46-3 (Eastdil Engagement Agreement). And the Debtor's manager has acknowledged that they have received many expressions of interest from prospective purchasers interested in using the property as a hotel. The package that the Debtor can offer to a prospective hotel purchaser makes such a use especially attractive. Although it is not currently accepting

guests, the Wardman Park, as one of Washington's major convention hotels, maintains group bookings for conferences and meetings years in advance. Those group contracts, according to the Hotel's manager, have an estimated value of more than $250 million, and, should the property be sold for use as a hotel, may be conveyed with the real estate, allowing a future owner to reopen with a built-in book of business.

41. It is not uncommon for hotel properties to remain closed, even for years, prior to reopening. *See* examples cited *supra* at 9. And labor law principles make plain that the duration of a closure does not by itself determine whether the operation is in "hiatus" or is permanently shuttered. In *N.L.R.B. v. Rockwood Energy & Mineral Corp.*, 942 F.2d 169 (3d Cir. 1991), the Third Circuit determined that the five-year-long closure of a coal mine constituted a hiatus, and not a termination, of the operation, because "although the Harmony mine produced no coal for five years, the mine and equipment were maintained during the suspension period, thus preserving the capacity of the mine to produce, and supporting the laid-off employees' expectation of recall." *Id* at 175. *See also Nephi Rubber Prods. Corp. v. N.L.R.B.*, 976 F.2d 1361, 1365 n.8 (10th Cir. 1992) (collecting cases); *see also Straight Creek Mining, Inc. v. N.L.R.B.*, 164 F.3d 292, 296 (6th Cir. 1998) (finding successorship after 54-month hiatus because the business "remained available for reopening even after [the prior owner] announced that it was going out of business") (internal quotation marks omitted).[4]

---

[4] Similar standards apply to the interpretation of collectively-bargained successorship obligations. *See*, *e.g.*, *In re CF&I Fabricators of Utah, Inc.*, 163 B.R. 858, 865 (Bankr. D. Utah 1994) (holding that successorship obligation continued to apply to two mines that were closed for 16 months with all except maintenance workers on layoff). Significantly, unlike the Owner's Letter provision at issue here, the successorship provision in that case did not explicitly provide for continued obligations "with hiatus." It would make little sense to interpret the Owner's Letters more narrowly.

42. The circumstances here present an equally compelling case that the current closure should be treated as a "hiatus" in the property's operation as a hotel.

43. Debtor's counsel's correspondence identifies no prejudice that would result from submission of this matter to arbitration. Notably, the Unions seek no monetary relief in the arbitration: they simply seek to adjudicate the Debtor's obligations under the Owner's Letter. Modification of the automatic stay—if the Court finds the stay is implicated—is particularly appropriate in such circumstances. *See In re Stone Res.*, 458 B.R. 823 (E.D. Pa. 2011) (granting relief from stay to enforce non-compete agreement), *vacated on other grounds* 482 F. App'x 719 (3d. Cir. 2012). And, if the Unions prevail, the Debtor will simply have to comply with its obligations under Section 1113—a result that, definitionally, cannot constitute unfair prejudice.

## REQUEST FOR WAIVER OF STAY

44. The Unions request that this Court waive the 14-day stay provided under Bankruptcy Rule 4001(a)(3), so that they may immediately initiate arbitration proceedings.

## RESERVATION OF RIGHTS

45. The Unions expressly reserve, and do not waive, any and all of their rights, claims, causes of action and defenses in connection with the Owner's Letters and CBAs, the Bankruptcy Code, the National Labor Relations Act, other applicable law, or otherwise against the Debtor, any successor in interest, and any and all third parties. The Unions do not waive any rights with respect to their ability to file a proof of claim or otherwise assert claims in the Chapter 11 Cases by filing this Motion and reserve all rights with respect thereto.

## NOTICE AND NO PRIOR REQUEST

46. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Debtor; (b) the Office of the United States Trustee; (c) the top twenty

creditors; and (d) any party requesting notice pursuant to Bankruptcy Rule 2002. In light of the

nature of the relief requested herein, the Unions submit that no other or further notice is required.

47. No previous request for the relief sought in this Motion has been made to this Court or

any other court.

**WHEREFORE**, the Debtors respectfully request that the Court (i) grant the relief

requested herein, (ii) enter the Order in the form attached hereto as **Exhibit A**, and (iii) grant the

Debtors such other and further relief as is just and proper.


Dated: March 12, 2021
      Wilmington, Delaware

*/s/ Susan E. Kaufman*
Susan E. Kaufman (Bar No. 3381)
LAW OFFICE OF SUSAN E. KAUFMAN, LLC
919 N. Market Street, Ste. 460
Wilmington, DE 19801
Tel. (302) 472-7420
Fax. (302) 792-7420
Email: skaufman@skaufmanlaw.com

And

Devki K. Virk*
Joshua Rosenthal*
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, N.W., Ste. 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax. (202) 842-1888
Email: dvirk@bredhoff.com
      jrosenthal@bredhoff.com

*Counsel for UNITE HERE Local 25*

And

_/s/ Robert E. Paul_ (as authorized on March 12, 2021)
Robert E. Paul*
LAW OFFICES OF ROBERT E. PAUL, PLLC
1025 Connecticut Ave. NW, Ste. 1000
Washington, DC 20036-5420
Tel. (202) 857-5000
Fax. (202) 327-5499
Email: rpaul@robertpaul.com

_Counsel for Local 99, International Union of Operating Engineers_

_*pro hac vice application pending_