**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| WARDMAN HOTEL OWNER, L.L.C., [1] | ) | Case No. 21-10023 (JTD) |
| | ) | |
| Debtor. | ) | |
| | ) | |

Hearing Date: June 9, 2021 at 3:00 p.m. (prevailing Eastern time)
Objection Deadline:  June 2, 2021 at 4:00 p.m. (prevailing Eastern time)

**MOTION FOR ENTRY OF AN ORDER (A) APPROVING BID PROCEDURES FOR
THE SALE OF THE ASSETS OF DEBTOR, (B) SCHEDULING AN AUCTION AND
HEARING TO CONSIDER THE SALE AND APPROVE THE FORM AND MANNER
OF NOTICES RELATED THERETO; (C) ESTABLISHING PROCEDURES RELATING
TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS,
INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING
BREAKUP FEE; AND (E) GRANTING OTHER RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor") files this

motion (the "Motion") for the entry of an order:  (a) approving bid procedures and certain

overbid protections in connection with the sale of the assets of the Debtor; (b) scheduling an

auction and hearing to consider the sale of and approve the form and manner of notices related

thereto; (c) establishing procedures for the assumption and assignment of certain contracts that

will be assumed and assigned as part of the sale; (d) authorizing the Debtor to provide a breakup

fee as described below; and (e) granting related relief (this "Motion").  While the marketing of

the assets has been highly successful to date as described below, the Debtor has determined in its

business judgment to move forward currently without a "stalking horse" bidder for its assets.

The Bid Procedures (as defined below) contemplate that a buyer will be identified at a later date,

---

[1]    The last four digits of the Debtor's U.S. tax identification number are 9717.  The Debtor's mailing address is
5035 Riverview Road, NW, Atlanta, GA 30327.

either at the auction contemplated by the Bid Procedures or, under appropriate circumstances and with sufficient notice, through the Debtor's identification of a stalking horse purchaser (the "Stalking Horse Purchaser").  In support of this Motion, the Debtor respectfully states as follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11, United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Background**

4.      On January 11, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is managing its properties as debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Debtor's chapter 11 case, and no committees have been appointed or designated.

5.      The Debtor is the sole owner of real property located in Woodley Park, Washington, D.C. The property was formerly operated as the Washington Marriott Wardman

DOCS_DE:234240.8

Park Hotel (the "Hotel"), a convention hotel. The factual background regarding the Debtor,

including its historical business operations and the events precipitating the chapter 11 filing, is

set forth in detail in the *Declaration of James D. Decker in Support of Debtor's Chapter 11

Petition and First Day Motions* (the "First Day Declaration") filed on the Petition Date and fully

incorporated herein by reference.

### Debtor's Assets to Be Sold

6.      The Debtor seeks to sell all of its right, title and interest in and to the following

property:[2]

- That certain real property located in the Washington, D.C., commonly known as 2660 Woodley Road NW, Washington, D.C. 20008 (the "Land");

- The buildings, structures and improvements erected or located on the Land (collectively, the "Improvements," and together with the Land, collectively, the "Real Property");

- Any rights and appurtenances pertaining to the Land, including minerals, oil and gas rights, air, water and development rights, roads, alleys, easements, streets and ways adjacent to the Land, rights of ingress and egress thereto, any strips and gores within or bounding the Land and in profits or rights or appurtenances pertaining to the Land (the "Appurtenant Rights");

- Certain agreements affecting the Property (collectively, the "Miscellaneous Agreements");

- All assignable permits and licenses to the extent the same pertain to the Real Property (collectively, the "Permits");

- All assignable intangible property, if any, used exclusively in connection with the occupancy and operation of the Real Property (the "Intangible Property"); and

- All assignable warranties of any contractor, manufacturer or materialman which relate to the Improvements or Personal Property included in the sale (collectively, the "Warranties").

---

[2] The description of assets to be sold provided herein is intended as a summary, and is more particularly described in the form of purchase and sale agreement attached hereto as **Exhibit E**.

The Real Property, Appurtenant Rights, Miscellaneous Agreements, Permits, Intangible Property and Warranties are herein collectively referred to as the "Assets".[3]  The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents or its estate.

7.      The Debtor's Land is comprised of three contiguous parcels, irregular in shape, and generally bound by Connecticut Ave. and 24th Street to the east; Woodley Road to the north; multi-family residential to the west; and Calvert St. and multi-family residential to the south. The site is considered to be fully improved and no excess or surplus land exists.

8.      The primary improvements on the Debtor's Land include a facility previously used as a convention style hotel with significant meeting space. The facility contains 1,152 guest rooms, lobby, registration area, lobby restaurant, pub, full-service restaurant, health center, business center, jewelry shop, car rental shop, gift/sundry shop, hair salon, and all necessary back of house and mechanical space to operate the facility. Additionally, the property contains 196,222 sq. ft. of meeting space that is divided between pre function space, ballrooms, break out rooms, and exhibition space. All public spaces are located on the lower levels of the property. The guest rooms are arranged in three towers: Wardman Tower (built 1928), Center Tower (built 1978), and Park Tower (built 1965). Other improvements to the site include an outdoor pool, 665 striped parking spaces divided between three garages and surface parking, landscaping, signage, property driveways, sidewalks, curbing, etc.

---

[3] For the avoidance of all doubt, in no event shall the Property including any rights, claims, interests, remedies or recoveries of Seller arising under or in connection with the allegations made in that certain action titled *Wardman Tower Residential Condominium Unit Owners Association v. JBG Smith Properties, et al.*, pending in the Superior Court of the District of Columbia under Case No. 2020 CA 004807 B.

**Financing and Liens Affecting the Assets**

9.      On January 19, 2018, the Debtor obtained a loan from Pacific Life Insurance Company ("Pacific Life"), in the principal sum One Hundred Twenty-Two Million Five Hundred Thousand and 00/100 Dollars ($122,500,000.00) (the "Prepetition Loan") pursuant to the terms of that certain Term Loan Agreement (the "Prepetition Loan Agreement" and, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Loan Documents") to facilitate Debtor's purchase of the Hotel and related real and personal property.  As of December 21, 2020, the Debtor was indebted to Pacific Life in respect of the Prepetition Loan in an aggregate principal amount, not less than $130,537,383 (collectively, together with accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, plus all interest, fees, costs, and other charges thereunder, the "Prepetition Loan Obligations"). Pursuant to the Final DIP Order (defined below), Pacific Life is the holder of an allowed secured claim for the Prepetition Loan Obligations.  *See* Final DIP Order ¶ G, 27, 43.

10.      In connection with the Prepetition Loan Obligations, the Debtor granted to Pacific Life a first-priority security interest in and continuing lien (the "Prepetition Secured Party Liens") on "Collateral" and "Secured Property" (the "Prepetition Secured Party Collateral"), as the term "Collateral" is defined in the Prepetition Loan Agreement and that certain Security

5

Agreement dated January 19, 2018 between Debtor and Pacific Life and as the term "Secured

Property" is defined in that certain Deed of Trust, Financing Statement and Security Agreement

(with Assignment of Rents and Fixture Filing) dated January 19, 2018 between Debtor, Pacific

Life and the Trustee (as defined therein).  As provided for in the Final Dip Order, and the

passage of the Challenge Deadline, the Prepetition Secured Party Liens constitute valid, first-

priority, liens on the Collateral and Secured Property.  *See* Final DIP Order ¶ G.

11.     Pursuant to motion filed on the Petition Date, the Debtor requested entry of orders

(a) authorizing the Debtor to obtain secured postpetition financing on a superpriority basis and to

borrow from time to time, up to $8.0 million (the "DIP Loan") from Pacific Life (in its capacity

as the lender under the DIP Loan, the "DIP Lender") pursuant to the terms and conditions of that

certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement and the ancillary

documents thereto (the "DIP Loan Documents"), (b) granting liens and superpriority

administrative expense claims, (c) authorizing the use of cash collateral, (d) modifying the

automatic stay, and (e) granting related relief.

12.     On February 9, 2021 the Court entered the  *Final Order (I) Authorizing Debtor to

Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority

Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured

Party, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 126]

(the "Final DIP Order") approving the DIP Loan and related relief.  Pursuant the Final DIP Order

and DIP Loan Documents, Pacific Life was granted, in order to secure the obligations under the

DIP Loan, continuing, valid, binding, enforceable, non-avoidable, and automatically and

properly perfected postpetition security interests in and liens (collectively, the "DIP Liens") on all the real and personal property, whether now existing or hereafter arising and wherever located, tangible or intangible, of the Debtor (the "DIP Collateral"). *See* Final DIP Order, ¶ 8. The DIP Liens, among other things, (a) encumber on a first priority basis all DIP Collateral that was unencumbered by duly perfected liens as of the Petition Date or by liens that are perfected after the Petition Date to the extent permitted by the Bankruptcy Code and (b) encumber all DIP Collateral on a junior basis solely to the extent such DIP Collateral is subject to the Prepetition Secured Party Liens. *See* Final DIP Order, ¶ 9(a) and (b).

### The Marketing Process

13.    Effective as of the Petition Date, the Debtor retained Eastdil Secured, L.L.C. ("Eastdil" or "Broker") as their real estate broker to market the Property in accordance with the terms and conditions of the engagement agreement between the Debtor and Eastdil. The Debtor selected Eastdil as its real estate broker in this chapter 11 case based upon Eastdil's excellent reputation for its real estate brokerage services. Eastdil is consistently recognized as the preeminent commercial property intermediary in the country, due to its extensive and unparalleled knowledge of the real estate industry and capital markets. Eastdil has completed over $495 billion in property sale transactions since 2009, among them many of the most landmark single asset and portfolio sales throughout all property types. On February 5, 2021, the Court entered an order approving the retention of Eastdil as of the Petition Date [Docket No. 105].

14.     Beginning on the Petition Date and continuing through the present, the Debtor

and its professionals have engaged in numerous activities related to the marketing of its Property,

including but not limited to the following:

- Prepared and delivered an initial teaser to over 5,000 individual investors;

- Engaged in numerous discussions with investors to preview the Property and respond to initial due diligence questions;

- Negotiated and arranged for the execution of confidentiality agreements with 173 interested investors who requested access to further due diligence materials;

- Established a data room to provide a single point of information for investors requesting confidential information, and populated the data room with information related to the Property;

- Provided a detailed offering memorandum to all investors who executed a confidentiality agreement;

- Provided tours of the Property to 31 potential investors;

- Coordinated with various vendors regarding site surveys, potential demolition costs, title reports, zoning issues, and other regulatory matters to facilitate the efficient closing of the sale to the ultimate purchaser; and

- Evaluated and responded to a number of non-binding expressions of interest submitted by potential purchasers.

15.     The marketing process is continuing, and the Debtors and their professionals

continue to respond to due diligence requests and work with potential purchasers to refine and

update the expressions of interest.

16.     While the ongoing marketing and sale process is thorough, as discussed above,

the Debtor has not chosen a "stalking horse" bidder for the Assets.  The Bid Procedures (as

defined below) contemplate that a buyer for the Assets will be identified at a later date, either at

the auction contemplated by the Bid Procedures or, under appropriate circumstances, through the

DOCS_DE:234240.8

Debtor's identification of a Stalking Horse Purchaser.  The Debtor will send, or will have sent, notice of the Bidding Procedures Motion to all parties that the Debtor believes may be potentially interested in acquiring the Assets.  The electronic data room has been, and will continue to be, available to interested parties who have, or will, execute confidentiality agreements acceptable to the Debtor.

17.    The Debtor believes that the Bid Procedures proposed hereby will enable the efficient consummation of the sale of the Assets at an auction to the highest or best bidder.  The Debtor will continue to market the Assets pending the outcome of the auction.  In light of the extensive marketing process already undertaken, and the additional efforts that will be made during the proposed sale process, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale of the Assets.

18.    The Debtor believes that such marketing of the Assets over the period contemplated by the Bid Procedures, in addition to the marketing activities that have taken place to date, will result in the highest or best price for the assets and maximize value for all of the Debtor's constituents.

## **Relief Requested**

19.    Pursuant to this Motion, the Debtor requests that the Court, among other things:

(a.)    approve the proposed bid procedures (the "Bid Procedures"), including the bidding, overbid, and break-up fee provisions, and grant the Debtor authority to designate a Stalking Horse Purchaser, subject to the parameters set forth in the Bid Procedures, attached hereto as **Exhibit A**;

(b.)     approve the procedures set forth herein for the assumption and assignment of certain executory contracts in connection with the sale (the "Cure Procedures");

(c.)     establish a date for holding the auction (the "Auction") and approve certain procedures in connection therewith;

(d.)     schedule the hearing (the "Sale Hearing") to approve any sale transaction(s) to the highest or best bidder for the Assets (the "Successful Bidder") and establish deadlines for objections and responses to the relief requested in a sale motion to be filed in advance of the Sale Hearing (the "Sale Motion"); and

(e.)     approve the form and manner of notice to be served upon certain parties, including:  (i) the form of notice, substantially in the form attached hereto as **Exhibit B**, to be served on the Sale and Bid Procedures Notice Parties (as defined below); (ii) the form of notice, substantially in the form attached hereto as **Exhibit C**, to be served on all known creditors of the Debtor (the "Creditor Notice"); and (iii) the form of notice to parties holding Assumed Contracts in conjunction with the proposed sale, in substantially the form attached hereto as **Exhibit D** (the "Cure Notice").

**Sale Hearing**

20.     The Debtor requests that the Court schedule the Sale Hearing on **July 22, 2021 at 1:00 p.m. (prevailing Eastern time)**, and that objections, if any, to the Sale Motion be filed no later than **July 8, 2021 at 5:00 p.m. (prevailing Eastern time)**.

**Proposed Bid Procedures**

21.    The Bid Procedures are attached hereto as **Exhibit A**.  The Bid Procedures are summarized as follows:

(a.)    <u>Assets to be Sold</u>.  Substantially all of the assets of the Debtor relating to the Property as described above.

(b.)    <u>Potential Bidders</u>.  Any person interested in participating in the bidding process for all or a portion of the Assets (each a "<u>Potential Bidder</u>") must satisfy the requirements set forth in the Bid Procedures.

(c.)    <u>Qualified Bidders</u>.  A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the assets of the Debtor do not overlap and who also are referred to in the Bid Procedures as a single Qualified Bidder) that delivers the documents described in the Bid Procedures with respect to its proof of financial ability to perform and otherwise satisfies the requirements of the Bid Procedures Order and the procedures set forth herein, and that the Debtor, in its discretion, determines is reasonably likely to submit a *bona fide* offer for the Assets and to be able to consummate a sale if selected as a Successful Bidder (defined below).  If selected, a Stalking Horse Purchaser shall be a Qualified Bidder and shall be deemed to satisfy all Bid requirements as set forth in the Bid Procedures. Notwithstanding anything to the contrary set forth herein, Pacific Life is a Qualified Bidder.  *See* Final DIP Order ¶ 15.

(d.)    <u>Bidding Process</u>.  The Debtor and its advisors, shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their

DOCS_DE:234240.8

due diligence investigations, as permitted by the provisions of the Bid Procedures; (iii) receive

offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets

(collectively, the "Bidding Process").  The Debtor may adopt rules for the Auction at or prior to

the Auction that, in its reasonable discretion, will better promote the goals of the Auction and

that are not inconsistent with any of the provisions of the Bid Procedures Order and the

Bankruptcy Code.

        (e.)    Bid Deadline.  The Debtor proposes that the deadline for submitting bids

by a Qualified Bidder shall be **July 8, 2021 at 5:00 p.m. (prevailing Eastern time)** (the "Bid

Deadline").  On or before the Bid Deadline, a Qualified Bidder that desires to make an offer,

solicitation or proposal (a "Bid") shall deliver written copies of its Bid to the Debtor, Wardman

Hotel Owner, L.L.C., 5035 Riverview Road, NW, Atlanta, GA 30327, Attn:  James D. Decker,

with a copy to:  (a) the Debtor's real estate broker, Eastdil Secured, L.L.C., 40 West 57th Street,

23rd Floor, New York, NY 10019, Attn: Alan Davis, and (b) counsel for the Debtor, Pachulski

Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, Delaware  19801, Attn:

Laura Davis Jones.  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

The Debtor is authorized, but is not required to, select the Stalking Horse Purchaser from the

Qualified Bids received on or before **July 16, 2021 at 5:00 p.m. (prevailing Eastern time)** (the

"Stalking Horse Selection Deadline").  In the event the Debtor selects a Stalking Horse

Purchaser, the Debtor shall immediately file a notice of such selection and serve the notice on (a)

the Sale and Bid Procedures Notice Parties and (b) all Qualified Bidders.  Qualified Bidders who

submitted a Bid prior to the Bid Deadline will be permitted to increase their Minimum Bid to account for the selection of a Stalking Horse Purchaser as provided in Section (f)(2) below.

(f.) <u>Bid Requirements</u>.  The Debtor proposes that, to be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtor to satisfy each of the following conditions, unless waived or modified by the Debtor in its discretion:

(1) <u>Good Faith Deposit</u>.  Each Bidder, other than Pacific Life, must make a deposit in escrow with First American Title Insurance Company (the "<u>Escrow Holder</u>") the sum of $5,000,000 (together with all interest from time to time accrued thereon while held by Escrow Holder, the "<u>Initial Deposit</u>").  Within two (2) business days following entry of the Sale Order (as defined below), the Successful Bidder, unless the Successful Bidder is Pacific Life, shall deposit with Escrow Holder an additional $5,000,000 (the "<u>Additional Deposit</u>," and, together with the Initial Deposit, and all interest from time to time accrued thereon while held by Escrow Holder, the "<u>Good Faith Deposit</u>").  The Debtor reserves the right to modify the amount of the Good Faith Deposit in its discretion.

(2) <u>Minimum Bid</u>.  The consideration proposed by the Bid may include only cash and/or other consideration acceptable to the Debtor in an amount of no less than $100,000,000 (the "<u>Minimum Bid</u>"), provided, however, that in the event that the Debtor selects a Stalking Horse Purchaser, in order to qualify for the Auction, any competing Bid must be for more than an amount equal to the offer of the Stalking Horse Purchaser, plus the aggregate of the sum of (a) $250,000 in cash; and (b) the Breakup Fee (as defined below), if any.

(3) <u>Irrevocable</u>.  All Bids must be irrevocable until three (3) business days after the Court has entered the Sale Order (the "<u>Termination Date</u>").  Bids selected as the Successful Bid or a Back-up Bid must be further irrevocable until three (3) business days after the closing of the sale.

(4) <u>Principal Terms</u>.  A Bid must include an executed asset purchase agreement (the "<u>Contemplated Transaction Documents</u>") similar in form and substance to the form purchase and sale agreement provided by the Debtor and attached hereto as **<u>Exhibit E</u>** (the "<u>Agreement</u>"), as modified by the potential purchaser, pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction and a black-lined copy of the Agreement marked to show all changes requested by the Qualified

Bidder, including specification of the proposed purchase price and any changes to any exhibits or schedules to the Agreement.  A Bid must identify with particularity each and every condition to closing and all executory contracts to be assumed and assigned pursuant to the Contemplated Transaction Documents.  The Contemplated Transaction Documents must include a commitment to close by no later than 30 days after entry of the Sale Order.  A Bid should propose a contemplated transaction involving all or substantially all of the Assets, <u>provided</u>, <u>however</u>, that the Debtor in its discretion may consider proposals for less than substantially all the Assets; <u>provided further</u> that the Debtor will evaluate all Bids, in its sole discretion, to determine whether such Bid or combination of Bids maximizes the value of the Debtor's estate as a whole in light of any factors regarding such bid which the Debtor, in its discretion, determines are appropriate to be considered in evaluating Bids.  A Bid must further disclose the planned use of the Property, including whether the Bidder intends to operate any part of the Property as a hotel.

(5)    <u>Contingencies</u>.  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties at or before closing or the satisfaction in all material respects at the closing of specified conditions.

(6)    <u>Authorization to Bid</u>.  A Bid must include evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery and closing of the Contemplated Transaction Documents.

(7)    <u>Financing Sources</u>.  A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtor with appropriate contact information for such financing sources.

(8)    <u>No Fees Payable to Qualified Bidder</u>.  Except with respect to the Breakup Fee, if any, that may be provided to the Stalking Horse Purchaser, if any, a Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures.

(9)    <u>Immediate Payment of the Breakup Fee</u>.  A Bid must allow for the immediate payment of the Breakup Fee, if any, to the Stalking Horse

Purchaser, if any, from the first proceeds of the cash portion of the purchase price of such Bid.

(10)    Non-Reliance.  A Bid must include an acknowledgement and representation of the Qualified Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

(g.)    Qualified Bids.  The Debtor proposes that a Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements and that satisfies the Bid Deadline requirement above shall constitute a "Qualified Bid," if the Debtor believes, in its reasonable discretion, that such Bid would be consummated if selected as the Successful Bid. The Debtor shall have the right to reject any and all bids that they believe, in its reasonable discretion, do not comply with the Bid Procedures.

(h.)    Auction.  The Debtor will conduct the Auction to determine the highest or best bid with respect to the Assets.

(1)    Unless otherwise designated by the Debtor, the Debtor proposes that the Auction shall commence on **July 20, 2021 at 10:00 a.m. (prevailing Eastern time)**, at 2660 Woodley Road NW, Washington, D.C. 20008, or by video conference to the live proceedings at this location.

(2)    In advance of the Auction, the Debtor will notify all Qualified Bidders of the highest or best Qualified Bid, as determined by the Debtor in its discretion (the "Baseline Bid").

(3)    The Debtor proposes that, if no higher or better offer is obtained at the Auction, then the Stalking Horse Purchaser, if any, or the Qualified Bidder submitting the Baseline Bid will be deemed the Successful Bidder.

(4)     Only Pacific Life, the Stalking Horse Purchaser, if any, and Qualified Bidders that have submitted Qualified Bids are eligible to participate at the Auction.  Only the authorized representatives and professional advisors of each of Pacific Life, the Qualified Bidders, the Debtor, and the U.S. Trustee shall be permitted to attend.

(5)     During the Auction, bidding shall begin initially with the Baseline Bid, which may be the Bid of a Stalking Horse Purchaser, if any, and subsequently continue with an initial minimum overbid of $250,000 (the "Initial Overbid") (plus the Breakup Fee, if any, in the event that the Baseline Bid is the Bid of a Stalking Horse Purchaser, if any).  Except as otherwise set forth herein, the Debtor may conduct the Auction in the manner they determine will result in the highest or best offer for the Assets.  Pursuant to Local Rule 6004-1, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the Bidding Procedures, the Auction or the proposed transaction.

(6)     Any Overbid after the Initial Overbid shall be made in increments of at least $250,000 in cash.  Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash and/or other consideration acceptable to the Debtor; provided, however, that any overbids by a Stalking Horse Purchaser thereafter shall only be required to be equal to the sum of (1) the then existing lead Bid plus (2) $250,000 less (3) the dollar value of the Breakup Fee, if any.

(7)     Additional provisions regarding the conduct of the Auction are set forth in the Bid Procedures.

(8)     Upon conclusion of the bidding, the Auction shall be closed, and the Debtor shall immediately identify the highest or best offer for the Assets (which may be an aggregate of bids for less than all of the Assets) (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest or best offer will provide the greatest amount of net value to the Debtor, and the two (2) next highest or best offers after the Successful Bid (the "Back-up Bids") and the entities submitting the Back-up Bids (the "Back-up Bidders"), and advise the Qualified Bidders of such determination.  Bids selected as the Successful Bid or a Back-up Bid must be irrevocable until three (3) business days after the closing of the sale.  As provided above, all Bids other than the Successful Bid and the Back-up Bids shall be considered revoked as of the Termination Date, which is three (3) business days after the Court has entered the Sale Order.

(i.)    Acceptance of Successful Bid.  The Debtor shall sell the Assets to the

Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the

Sale Hearing.  In the event the transaction does not close with the Successful Bidder, the Debtor

shall be authorized to sell the Assets to the Back-up Bidders.  The Debtor's presentation of a

particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtor's

acceptance of such Qualified Bid.  The Debtor will be deemed to have accepted a Qualified Bid

only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

(j.)    <u>Breakup Fee/Expense Reimbursement</u>.  The Debtor may, but is not

required to, solicit "stalking horse" bids for the Assets prior to the Auction.  Recognizing a

stalking horse bidder's expenditure of time, energy and resources, and that the stalking horse

provides a floor bid with respect to the Assets that it offers to purchase, the Debtor seeks

authority to provide the following bidding protections in the event that a Stalking Horse

Purchaser is selected by the Debtor in its sole discretion in advance of the Auction.

(1)    The Debtor may agree to pay a Stalking Horse Purchaser a breakup fee and/or an expense reimbursement in an amount not to exceed $3,000,000 in the aggregate (the "<u>Breakup Fee</u>") in the event that: (i) the Stalking Horse Bidder is not approved by the Bankruptcy Court as the purchaser of the Assets on which it bid, (ii) the Stalking Horse Purchaser is not in default of its obligations under its asset purchase agreement with the Debtor, **and** (iii) the assets on which the Stalking Horse Purchaser bid are thereafter sold to a Successful Bidder(s) at the Auction for consideration in excess of the purchase price provided for in the asset purchase agreement with the Stalking Horse Purchaser notwithstanding the Stalking Horse Purchaser's willingness and ability to consummate the transactions contemplated by the Stalking Horse Purchaser's asset purchase agreement.  Such payments shall be made to the Stalking Horse Purchaser solely out of the proceeds of closing with the Successful Bidder(s) of the Assets on which the Stalking Horse Purchaser bid.

(2)    In the event a Stalking Horse Purchaser is designated, any bid(s) submitted by a party or parties other than the Stalking Horse Purchaser must be in an amount that is sufficient to pay the Breakup Fee and result in additional consideration to the Debtor's estate in the amount of at least $250,000 after payment of the Breakup Fee.

**Notice of Sale Hearing**

22.     As noted above, the Debtor request that the Court schedule the Sale Hearing on

**July 22, 2021 at 1:00 p.m. (prevailing Eastern time)**.  The Debtor proposes that objections, if

any, to the Sale Motion be filed on or before **July 8, 2021 at 5:00 p.m. (prevailing Eastern**

**time)**.

23.     The Debtor request that the Court approve the manner of notice of the Sale

Motion, the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached

hereto as **Exhibit B** (the "Sale and Bid Procedures Notice"), which the Debtor will serve on the

following parties:

   (a.) the U.S. Trustee;

   (b.) all parties known to assert a lien on any of the Assets, including, but not

limited to, Pacific Life;

   (c.) all known counterparties to the Assumed Contracts, if any;

   (d.) all entities known to have expressed an interest in bidding on the Assets;

   (e.) the United States Attorney's office;

   (f.) all state attorney generals in states in which the Debtor does business;

   (g.) state taxing authorities in the states in which the Debtor does business and

the Internal Revenue Service;

   (h.) environmental authorities in the states or smaller applicable jurisdictions

in which the Debtor does business;

   (i.) the Stalking Horse Purchaser, if any, and its counsel; and

(j.)     all other parties that had filed a notice of appearance and demand for service of papers in this bankruptcy case under Bankruptcy Rule 9010(b) as of the date of entry of the Bid Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

24.     Additionally, the Debtor proposes to serve the Creditor Notice substantially in the form attached hereto as **Exhibit C** on all known creditors of the Debtor.

25.     The Debtor proposes to serve the Sale and Bid Procedures Notice and the Creditor Notice within two (2) Business Days from the date of entry of an order granting this Motion (the "Bid Procedures Order"), by either email or first-class mail on the appropriate parties as described above.  Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Bid Procedures Order that wishes to obtain a copy of such document may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn:  Laura Davis Jones, Esquire), ljones@pszjlaw.com.

### Sale Hearing

26.     At the Sale Hearing, the Debtor will seek Bankruptcy Court approval of the sale of the Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code with all such liens, claims and interests to attach to the proceeds of the sale, with the same validity and in the same order of priority as they attached to the Assets prior to the sale, including the assumption by the Debtor and assignment to the Successful Bidder of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code,

19

except that (a) the allowed secured claim of Pacific Life shall be paid at the closing of the sale, less amounts to pay anticipated allowed administrative expenses, if any, to which Pacific Life agrees or as to which the Court orders a reserve a the Sale Hearing, and (b) as otherwise provided by the Court order approving the sale of the Assets (the "Sale Order").  The Debtor will present additional evidence, as necessary, at the Sale Hearing and submit that the relief sought herein, including the sale and related assumption and assignment of contracts, is fair, reasonable and in the best interest of the Debtor's estate.

## Closing

27.     The closing shall take place in accordance with terms of an agreement approved by the Bankruptcy Court at the Sale Hearing.

## Procedures for the Assumption and Assignment of Assumed Contracts

28.     At the closing, the Debtor may seek to assume and assign to the Successful Bidder, certain executory contracts (the "Assumed Contracts").[4]  The list of the Assumed Contracts will be attached to the Agreement accompanying a Qualified Bid, provided, however, that the Successful Bidder may add to the list of Assumed Contracts (so long as the Debtor files and serves the Cure Notice on each affected contract counterparty within fourteen (14) days before the Sale Hearing), and may remove any executory contract or lease to the list of Assumed Contracts at any time prior to the closing of the sale.

---

[4]  The inclusion of any agreement in the list of Assumed Contracts does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included in the list of Assumed Contracts.

20

29.     The Debtor proposes to serve the Cure Notice, in substantially the form annexed hereto as **Exhibit D**, upon each counterparty whose agreement is on the list of Assumed Contracts two (2) business days after the entry of the Order approving the Bid Procedures.  The Cure Notice also will identify the amounts, if any, that the Debtor believes are owed to each counterparty to an Assumed Contract in order to cure any defaults that exist under such contract (the "Cure Costs").  The Debtor has proposed that the Cure Notice will state the date by which any objection to the Cure Costs or the assumption and assignment of the Assumed Contract (including with respect to adequate assurance of future performance) must be filed and served, which the Debtor proposes to be **July 15, 2021 at 5:00 p.m. (prevailing Eastern time)**.  If a contract is assumed and assigned pursuant to the Bankruptcy Court's order approving same, then unless the affected counterparty properly files and serves an objection to the Cure Costs contained in the Cure Notice, the counterparty will receive at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Costs as set forth in the Cure Notice, with payment made pursuant to the terms of the Agreement accompanying a Qualified Bid, or the agreement of the Successful Bidder.  If an objection is filed by a counterparty to an Assumed Contract with respect to the amount of the Cure Costs set forth in the Cure Notice, the Debtor proposes that such objection must set forth a specific default under the Assumed Contract and claim a specific monetary amount that differs from the amount (if any) specified by the Debtor in the Cure Notice or, alternatively, state why the counterparty believes any Cure Costs are owing, and state the basis for any other objection to the assumption and assignment of the Assumed Contract.

DOCS_DE:234240.8

30.    The Successful Bidder, shall assume and be responsible for payment of any Cure

Costs that may be owed to any counterparty to the Assumed Contracts.  The Successful Bidder

shall be responsible for satisfying any requirements regarding adequate assurances of future

performance that may be imposed under section 365(b) of the Bankruptcy Code in connection

with the proposed assignment of any Assumed Contracts.  The Debtor proposes that the Court

make its determinations concerning adequate assurance of future performance under the

Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing.  The

Debtor further proposes that Cure Costs disputed by any counterparty will be resolved by the

Court at the Sale Hearing.

31.    Except to the extent otherwise provided in the agreement entered into with the

Successful Bidder(s), subject to the payment of any Cure Costs, the assignee of an Assumed

Contract will not be subject to any liability to the assigned contract counterparty that accrued or

arose before the closing date of the sale of the Assets and the Debtor shall be relieved of all

liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

### Approval of the Bid Protections and Bid Procedures is Appropriate

32.    To the extent the Debtor determines to identify a Stalking Horse Purchaser, the

Breakup Fee, if any, and the Bid Procedures described herein are reasonably calculated to

encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The

Stalking Horse Purchaser, if any, will be the stalking horse for competitive bids, perhaps leading

to further competition and the establishment of a baseline against which higher or otherwise

better offers can be measured.

33.     As indicated above, the Debtor hereby requests that the Court approve the overbid

requirements and Bid Procedures as are customary in similar circumstances, including granting

the Debtor discretion to agree to the Breakup Fee, within specified parameters, in favor of a

Stalking Horse Purchaser in the event that one is selected by the Debtor.  The Debtor submits

that cause exists to approve such payments and procedures because they are fair and reasonable

under the circumstances and will encourage competitive bidding and the highest or best price for

the Assets.

34.     Bidding incentives encourage a potential purchaser to invest the requisite time,

money and effort to negotiate with the Debtor and perform the necessary due diligence attendant

to the acquisition of the Assets, despite the inherent risks and uncertainties of the chapter 11

process.  Historically, bankruptcy courts have approved bidding incentives similar to the

Breakup Fee, under the "business judgment rule," which proscribes judicial second-guessing of

the actions of a corporation's board of directors taken in good faith and in the exercise of honest

judgment.  *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)

(bidding incentives may "be legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (internal

quotation marks and citation omitted).

35.     The Third Circuit has established standards for determining the appropriateness of

bidding incentives in the bankruptcy context.  *In re Calpine Corp. v. O'Brien Envtl. Energy, Inc*.,

181 F. 3d 527 (3rd Cir. 1999), the court held that even though bidding incentives are measured

against a business judgment standard in nonbankruptcy transactions, the administrative expense

provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate.  *See id*. at 533.

36.      The *O'Brien* court identified at least two instances in which bidding incentives such as expense reimbursements and breakup fees may provide benefit to the estate.  First, benefit may be found if "assurance of a breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id*. at 537.  Second, where the availability of bidding incentives induces a bidder to research the value of the Debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id*.

37.      Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Debtor's proposed authority to approve Bid Protection in this case passes muster.  The Breakup Fee is fair and reasonable in amount, and are reasonably intended to compensate for the risk that a Stalking Horse Purchaser, should one be selected by the Debtor, is taking by setting a baseline price for the Assets and investing resources in making a bid.

38.      For the reasons set forth above, the Debtor respectfully requests approval of:  (a) the proposed overbid protections including the Breakup Fee to be authorized in favor of a Stalking Horse Purchaser in the Debtor's discretion; (b) the Bid Procedures for the conduct of overbidding, the Auction and selection of the Successful Bidder(s); (c) the procedures set forth herein for notice to counterparties under executory contracts proposed to be assumed and

assigned in connection with the proposed sale, and the determination and payment of Cure Costs

to the counterparties to contracts to be assumed and assigned; (d) the scheduling of the Sale

Hearing and other matters for which scheduling is requested herein; and (e) the related relief

sought hereby.

### No Prior Request

39.     No prior request for the relief sought in this Motion has been made to this

or any other court.

### Notice

40.     Concurrently with this filing, copies of this Motion (which sets forth

various requested dates relating to the sale) will be provided to (a) the Office of the United States

Trustee; (b) counsel to the Debtor's prepetition and postpetition secured lender; (c) the Debtor's

largest unsecured creditors; (d) all entities known to have expressed an interest in bidding on the

Assets; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002.

41.     In addition, within two (2) business days following entry of the Bid

Procedures Order, the Debtor will provide notice of the Bid Procedures Order and the Sale

Hearing with definitive dates once determined by the Court in the Bid Procedures Order on the

Sale and Bid Procedures Notice Parties and the Debtor's known creditors.

42.     The Debtor respectfully submits that such notice is sufficient, and request

that the Court find that no further notice of the relief requested herein is required.

DOCS_DE:234240.8

WHEREFORE, the Debtor respectfully requests that the Court enter an order,

substantially in the form filed contemporaneously with this Motion, granting the relief requested

herein and such other and further relief as this Court deems appropriate.

Dated: May 19, 2021                **PACHULSKI STANG ZIEHL & JONES LLP**

    */s/ Timothy P. Cairns*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email: ljones@pszjlaw.com
      dbertenthal@pszjlaw.com
      tcairns@pszjlaw.com

*Counsel to the Debtor and Debtor in Possession*