## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WARDMAN HOTEL OWNER, L.L.C., [1] | ) | Case No. 21-10023 (JTD) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**Hearing Date: July 22, 2021 at 1:00 p.m. (prevailing Eastern time)**
**Objection Deadline:  July 8, 2021 at 5:00 p.m. (prevailing Eastern time)**

## MOTION FOR ORDER (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF DEBTOR'S ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(b), 363(f), 363(m) AND 1146; (C) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF

Wardman Hotel Owner, L.L.C., the above-captioned debtor and debtor in possession (the "Debtor") hereby files this motion (this "Sale Motion") for entry of an order substantially in the form attached hereto as **Exhibit A** (the "Sale Order") (a) authorizing the sale (the "Sale") of the Debtor's Assets (as defined below) substantially in the form of the draft *Asset Purchase Agreement* attached hereto as **Exhibit B** (the "Sale Agreement");[2] (b) authorizing the sale of the Assets free and clear of all liens, claims, rights, encumbrances, and other interests pursuant to sections 105, 363(b), 363(f), 363(m), and 1146 of the

---

[1]    The last four digits of the Debtor's U.S. tax identification number are 9717.  The Debtor's mailing address is 5035 Riverview Road, NW, Atlanta, GA 30327.

[2]    As described below, the Debtor has filed this Sale Motion without having designated a stalking horse purchaser as of the date hereof.  Upon the selection of the Purchaser of the Assets, the Debtor reserves the right to propose modifications to the proposed form of Sale Order and Sale Agreement upon such terms and conditions as may be agreed by the parties.

Bankruptcy Code; (c) authorizing the assumption and assignment of certain executory contracts and unexpired leases of the Debtor pursuant to sections 363 and 365 of the Bankruptcy Code (collectively, the "Assumed Contracts"); and (d) granting related relief.  In support of this Sale Motion, the Debtor respectfully states as follows:

## Preliminary Statement

1.      On May 19, 2021, the Debtor filed the *Motion for Entry of an Order (A) Approving Bid Procedures for the Sale of the Assets of Debtor, (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notices Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Approving Breakup Fee; and (E) Granting Other Related Relief* [Docket No. 229] (the "Bid Procedures Motion"), which seeks approval of certain sale and bid procedures for the Sale (the "Bid Procedures").  The Court granted the Bid Procedures Motion and approved the Bid Procedures at a hearing conducted on June 9, 2021.

2.      Pursuant this Sale Motion, the Debtor seeks approval of the Sale of the Assets to a proposed purchaser (a "Purchaser").[3]  As disclosed in the Bid Procedures Motion, the Debtor has determined in its business judgment to move forward with the Sale of the Assets without a stalking horse bidder (subject to the Debtor's ability to later name a stalking horse bidder pursuant to the Bid Procedures Order).  The Bid Procedures Motion provides that a buyer will be identified at a later date, either at the auction contemplated by the proposed Bid

---

[3]  The Debtor reserves the ability and right to consummate the Sale pursuant to a chapter 11 plan.

Procedures, through the Debtor's subsequent identification of a stalking horse purchaser (a

"Stalking Horse Purchaser"), or under appropriate circumstances as set forth in the Bid

Procedures.

3.      The Debtor seeks to sell the Assets free and clear of liens, claims,

encumbrances, rights, and other interests other than those liens and interests expressly provided

under the Sale Agreement and Sale Order.  As described in the Bid Procedures Motion, the

Debtor and its real estate broker, Eastdil Secured L.L.C. ("Eastdil" or the "Broker") have

engaged in an extensive, comprehensive prepetition marketing process, which began on the the

Petition Date, to market the Assets.  The Debtor believes that the sale of Assets provided under

the Bid Procedures along the current marketing of the Assets, as described in the Bid

Procedures Motion, will result in the highest and best purchase price for the Assets and provide

maximum value for the Debtor's economic constituents.  The Debtor therefore seeks approval

of the Sale Motion.

### Jurisdiction and Venue

4.      This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

6.      The statutory predicates for the relief sought herein are sections 105,

363, 365, 503, 1107, 1108, and 1146 of chapter 11 of title 11, United States Code (the

"Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of

the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware (the "Local Rules").

**Background**

7.      On January 11, 2021 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is managing its

properties as debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No

trustee or examiner has been appointed in the Debtor's chapter 11 case, and no committees

have been appointed or designated.

8.      The Debtor is the sole owner of real property located in Woodley Park,

Washington, D.C. The property was formerly operated as the Washington Marriott Wardman

Park Hotel (the "Hotel"), a convention hotel. The factual background regarding the Debtor,

including its historical business operations and the events precipitating the chapter 11 filing, is

set forth in detail in the *Declaration of James D. Decker in Support of Debtor's Chapter 11

Petition and First Day Motions* filed on the Petition Date and fully incorporated herein by

reference.

**Debtor's Assets to Be Sold**

9.      The Debtor seeks to sell all of its right, title and interest in and to the

following property:

- That certain real property located in the Washington, D.C., commonly known as 2660 Woodley Road NW, Washington, D.C. 20008 (the "Land");

- The buildings, structures and improvements erected or located on the Land (collectively, the "Improvements," and together with the Land, collectively, the "Real Property");

- Any rights and appurtenances pertaining to the Land, including minerals, oil and gas rights, air, water and development rights, roads, alleys, easements, streets and ways adjacent to the Land, rights of ingress and egress thereto, any strips and gores within or bounding the Land and in profits or rights or appurtenances pertaining to the Land (the "Appurtenant Rights");

- Certain agreements affecting the Property (collectively, the "Miscellaneous Agreements");

- All assignable permits and licenses to the extent the same pertain to the Real Property (collectively, the "Permits");

- All assignable intangible property, if any, used exclusively in connection with the occupancy and operation of the Real Property (the "Intangible Property");

- All assignable warranties of any contractor, manufacturer or materialman which relate to the Improvements or Personal Property included in the sale (collectively, the "Warranties"); and

- Any of the Debtor's fixtures, furniture or equipment with respect to the foregoing (the "FF&E").

The Real Property, Appurtenant Rights, Miscellaneous Agreements, Permits, Intangible Property, Warranties, and FF&E are herein collectively referred to as the "Assets".[4]  The Sale Agreement provides that the sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents or its estate.[5]

---

[4] For the avoidance of doubt, in no event shall the Property including any rights, claims, interests, remedies or recoveries of Seller arising under or in connection with the allegations made in that certain action titled *Wardman Tower Residential Condominium Unit Owners Association v. JBG Smith Properties, et al.*, pending in the Superior Court of the District of Columbia under Case No. 2020 CA 004807 B.  For avoidance of doubt, the Sale Motion does not seek to sell or transfer any of the Debtor's claims and causes of action against Marriott Hotel Services, Inc.

[5] Sale Agreement, § 4.1

10.     The Land is comprised of three contiguous parcels, irregular in shape, and generally bound by Connecticut Ave. and 24th Street to the east; Woodley Road to the north; multi-family residential to the west; and Calvert St. and multi-family residential to the south. The site is considered to be fully improved and no excess or surplus land exists.

11.     The primary improvements on the Debtor's Land include a facility previously used as a convention style hotel with significant meeting space. The facility contains 1,152 guest rooms, lobby, registration area, lobby restaurant, pub, full-service restaurant, health center, business center, jewelry shop, car rental shop, gift/sundry shop, hair salon, and all necessary back of house and mechanical space to operate the facility. Additionally, the property contains 196,222 sq. ft. of meeting space that is divided between pre function space, ballrooms, break out rooms, and exhibition space. All public spaces are located on the lower levels of the property.  The guest rooms are arranged in three towers: Wardman Tower (built 1928), Center Tower (built 1978), and Park Tower (built 1965). Other improvements to the site include an outdoor pool, 665 striped parking spaces divided between three garages and surface parking, landscaping, signage, property driveways, sidewalks, curbing, etc.

**Financing and Liens Affecting the Assets**

12.     On January 19, 2018, the Debtor obtained a loan from Pacific Life Insurance Company ("Pacific Life"), in the principal sum One Hundred Twenty-Two Million Five Hundred Thousand and 00/100 Dollars ($122,500,000.00) (the "Prepetition Loan") pursuant to the terms of that certain Term Loan Agreement (the "Prepetition Loan Agreement"

and, together with any other agreements and documents executed or delivered in connection

therewith, each as amended, restated, supplemented, waived, or otherwise modified from time

to time, the "Prepetition Loan Documents") to facilitate Debtor's purchase of the Hotel and

related real and personal property.  As of December 21, 2020, the Debtor was indebted to

Pacific Life in respect of the Prepetition Loan in an aggregate principal amount, not less than

$130,537,383 (collectively, together with accrued and unpaid interest, fees, expenses, and

disbursements (including, without limitation, any accrued and unpaid attorneys' fees,

accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and

disbursements), indemnification obligations, and other charges, amounts, and costs of whatever

nature owing, plus all interest, fees, costs, and other charges thereunder, the "Prepetition Loan

Obligations").  Pursuant to the Final DIP Order (defined below), Pacific Life is the holder of an

allowed secured claim for the Prepetition Loan Obligations.  *See* Final DIP Order ¶ G, 27, 43.

13.     In connection with the Prepetition Loan Obligations, the Debtor granted

to Pacific Life a first-priority security interest in and continuing lien (the "Prepetition Secured

Party Liens") on "Collateral" and "Secured Property" (the "Prepetition Secured Party

Collateral"), as the term "Collateral" is defined in the *Prepetition Loan Agreement and that*

*certain Security Agreement* dated January 19, 2018 between Debtor and Pacific Life and as the

term "Secured Property" is defined in that certain *Deed of Trust, Financing Statement and*

*Security Agreement (with Assignment of Rents and Fixture Filing)* dated January 19, 2018

between Debtor, Pacific Life and the Trustee (as defined therein).  As provided for in the Final

Dip Order, and the passage of the Challenge Deadline, the Prepetition Secured Party Liens

constitute valid, first-priority, liens on the Collateral and Secured Property.  *See* Final DIP

Order ¶ G.

14.    Pursuant to a motion filed on the Petition Date, the Debtor requested

entry of orders (a) authorizing the Debtor to obtain secured postpetition financing on a

superpriority basis and to borrow from time to time, up to $8.0 million (the "<u>DIP Loan</u>") from

Pacific Life (in its capacity as the lender under the DIP Loan, the "<u>DIP Lender</u>") pursuant to

the terms and conditions of that certain *Senior Secured, Super-Priority Debtor-in-Possession*

*Credit Agreement* and the ancillary documents thereto (the "<u>DIP Loan Documents</u>"), (b)

granting liens and superpriority administrative expense claims, (c) authorizing the use of cash

collateral, (d) modifying the automatic stay, and (e) granting related relief.

15.    On February 9, 2021 the Court entered the  *Final Order (I) Authorizing*

*Debtor to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing*

*Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to*

*Prepetition Secured Party, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*

[Docket No. 126] (the "<u>Final DIP Order</u>") approving the DIP Loan and related relief.  Pursuant

the Final DIP Order and DIP Loan Documents, Pacific Life was granted, in order to secure the

obligations under the DIP Loan, continuing, valid, binding, enforceable, non-avoidable, and

automatically and properly perfected postpetition security interests in and liens (collectively,

the "<u>DIP Liens</u>") on all the real and personal property, whether now existing or hereafter

arising and wherever located, tangible or intangible, of the Debtor (the "<u>DIP Collateral</u>").  *See*

Final DIP Order, ¶ 8.  The DIP Liens, among other things, (a) encumber on a first priority basis

all DIP Collateral that was unencumbered by duly perfected liens as of the Petition Date or by liens that are perfected after the Petition Date to the extent permitted by the Bankruptcy Code and (b) encumber all DIP Collateral on a junior basis solely to the extent such DIP Collateral is subject to the Prepetition Secured Party Liens.  *See* Final DIP Order, ¶ 9(a) and (b).[6]

16.    As detailed in the Bid Procedures Motion, the Debtor retained Eastdil to market the Assets in accordance with the terms and conditions of the engagement agreement between the Debtor and Eastdil.  The Debtor selected Eastdil as its real estate broker in this chapter 11 case based upon Eastdil's excellent reputation for its real estate brokerage services. Eastdil is consistently recognized as the preeminent commercial property intermediary in the country, due to its extensive and unparalleled knowledge of the real estate industry and capital markets.  Eastdil has completed over $495 billion in property sale transactions since 2009, among them many of the most landmark single asset and portfolio sales throughout all property types.

### Sale Agreement With Purchaser[7]

17.    The pertinent terms of the Sale Agreement and the Sale Order, including the provisions required by Local Rule 6004-1, are summarized below.  The description below only summarizes certain provisions of the Sale Agreement and the Sale Order.  The terms of the Sale Agreement and the Sale Order, as applicable, control in the event of any inconsistency.

---

[6] The Debtor is currently negotiating an extension of the DIP Loan with the DIP Lender.

[7]  Unless otherwise noted, capitalized terms used in this section have the meanings ascribed in the Sale Agreement.

a.    Sale to Insider.  As noted above, there is currently no Stalking Horse Purchaser.  However, as noted in the Bid Procedures Motion, Pacific Life is a Qualified Bidder.  The equity interests of the Debtor is currently owned by PL Wardman Member, LLC, a wholly owned subsidiary of Pacific Life.  Neither Pacific Life, PL Wardman Member, LLC, nor any entity related to either of them will seek or otherwise obtain any stalking horse protections provided under the Bid Procedures.

b.    Agreements with Management.  The Debtor is not aware of any agreements between a potential Purchaser and management or any key employees at this time.

c.    Releases.  The Purchaser will have no obligations arising as part of the Sale except as set forth in the Sale Agreement with such Purchaser.  The Debtor will be released of any further obligations arising under any assumed contracts or unexpired leases and certain other assumed obligations as set forth in the Sale Agreement.

d.    Private Sale/No Competitive Bidding.  An auction may occur with respect to the Sale as provided by the Bid Procedures Order.

e.    Closing.  No later than 30 days after entry of the Sale Order (the "Closing Date").  Sale Agreement § 7.1.

f.    Deposit.  The sum of $5,000,000, together with all interest from time to time accrued thereon (the "Initial Deposit") to be held in escrow with Seller's counsel, Pachulski Stang Ziehl & Jones LLP ("PSZJ"), in accordance with the terms of the Bid Procedures.  Within two (2) business days following entry of the Sale Order (i) the Seller shall cause PSZJ to deliver the Initial Deposit to the Escrow Holder; and (ii) the Purchaser, unless the Purchaser is Pacific Life, shall deposit with the Escrow Holder an additional $5,000,000 (the "Additional Deposit," and, together with the Initial Deposit, and all interest from time to time accrued thereon while held by Escrow Holder, the "Deposit") in accordance with the Bid Procedures. The Deposit shall be non-refundable and shall be deemed fully earned by Seller upon PSZJ's delivery of the Initial Deposit to Escrow Holder and Purchaser's deposit of the Additional Deposit with Escrow Holder, subject only to Purchaser's rights to obtain a refund as set forth in the Sale Agreement.  Sale Agreement § 2.

g.    Interim Arrangements with Proposed Purchaser.  There are no provisions for operation or management of the Debtor by the Purchaser prior to the closing of the Sale (the "Closing").

h.    Use of Proceeds.  The allowed secured claim of Pacific Life shall be paid at the Closing, less amounts to pay anticipated allowed administrative expenses, if any, to which Pacific Life agrees or as to which the Court orders a reserve at the Sale Hearing, except as otherwise provided in the Sale Order.

i.      Tax Exemption.  The Debtor seeks a tax exemption under section 1146(a) of the Bankruptcy Code pursuant to this Sale Motion.  The proposed Sale is in contemplation of a Chapter 11 plan that the Debtor expects to file prior to the hearing on the Sale Motion that approves, provides for, or otherwise contemplates the transfer contemplated by the Sale Motion (the "Anticipated Plan").  Notwithstanding the preceding, should the Debtor not seek confirmation of the Anticipated Plan, the Debtor will not seek to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.  The Debtor reserves any and all rights with respect to any tax exemptions authorized under section 1146(a) of the Bankruptcy Code.

j.      Record Retention.  For as long as the Debtor's bankruptcy case is pending, the Purchaser shall permit Seller's counsel and other professionals and counsel for any successor to Seller and their respective professionals (collectively, "Permitted Access Parties") reasonable access to any books and records relating to the Property (to the extent conveyed under the Sale Agreement) to facilitate Seller's administration and winding down of the bankruptcy case, which access shall include (i) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (ii) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the reasonable costs and expenses thereof, and (ii) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to Purchaser's personnel during regular business hours to assist Seller and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of tax returns), provided that such access does not unreasonably interfere with the Purchaser's business operations.  Sale Agreement § 15.17.

k.      Sale of Avoidance Actions.  The Purchase Agreement does not currently provide for the sale of any avoidance claims under chapter 5 of the Bankruptcy Code.

l.      Requested Findings as to Successor Liability.  The transaction documents contemplate that, except as to any assumed liabilities as may be agreed by the Purchaser and Debtor, including without limitation, the assumed liabilities with respect to the Master Condominium (defined below), the Purchaser will purchase the Assets free and clear of all pre-Closing liabilities under successor liability theories.  *See* Sale Order ¶ C and 6.

m.      Sale Free and Clear of Unexpired Leases.  The Sale of the Assets shall be free and clear of all liens, claims, rights, encumbrances or other interests pursuant to sections 105, 363(b), 363(f) and 363(m) of the Bankruptcy Code, except with respect to any liabilities assumed by Purchaser under the Sale Agreement and Sale Order.  Sale Order ¶ 5.

*n.*     Credit Bid.  The Sale Motion does not seek to affect in any manner any credit bidding rights pursuant to section 363(k) of the Bankruptcy Code.

o.     Relief From Bankruptcy Rule 6004(h).  The Sale Order provides that, notwithstanding Bankruptcy Rules 6004 and 6006, the Sale Order shall be effective and enforceable immediately upon entry.  Sale Order ¶ 9.  The Sale Agreement provides an outside Closing Date for the proposed transaction to occur on or before thirty (30) days after entry of the Sale Order.  Sale Agreement, § 7.1.  As set forth in this Sale Motion, the Bid Procedures Motion and the Bid Procedures Order, the Debtor will ensure that all parties in interest will receive ample notice and opportunity to object at the sale hearing.

p.     Assumed Liabilities.  Effective as of the Closing, Purchaser shall assume and agree to perform and discharge in full all liabilities and obligations of Seller to Wardman Tower Master Condominium (the "Master Condominium") to the extent relating to or arising from and after the Closing, including, without limitation, all such liabilities and obligations of Seller under the documents and agreements described on Schedule 5.2 attached to the Sale Agreement.  Sale Agreement § 5.2.

q.     Conditions/Termination.  Conditions of the Debtor's obligations to close the Sale include the following:  (a) Purchaser shall have deposited into Escrow the cash portion of Purchase Price, subject to adjustment for any prorations and credits provided hereunder, and all other monies required to be deposited by Purchaser hereunder; (b) Purchaser shall have deposited into Escrow all instruments and documents to be delivered by Purchaser to Seller at the Closing under the provisions of the Sale Agreement; (c) The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be unstayed and in full force and effect; (d) Purchaser shall have performed and satisfied all material covenants and material obligations of Purchaser under the Sale Agreement to the extent such covenants and obligations are to be performed or satisfied as of the Closing Date.  Sale Agreement § 6.2.

r.     Conditions to Purchaser's Obligations to Close.  The conditions of the Purchaser's obligation to close the Sale include the following: (a) Seller shall have deposited into Escrow all instruments and documents to be delivered by Seller to Purchaser at the Closing under the provisions of the Sale Agreement; (b) First American Title Insurance Company (the "Title Company") shall be irrevocably committed to issuing to Purchaser at the Closing an owner's title insurance policy, dated as of the Closing Date, in the full amount of the Purchase Price, showing title to the Real Property vested in the Purchaser, the form of which shall be CLTA standard coverage; provided that if Purchaser obtains an updated ALTA survey of the Property, in form sufficient to satisfy the requirements of the Title Company for the issuance of an ALTA owner's policy of title insurance, then the form shall be [ALTA (2006)] Standard Form B, with extended coverage (the "Title Policy"), which Title Policy shall be in the form and content of the Title Company's pro forma policy no. 3020-1052126 attached as Exhibit A to the Sale Agreement; (c) The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be unstayed and in full force and effect; and (d) Seller shall

have performed and satisfied all material covenants and material obligations of Seller under the Sale Agreement to the extent such covenants and obligations are to be performed or satisfied as of the Closing Date.  Sale Agreement § 6.1.

18.     The Debtor has determined that, in light of the Debtor's financial situation, liquidity needs, and value of the Assets, a more viable alternative to sale of the Assets does not exist.  The Debtor determined that the Sale of the Assets optimizes value for the estate and its creditors.

**Relief Requested**

19.     The Debtor is requesting that this Court, *inter alia*, (a) authorize the Sale of the Assets (including the assumption and assignment of any Assumed Contracts), to the Purchaser pursuant to the Sale Agreement, entered into in accordance with the Bid Procedures Order, (b) authorize such sale of the Assets to be free and clear of all liens, claims, rights, encumbrances or other interests pursuant to sections 105, 363(b), 363(f), and 363(m) of the Bankruptcy Code, with such liens, claims, rights, encumbrances and interests including, without limitation, any and all obligations to and claims asserted by UNITE HERE Local 25 and Local 99, International Union of Operating Engineers (collectively, the "Liens, Claims and Encumbrances") attaching to the sale proceeds of the Assets (the "Sale Proceeds") with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale; (c) authorize the assumption and assignment of the Assumed Contracts to the Purchaser, as applicable, pursuant to sections 363 and 365, and (d) grant such other relief as may be necessary or appropriate.

**Basis for Relief**

20.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

21.     A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so.  *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).  The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include:  the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the Property; and whether the asset is decreasing or increasing in value.  124 B.R. at 176.

22.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Purchaser is proceeding in good faith." *Id*.

23.     The Debtor has proposed the sale of the Assets after thorough consideration of all viable alternatives and has concluded that the Sale is supported by sound business reasons.  The Debtor has marketed the Assets as described in the Bid Procedures Motion and has proposed Bid Procedures designed to maximize the purchase price realized from the Sale of the Assets.

24.     The Debtor believes that, as a result of the marketing efforts that have been undertaken and that it will continue to undertake, the highest or otherwise best offer obtained through the proposed Bid Procedures will provide maximum value to the Debtor under the current circumstances.  Potential buyers and parties that have expressed interest in the acquisition of the Assets will be served with the Sale Motion and/or notice thereof.  The fairness and reasonableness of the consideration to be paid by the Purchaser is demonstrated by the marketing efforts that the Debtor has undertaken, and will continue to undertake, followed by a fair and reasonable sale process including a potential auction, and culminating in the Sale of the Assets.  As noted herein, notice of this Sale Motion has been or will shortly be served by the Debtor on potential bidders, as well as known putative lienholders.

25.     The Sale of the Assets is supported by sound business reasons and is in the best interests of the Debtor and its estate.  Accordingly, the Debtor requests approval under Bankruptcy Code section 363(b) of the Sale to the Purchaser, as set forth herein.

**The Proposed Sale Satisfies the Requirements of Section 363(f) of the**
**Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests**

26.     Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such Property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

27.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests."  The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000).  In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest."  209 F.3d at 258.  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in modern cases is toward "a broader interpretation which includes other obligations that may flow from ownership of the Property."  *Id.* at *258* (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]).  As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests.  Thus, the Third

Circuit in *Folger Adam* made clear that debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

28.    Furthermore, the Assets may be sold free and clear of obligations under collective bargaining agreements, including successorship provisions. *See In re Mission Coal Co., LLC*, No. 18-04177-TOM11, 2019 Bankr. LEXIS 660 (Bankr. N.D. Ala. Mar. 1, 2019) (permitting sale free and clear of successorship provisions of collective bargaining agreement where after a fulsome sale process no viable bidder was willing to assume those obligations); *In re After Six*, 154 B.R. 876, 884 (Bankr. E.D. Pa. 1993) (permitting sale free and clear of collective bargaining agreement even where the other competing bidder was potentially willing to assume obligations to the employees); *In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 332-333 (Bankr. E.D. Va. 2016) (permitting sale free and clear of successor provisions of collective bargaining agreements); *In re Lady H Coal Co.*, 193 B.R. 233, 246 (Bankr. S.D. W. Va. 1996) (finding that even where Debtor had not met the standard for rejection of the collective bargaining agreement, the debtor could still sell its assets free and clear of those interests because to do otherwise would effectively allow the union to enjoin the sale of property and "no law permits this Court to impose such a penalty on all creditors in the case.").

29.    Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all of the applicable Liens, Claims and Encumbrances, except with respect to any Liens, Claims and Encumbrances permitted under the Sale Agreement.  *See Citicorp Homeowners*

*Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtor submits that each Lien, Claim and Encumbrance that is not an assumed liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Lien, Claim or Encumbrance will be adequately protected by either being paid in full at the time of Closing, or by having it attach to the Sale Proceeds, subject to any claims and defenses the Debtor may possess with respect thereto.[8]  The Debtor accordingly requests authority to convey the Assets to the Purchaser, free and clear of all Liens, Claims and Encumbrances except for the Liens, Claims and Encumbrances that expressly permitted under the terms of the Sale Agreement (including, without limitation,  and all obligations to and claims asserted by UNITE HERE Local 25 ("Local 25") and Local 99, International Union of Operating Engineers ("Local 99" and together with Local 25, the "Unions")), with such Liens, Claims and Encumbrances to attach to the Sale proceeds, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the Sale Agreement and the Sale Order.[9]

30.     The Debtor has conducted a UCC search and other lien searches of purported lienholders in conjunction with the proposed sale of the Assets.  The Debtor either has served or will serve such purported lienholders with notice of this Sale Motion, and will serve notice of the Sale Order on such parties if and when such order is entered by the Court.

---

[8] The allowed secured claim of Pacific Life shall be paid at the Closing, less amounts to pay anticipated allowed administrative expenses, if any, to which Pacific Life agrees or as to which the Court orders a reserve at the Sale Hearing, except as otherwise provided in the Sale Order.

[9]  With respect to the obligations, if any, to and claims asserted by the Unions in connection with those certain *Owner's Letters* between each union and the Debtor, respectively, the Debtor reserves its rights prior to the Sale Hearing to provide for or require the assumption by Purchaser of such Owner's Letters and the assumption of any obligations associated therewith.

Accordingly, this Court should approve the Sale of the Assets to the Purchaser, free and clear

of Liens, Claims and Encumbrances under Bankruptcy Code section 363(f), and any potential

claimants should be compelled to look exclusively to the proceeds of the Sale for satisfaction

of their claims.

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

31.      Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of Property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such Property
> in good faith, whether or not such entity knew of the pendency of
> the appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in

turn, that a trustee may avoid a sale under such section if the sale price was controlled by an

agreement among potential bidders as the sale.  *See* 11 U.S.C. § 363(n).  Although the

Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a Buyer's good
> faith status at a judicial sale involves fraud, collusion between
> the Buyer and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

32.      The Debtor intends to make an appropriate showing at the Sale Hearing that the purchase agreement with the Purchaser is a negotiated, arms' length transaction, in which the Purchaser at all times has acted in good faith under and otherwise in accordance with such standards.  The Debtor will request at the Sale Hearing that the Court find that the Purchaser or the Successful Bidder has purchased the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

### Authorization of Assumption and Assignment of Assumed Contracts

33.      At the Closing, the Debtor may seek to assume and assign to the Purchaser all or certain of the Assumed Contracts.[10]  The list of the Assumed Contracts, if any, will be attached to the Sale Agreement with the Purchaser.

34.      The Purchaser, shall assume and be responsible for payment of any Cure Costs that may be owed to any counterparty to the Assumed Contracts.  The Purchaser shall also be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts.  The Debtor proposes that the Court make its determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing.

---

[10]  The inclusion of any agreement in the list of Assumed Contracts does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included in the list of Assumed Contracts.

The Debtor further proposes that Cure Costs disputed by any counterparty will be resolved by the Court at the Sale Hearing.

> 35.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:
>
>> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>>
>> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>>
>> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

36.     Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision.  *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977).  A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors.  *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The potential assumption and assignment of the Assumed Contracts, or any of them, set forth in the Sale Agreement, will be a necessary part of the deal that Debtor has struck with the Successful Bidder and, as stated above, will benefit the estate of Debtor.

37.     With respect to Assumed Contracts to be potentially assumed and assigned pursuant to the Sale Agreement, the Debtor will send the Cure Notices to all Assumed Contract counterparties in accordance with the Bid Procedures Order, thereby notifying such counterparties of the potential assumption by the Debtor and assignment of the Assumed Contracts at the Sale Hearing to the ultimate Purchaser of the Assets.  The Cure Notices will set forth the Cure Costs owing on each of the Assumed Contracts, according to the Debtor's books and records and, in accordance with the provisions set forth in the Bid Procedures, shall be  the amounts required to be paid pursuant to section 365(b)(1) of the Bankruptcy Code.

38.     Cure Costs disputed by any counterparty will either be considered by the Court either at the Sale Hearing or, to the extent the Court deems appropriate, at some later

date as may be scheduled by the Court to determine contested objections regarding Cure Costs, which have not been resolved in advance or at the Sale Hearing.  With respect to payment of Cure Costs, the Purchaser shall bear and pay the entire amount of such costs.

39.    The Purchaser or Successful Bidder is responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any Assumed Contract.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  *See also In re Natco Indus., Inc*., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  Because the identity of the Purchaser will not be known until after any auction pursuant to the Bid Procedures, the Debtor requests that objections on adequate assurance grounds be considered either at the Sale Hearing, or at a continued hearing to the extent the Court determines appropriate.  Moreover, any potential Purchaser will be required to provide to the Debtor evidence that the bidder can provide adequate assurance of future performance with respect to any of the Assumed Contracts it wishes to acquire at the time it submits its bid.

40.     Finally, the Debtor will not sell any individuals' personal information to the Purchaser.  Therefore, the Debtor believes that the appointment of an ombudsman pursuant to section 332 of the Bankruptcy Code is not required in this case.

**Debtor's Request for Waiver of Automatic**
**Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

41.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen (14) days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

42.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, commentators agree that the stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  *See generally* 10 COLLIER ON BANKRUPTCY ¶ 6004.09 (15th ed. 1999). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id.*  Because of the potentially diminishing value of the Assets and the financing

conditions imposed under the Final DIP Order, the Debtor must close this sale promptly after all closing conditions have been met or waived.

**Notice**

43.    Notice of the Sale Motion shall be provided to (a) the Office of the United States Trustee; (b) counsel to the Debtor's prepetition and postpetition secured lender; (c) the Debtor's largest unsecured creditors; (d) ) all entities known to have expressed an interest in bidding on the Assets; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtor respectfully submits that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

**Conclusion**

44.    The Debtor's proposed sale of the Assets as described in this Sale Motion is supported by sound business reasons, as set forth herein.  The proposed Sale is proper, necessary and serves the best interests of the Debtor, its estate and creditors and all parties in interest.  The Debtor thus requests that the Court approve the proposed Sale of the Assets free and clear of all interests, liens, claims, and encumbrances, as requested, to the Purchaser.

**No Prior Request**

45.    No prior request for the relief sought in this Sale Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court (i) grant this Sale Motion and authorize the sale and transfer of the Assets (including any Assumed Contracts) to the Purchaser and approve the Sale Agreement, pursuant to the attached proposed order; (ii) approve the form and manner of notice of this Sale Motion, and of the proposed sale and assumptions and assignments of the Assumed Contracts; and (iii) grant such other and further relief as is just and proper.

Dated: June 18, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

   */s/ Timothy P. Cairns*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        tcairns@pszjlaw.com

*Counsel to the Debtor and Debtor in Possession*