# EXHIBIT 1

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| **In the Matter of the Arbitration** | **Grievance: Debtors Obligations Under** |
| **between** | **the Collective Bargaining Agreement** |
| **International Union of** | **AAA No.: 01-21-0003-9854** |
| **Operating Engineers (IUOE), Local 99,** | |
| **and** | |
| **Wardman Hotel Owner, LLC** | |

**OPINION AND AWARD:**  Dr. Andrée Y. McKissick, **ARBITRATOR**

**APPEARANCES:**

For Management:    Peter G. Fischer, Esquire
Baker & Hostetler, LLP
1050 Connecticut Avenue, NW, Suite 1100
Washington, DC 20036-5304

For Union:    Robert E. Paul, Esquire
Zwerdling Paul Kahn & Wolly, PC
1025 Connecticut Avenue, NW, Suite 1000
Washington, DC 20036-5420

**PLACE OF HEARING:**    Baker & Hostetler, LLP
1050 Connecticut Avenue, NW, Suite 1100
Washington, DC 20036-5304

**DATE OF HEARING:**    June 18, 2021

**DATE OF AWARD:**    July 5, 2021

**AWARD:**    This Arbitrator finds that under the provisions of the Owner's Letter and upon the January 11, 2021 termination of the Marriott as the Operator, the Debtor became bound to Marriott's Collective Bargaining Agreement (CBA) with Local 99. Consequently, the Debtor is contractually required to the exacting requirements of paragraph four (4) and paragraph five (5) of the Owner's Letter, to make a "written, material condition" of the approaching sale of the hotel that the buyer must assume and be bound by the Local 99 CBA.

**BACKGROUND**

This case arose from a Joint Motion of Unite Here, Local 25 and International Union of Operating Engineers (IUOE), Local 99 for Relief from a Stay to Pursue Arbitration to Determine Debtor's Contractual Obligation to the Movants. This Court entered this Order on May 18, 2021 after a May 11, 2021 hearing. The Honorable John T. Dorsey, in the United States Bankruptcy Court for the District of Delaware granted this motion. He ordered as follows:

1. The Motion is Granted, as set forth herein.

2. The Unions are granted relief from the automatic stay to pursue arbitration with the Debtor to determine whether, under the provisions of the Owner's Letter, upon its termination of Marriott as operator on January 11, 2021, the Debtor became contemporaneously bound to Marriott's Collective Bargaining Agreements with Unite Here, Local 25, and IUOE, Local 99 and their respective terms and conditions as a successor (Exhibit L99-3).

**STATEMENT OF FACTS**

Wardman Park Hotel Owner, the Debtor, filed for reorganization through Chapter 11 of the United States Bankruptcy Code in the federal district bankruptcy court in Wilmington, Delaware on January 11, 2021. This was the same day that the Operator, the Marriott, was terminated. The Wardman Park Hotel is a luxury hotel and hospitality facility in the Woodley Park neighborhood in Washington, DC. This property has one thousand, one hundred and fifty-three (1,153) rooms in three (3) towers with an outdoor swimming pool, sundeck, and extensive meeting spaces. Local 99 has represented the engineering staff at the hotel for more than fifty (50) years under a series of collective bargaining agreements (CBAs). However, in March 2020, this hotel, like many others, was adversely affected by the Covid-19 pandemic.

This resulted in the hotel's closure to the public.  In turn, most of the staff of Local 99 employees were laid off.  On or about October 1, 2020, an Independent Manager James Decker was appointed by the Owner (Debtor) to manage the property.  Subsequently, Manager Decker decided to terminate Marriott's contract and file for bankruptcy on January 11, 2021.  His aim was to sell the property to the highest bidder.  Thus, Manager Decker arranged a "Debtor in Possession" (DP) loan financed by Pacific Life Insurance Company.

The record reflects that Manager Decker entered into two (2) significant contracts. The first contract was with Eastdil Secured, LLC, to market this real estate.  Eastdil produced a marketing brochure entitled "Confidential Offering Memorandum" for potential buyers. The second contract was with PDSI to provide maintenance services on the property to bring "stasis" in the interim.  The United States Bankruptcy Code allows labor agreements special protections.  Thus, collective bargaining agreements cannot be rejected by a debtor without first following the specific requirements and procedures set forth in 11 USC §1113.  Based on the foregoing, Wardman Park Hotel Owner (the Debtor) with IUOE Local 99 and Local 25 agreed to an evidentiary hearing, consolidated by this Arbitrator who was jointly selected by all parties in adherence to an expedited briefing schedule and hearing on Friday, June 18, 2021.  Exhibits were offered and made part of the record and oral arguments were heard.  Post-hearing briefs were delivered on June 25, 2021.  Two (2) awards will issue on July 6, 2021 to comply with the schedule set forth by Judge Dorsey for a timely resolution of this case.

**ISSUE:**

**Whether or not, under the provisions of the Owner's Letter, upon its termination of Marriott as operator on January 11, 2021, the Debtor became contemporaneously bound to Marriott's Collective Bargaining Agreements (CBAs) with**

**Unite Here, Local 25 and IUOE, Local 99 and their respective terms and conditions as a successor?**

**PERTINENT PROVISIONS**

**EXHIBIT B**
**OWNER'S LETTER**
_____, 2019

[Name]
[Title]
**International Union of Operating Engineers, Local 99**
**9315 Largo Drive West, Suite 200**
**Upper Marlboro, MD 20774**

Re: [Name of Hotel]

Dear _____:

[NAME OF OWNER] (the "Owner") is the owner of the hotel doing business as the [NAME OF HOTEL] (the "Hotel"). We acknowledge that International Union of Operating Engineers, Local 99-99A (the "Union") has entered into a collective bargaining agreement dated January 15, 2019 to October 31, 2023 ("CBA") with [NAME OF OPERATOR] ( "Operator") and that [OPERATOR] operates the Hotel as "Employer" pursuant to an agreement with Owner.

In consideration of the Union entering into the CBA with Operator for the Hotel, Owner agrees to be bound by the Successorship provisions (Art. 5.22) of the CBA which apply to Owner.

In the event that Operator ceases to operate or manage the Hotel, in whole or in part, and the property continues to be operated as a hotel, with or without hiatus, then any replacement operating entity (or, if there is no replacement operating entity, Owner),[1] shall contemporaneously be bound by the CBA and its terms and conditions as a successor under the CBA.

In such a case, the CBA shall be binding upon Owner, or the replacement operating entity, and no provisions, terms, or obligations contained in the CBA shall be affected, modified, altered, or changed in any respect whatsoever by the

---

[1] [REIT footnote: "Owner, as a REIT, has no intention, given its current structure, of operating the Hotel."]

consolidation, merger, sale, transfer, or assignment or by any change of any kind in the legal status, ownership, or management.  Owner or the replacement operating entity, as the case may be, shall assume all of the obligations under the CBA of Operator to the employees, the Union and/or to any of the funds to which the Hotel is required to contribute under the CBA.[2]  Where a replacement operating entity assumes the CBA and Owner remains the same, Owner shall continue to be bound by this letter.

Owner shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel that the entity assuming such majority ownership, management or operational control ("Transferee") must assume and be bound in writing (a) to the CBA, if the Transferee is an operator or manager of the Hotel, or (b) to the terms of this letter agreement, if the Transferee obtains an ownership interest in the Hotel.

The parties agree that the obligations concerning notice of any transaction subject to this letter shall be provided as required in Article 5.22 of the CBA, and that Owner is bound by those provisions.

## COLLECTIVE BARGAINING AGREEMENT
by and between
### CAPITOL EMPLOYMENT SERVICES, LLC
### EMPLOYER AT THE MARRIOTT WARDMAN PARK HOTEL
and
### LOCAL 99-99A, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFFILIATED WITH THE GREATER WASHINGTON CENTRAL LABOR COUNCIL, AFL-CIO AND THE MARYLAND STATE AND DISTRICT OF COLUMBIA AFL-CIO
[January 15, 2019 – October 31, 2023]
(Exhibit L99-1)

### ARTICLE V – Miscellaneous

Section 22 – Successorship:

(a)  In the event the Employer sells or by other contractual arrangement to which it is a party transfers all or part of its management of the Hotel to another party, the Employer shall require, as a condition of such transaction, that the other party be bound by the terms and provisions of this Agreement, or

---

[2] [REIT footnote: "Owner, as a REIT, has no intention, given its current structure, of operating the Hotel."]

offer satisfactory proof (in writing to the Employer and to the Union) that the Employer has made an arrangement with the Union satisfactory to the Union.

(b)  The Employer confirms that the owner(s) of the Hotel, as a condition of this Agreement, agree to be bound by all the provisions of the Owner's Letter (attached hereto as Exhibit B incorporated by reference in this Agreement), and shall execute a copy of such Letter and deliver the same to the Union within five (5) business days following receipt by the owner(s) of a written request from the Union.  Failure by the owner(s) to adhere to the time period specified in this subsection shall be grounds for voiding the Union's obligation under Article 6.3 of the Agreement to refrain from striking and engaging in other economic activity until the owner(s) executes and delivers such letter to the Union.

(c)  Notice of any transaction subject to this Article or to the Owner's Letter shall be delivered to the Union, in writing, no later than fifteen (15) calendar days prior to the closing of the transaction.  Such notice shall include the full and complete identity of the transferee, together with a duly executed copy of the pertinent provisions of the transaction agreement establishing that the obligations created by this Article have been met.  Said notice will be held by the Union in strict confidence and, upon request of the Employer, the Union will sign a nondisclosure agreement with terms mutually acceptable to the Employer and the Union, provided, however, that such nondisclosure agreement will be ineffective if either the Employer fails to strictly comply with all provisions of this Article, or the Owner(s) fail to strictly comply with its obligations under this Article and the Owner's letter.

## POSITIONS OF THE PARTIES

It is the Owner's position that the Wardman Park Hotel did not assume the obligations of the Collective Bargaining Agreements (CBAs) because the Owner's Letter was an unsigned, separate document, when it terminated the Operator, Marriott, on January 11, 2021. Thus, the Owner maintains that the Union cannot enforce such an agreement.  In other words, the Union's relationship is with the Operator only, not the Owner due to the unsigned Owner's Letter.  It is the position of the Owner that the sole issue before this Arbitrator is:

whether or not the Owner has continued hotel operations at the property after it fired the Operator?  Thus, it is the position of the Owner that the answer is unequivocally no.

The Owner further explains that for it to be bound to the Collective Bargaining Agreements (CBAs) that a continuation of hotel operations must be found, after the termination of the Operator.  However, the Owner argues that this simply did not happen here.  Specifically, the Owner points out that it has no employees, does not plan to have any employees, has no revenue, has no forecast to have any revenue, has not engaged in any hotel operations and will sell this property as a real estate asset to the highest bidder in less than a month.  Stated differently, the Owner strenuously argues that to require that it assume the obligations of the Collective Bargaining Agreements (CBAs), the Union must show that it fired the Operator and continued to operate the property as a hotel, with or without hiatus. Thus, the Owner further asserts that the Union cannot meet this burden.  That is, there are two (2) condition precedents which must be met, the Owner reasons.

In response to the Union's assessment that PDSI is performing the work of operating a hotel during this hiatus, the Owner retorts that the fact that boilers, fire systems, and HVAC are being maintained does not constitute evidence that hotel operations are continuing.  In other words, the Owner further asserts that the mere maintenance of these common systems does not mean that this hotel is in an operating status.  In sum, the Owner urges the Arbitrator to make an adverse inference of the absence of any indicia or a showing that there is evidence of the continuing operation of a hotel since closure, as the Union contends.

Moreover, the Owner adds that no part of the Owner's Letter or the Collective Bargaining Agreements (CBAs) would obligate a successor or employer to hire bargaining unit employees.  It reasons that there is no employment relationship between the Owner and the Operator's former bargaining unit employees.

Still further, the Owner points to case law, asserting that where an employer does not presently employ employees that it is impermissible for it to recognize any union or become a party to a collective bargaining agreement with a union (see CRN-Vi-Ro Pipe Co., 180 NLRB 344 at 346 (1969). Additionally, the Owner notes that if an entity recognizes a union without having any employees or the entity is not yet engaged in normal operations, then both the union and the entity would be in violation of federal labor law (see Elmhurst Care Center, 345 NLRB 1176 at 1177 (2005)).

Based on this analysis, the Owner further reasons that since it has not hired any employees for the union to represent that it would be illegal for the Owner to recognize the union. Thus, the Owner sums up that a company that employs no bargaining unit employees cannot be compelled to assume a collective bargaining agreement for the operation of a business that it does not run. Based on the foregoing, the Owner maintains that it cannot assume or be bound by the Collective Bargaining Agreements (CBAs) under the terms of the Owner's Letter because it has not continued to operate the hotel, as enumerated. Still further, it has not employed employees to operate the hotel; thus, it is not engaged in the business of operating a hotel. Based on the foregoing, the Owner concludes that it cannot be bound by the unsigned Owner's Letter nor the Collective Bargaining Agreements (CBAs).

On the other hand, it is the Local 99's position that the argument regarding the unsigned Owner's Letter was resolved by Judge Dorsey. That is, the Union asserts that the court expressly rejected this contention. Moreover, the Union adds that the Judge stated that the unsigned Owner's Letter was of "no consequence" because the Owner (Debtor) was "aware of it" and "reaped the benefits from it." Thus, the Union strongly asserts that the Owner is bound by not only the Owner's Letter but also Section 5.22(a)(b) and (c) of the Collective Bargaining Agreement (CBA).

Focusing on the continuing operation of a hotel that the Owner points out as a condition precedent to one's obligations under the CBA, the Union rebuts that the Wardman Park Hotel is still today an operating hotel in hiatus.  However, the Union asserts that this premise is true in spite of the fact that it is not currently accepting overnight guests or holding conferences in its meeting rooms.  This is because the Debtor is keeping the property in "stasis" for a future owner to reopen the facility as another hotel.  Stated differently, the Union maintains that it is operating as a hotel now even though it is currently closed to the public and termed a "hiatus."  The Union points to the language "with or without a hiatus" in the Owner's Letter which reflects this temporary pause.

It is important to also note that the Debtor is concurrently taking active steps to maintain the property for future use as a hotel through marketing it as such.  Moreover, the Union also points out that the PDSI has hired non-union workers who are currently performing the same duties as Local 99 performed before Marriott's closure.

In regards to Section 5.22, the successorship provision, the Union points out that this language developed and evolved from 2018-2019 contract negotiations between Local 99 and the Hotel Association of Washington, DC.  Due to a long-standing relationship between Local 25 and Local 99, Local 99 adopted the successorship language of Local 25.  Currently, the Owner's Letter and the associated successorship language 5.22 are part of Local 99's Collective Bargaining Agreement (CBA).  Local 99 asserts that this language is clear, straight-forward and unambiguous because it reflects the intent of the Parties in all three (3) parts of Section 5.22 and the express words of the Owner's Letter.  Since the Operator ceases to exist, the Owner (the Debtor) shall contemporaneously be bound by the CBA.

Lastly, the Union also points out that the omission of these words, "for any use covered by the CBA," was inadvertently omitted by pure mutual mistake. Thus, Local 99 adds that its Collective Bargaining Agreement (CBA) differs from the wording of Local 25's Owner's Letter. Nonetheless, the Union contends that the Owner's obligations under the CBA are the same; and the Debtor is bound as well by successors through the mutual content of the Parties.

## FINDINGS AND DISCUSSION

After a careful review of the record in its entirety, and after having had the opportunity to weigh and evaluate the witnesses, this Arbitrator finds that under the provisions of the Owner's Letter and upon the January 11, 2021, termination of the Marriott as the Operator of the hotel that the Debtor became contemporaneously bound to Marriott's Collective Bargaining Agreement (CBA) with the International Union of Operating Engineers (IUOE) Local 99 and its respective terms and conditions as a successor through Article 5.22, incorporated by reference in the Owner's Letter. Consequently, the Debtor is contractually required, pursuant to the precise requirements of paragraphs four (4) and five (5) of the Owner's Letter, to make a "written, material condition" of the approaching sale of the hotel that the buyer must assume and be bound by the Local 99 CBA for the following reasons.

First, according to the transcript (Exhibit L 99-2) before the Honorable John T. Dorsey, United States Bankruptcy Judge on May 11, 2021 on the issue of the unsigned Owner's Letter, he states the following:

> The question as to whether Local 99 is — — whether their Agreement was actually signed by the Debtor I think is of no consequence because, while it's not signed, the Debtor was aware of it. It was integral to the entry into the CBA between the Union and Marriott.
>
> Marriott operated the hotel for the benefit of the Debtor pre-petition for many years. And therefore I can come to the conclusion that the Debtors were well aware of this Owner Agreement. Even though they may not have signed it, they reaped the benefits from it, therefore they cannot now disavow it.

Based upon this prior ruling on this issue, this matter was not reconsidered in the Friday, June 18, 2021 hearing. Thus, this Arbitrator finds the Owner's Letter, Exhibit B of the CBA (Exhibit L-99-1) to be operative in its unsigned state.

Second, focusing now upon the language of the Owner's Letter, it states as follows:

> In consideration of the Union entering into the CBA with the Operator for the Hotel, Owner agrees to be bound by the Successorship provision (Art. 5.22) of the CBA which apply to Owner.
>
> In the event that Operator ceases to operate or manage the Hotel, in whole or in part, and the property continues to be operated as a hotel, with or without hiatus, then any replacement operating entity (or if there is no replacement operating entity, Owner, shall contemporaneously be bound by the CBA and its terms and conditions under the CBA.
>
> In such a case, the CBA shall be binding upon Owner, or replacement operating entity, and no provisions, terms, or obligating contained in the CBA shall be affected, modified, altered or changed in any respect whatsoever by the consolidation, merger, sale, transfer, or assignment or by any change of any kind in the legal status, ownership, or management. Owner or the replacement operating entity, as the case may be, shall assume all the obligations under the CBA of Operator to the employees, the Union and/or to any funds to which the Hotel is required to contribute under the CBA. Where a replacement operating entity assumes the CBA and the Owner remains the same, Owner shall continue to be bound by this letter.
>
> Owner shall make it a written material condition of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel that the entity assuming such majority ownership, management or operational control ( "Transferee") must assure and be bound in writing (a) to the CBA, if the Transferee is an operator or manager of the Hotel, or (b) to the

> terms of this letter agreement, if the Transferee obtains an ownership interest in the Hotel.
>
> The Parties agree that the obligations concerning notice of any transaction subject to this letter shall be provided as required in Article 5.22 of the CBA, and that Owner is bound by those provisions.

This language is clear and unambiguous and states that the Owner is bound by Owner's Letter, which incorporates by reference, Article 5.22, the successorship provision of the Collective Bargaining Agreement (CBA). Moreover, it continues that if there is no operator, then the owner must assume the obligations of the CBA. Still further, it requires that the property be operational for the Owner to be contemporaneously be bound. It is significant to note that the Debtor is bound as well as the Transferee. That is, the Owner is required to make a "written material condition" of the sale or transfer to the "Transferee" to also assume the obligations of the Owner's Letter as well as be concurrently bound by the Local 99's CBA.

Third, as to whether the property is currently operational, the Debtor explains that there are no employees, no revenue and the property has not engaged in any hotel operations. However, Eastdil Secured, the Debtor's broker, produced a marketing brochure (Exhibit O-4), which contradicts this assertion. The brochure is entitled "Confidential Offering Memorandum." In the "Executive Summary," entitled "The Offering," it describes in colorful details the grounds of Wardman Park as "a rare 12.8 acre parcel" with "1,153-room structure formerly operated as a large scale convention hotel." Still further, it states that it "offers a new owner the unprecedented opportunity to reimage the future of a storied property in the District of Columbia as a transformational redevelopment or revitalized lodging facility."

In addition to this type of marketing, Manager Decker also contracted with PDSI (Exhibit O-2) where maintenance tasks, formerly performed by Local 99, are now maintained in "stasis" on this property by non-union employees.  The usage of a non-union workforce in conjunction with this aggressive marketing by Eastdil Secured is jointly indicative of an operational "stasis" of property, which is actively preparing to reopen.  Local 99's Business Agent, Raymond Stack, testified to this assessment at TR-253.   Moreover, Independent Manager Decker also conceded that the continuing maintenance was so that a new owner could operate a hotel (TR-135-138).  The totality of evidence suggests to this Arbitrator that this property is in operational stasis, awaiting a new owner who will quite likely use the property for another hotel.

Fourth, it is important to note that the language of Local 99's Owner's Letter and its current successorship provisions of Article 5.22 was derived and evolved from Local 25's long-standing relationship with each other.  In 2018-2019 in its contract negotiations, the Chief Negotiator Olmstead of Local 99 contracted Local 25's Executive Secretary-Treasurer John A. Boardman for his insight.  Thereafter Negotiator Olmstead forwarded the Hotel Association's proposed new language on successorship.   In turn, Secretary-Treasurer Boardman sent Local 99 a copy of their current and broader successorship language and also informed him about Local 25's Owner Letter.  Notice that the language "for any use covered by the CBA" was omitted inadvertently in Local 99's contract.  This was a mutual mistake. In sum, both the Owner's Letters are strikingly similar except as noted.   However, the Owner's assumptions of obligations are identical for both, Local 99 and Local 25.

Fifth, Local 99 rightly points out several analogous cases.  In particular, Southern Connecticut Newspaper, Inc. versus International Union, United Auto Aerospace and

<u>Agricultural Implement Workers and Local 2110, VAM</u>, Arbitrator David Vaugh, Esq., also found that the contract language regarding a successorship provision to be clear and unambiguous, as here.  Specifically, he found that the Parties' intent is reflective in their choice of words utilized in a given provision.  As Local 99 also points out that the specific language in their Owner's Letter is significant because it was intentionally lifted by the Parties in their 2018-2019 negotiations from the existing successorship provisions of the Local 25 contract.  As to the importance of mutual intent of the Parties, <u>Globe Newspaper Company, 74 LA 1261 (Arbitrator Kates, 1980)</u> was cited as was <u>City of Canton, 131 LA 51 (Arbitrator Szuter, 2012)</u>.  On the issue of mutual mistake, requiring the reformation of the contract to show mutual intent, Local 99 cites <u>Golden Eagle Construction Company, 189 LA 1057 (Arbitrator Miles, 1997)</u>.

Based on all the foregoing, this Arbitrator concludes that the Debtor became contemporaneously bound to Marriott's Collective Bargaining Agreement (CBA) with IUOE Local 99 and its respective terms and conditions as a successor.

## AWARD

> This Arbitrator finds that under the provisions of the Owner's Letter and upon the January 11, 2021 termination of the Marriott as the Operator, the Debtor became bound to Marriott's Collective Bargaining Agreement (CBA) with Local 99.  Consequently, the Debtor is contractually required to the exacting requirements of paragraph four (4) and paragraph five (5) of the Owner's Letter, to make a "written, material condition" of the approaching sale of the hotel that the buyer must assume and be bound by the Local 99 CBA.

_____
**ARBITRATOR**

DATE OF AWARD:  July 5, 2021

C:\AAA\AAA-IUOE, Local 99 (DC) July 5,2021.docx