# EXHIBIT 2

**AMERICAN ARBITRATION ASSOCIATION**

|  |  |
|---|---|
| In the Matter of the Arbitration<br><br>between<br><br>Unite Here, Local 25,<br><br>and<br><br>Wardman Hotel Owner, LLC | Grievance: Debtors Obligations Under the Collective Bargaining Agreement<br><br>AAA No.: 01-21-0003-9854 |

**OPINION AND AWARD:** Dr. Andrée Y. McKissick, **ARBITRATOR**

**APPEARANCES:**

    For Management:     Peter G. Fischer, Esquire
                                      Baker & Hostetler, LLP
                                      1050 Connecticut Avenue, NW, Suite 1100
                                      Washington, DC 20036-5304

    For Union:     Devki K. Virk, Esquire
                                        Joshua A. Rosenthal, Esquire
                                      Bredhoff & Kaiser, PLLC
                                      805 Fifteenth Street, NW, 10th Floor
                                      Washington, DC 20005

**PLACE OF HEARING:**     Baker & Hostetler, LLP
                                        1050 Connecticut Avenue, NW, Suite 1100
                                        Washington, DC 20036-5304

**DATE OF HEARING:**     June 18, 2021

**DATE OF AWARD:**     July 5, 2021

**AWARD:**     Based upon the provisions of the Owner's Letter and upon the January 11, 2021 termination of the Marriott, this Arbitrator finds that the Debtor became contemporaneously bound to Marriott's Collective Bargaining Agreement (CBA) with Local 25. This Arbitrator further finds that the Debtor is contractually required to the specific requirements enumerated in paragraph four (4) and paragraph five (5) of the Owner's Letter, to make a "written, material condition" of the approaching sale of the hotel that the buyer must assume and be bound by the Local 25's CBA.

## BACKGROUND

This case arose from a Joint Motion of Unite Here, Local 25 and International Union of Operating Engineers (IUOE), Local 99 for Relief from a Stay to Pursue Arbitration to Determine Debtor's Contractual Obligation to the Movants. This Court entered this Order on May 18, 2021 after a May 11, 2021 hearing. The Honorable John T. Dorsey, in the United States Bankruptcy Court for the district of Delaware granted this motion. He ordered as follows:

1. The Motion is Granted, as set forth herein.

2. The Unions are granted relief from the automatic stay to pursue arbitration with the Debtor to determine whether, under the provisions of the Owner's Letter, upon its termination of Marriott as operator on January 11, 2021, the Debtor became contemporaneously bound to Marriott's Collective Bargaining Agreements with Unite Here, Local 25, and IUOE, Local 99 and their respective terms and conditions as a successor (Exhibit L99-3).

## STATEMENT OF FACTS

Wardman Park Hotel Owner, the Debtor, filed for reorganization through Chapter 11 of the United States Bankruptcy Code in the federal district bankruptcy court in Wilmington, Delaware on January 11, 2021. This was the same day that the Operator, the Marriott, was terminated. The Wardman Park Hotel is a luxury hotel and hospitality facility in the Woodley Park neighborhood in Washington, DC. This property has one thousand, one hundred and fifty-three (1,153) rooms in three (3) towers with an outdoor swimming pool, sundeck, and extensive meeting spaces. Local 25 represents approximately seven thousand, two hundred (7,200) hospitality industry employees, chiefly at the properties located in the Washington, DC metropolitan area. Local 25's members include workers in guest-facing roles such as:

servers, banquet personnel, and bell-stand staff, as well as housekeepers, cooks, dishwashers, laundry attendants, and other behind-the-scenes occupations. They are governed by the current Collective Bargaining Agreement (CBA) between Local 25 and the Hotel Association of Washington, DC, scheduled to expire in 2022, that reflects a mature, decades-long relationship for at least sixty (60) years. However, in March 2020, this hotel, like many others, was adversely affected by the Covid-19 pandemic. This resulted in the hotel's closure to the public. All Local 25 members were laid off; and the hotel's engineering staff, represented by International Union of Operating Engineers (IUOE), Local 99, reduced to a crew of five (5) people charged with monitoring and maintaining the property. On or about October 1, 2020, an Independent Manager James Decker was appointed by Pacific Life, in its capacity as a controlling member of the ownership entity, to manage the property. Subsequently, Manager Decker decided to terminate Marriott's contract and file for bankruptcy on January 11, 2021. His aim was to sell the property to the highest bidder. Thus, Manager Decker arranged a "Debtor in Possession" (DP) loan financed by Pacific Life Insurance Company.

The record reflects that Manager Decker entered into two (2) significant contracts. The first contract was with Eastdil Secured, LLC, to market this real estate. Eastdil produced a marketing brochure entitled "Confidential Offering Memorandum" for potential buyers. The second contract was with PDSI to provide maintenance services on the property to bring "stasis" in the interim. The United States Bankruptcy Code allows labor agreements special protections. Thus, collective bargaining agreements cannot be rejected by a debtor without first following the specific requirements and procedures set forth in 11 USC §1113. Based on the foregoing, Wardman Park Hotel Owner (the Debtor) with IUOE Local 99 and Local 25 agreed to an evidentiary hearing, consolidated by this Arbitrator who was jointly selected by

all parties in adherence to an expedited briefing schedule and hearing on Friday, June 18, 2021. Exhibits were offered and made part of the record and oral arguments were heard. Post-hearing briefs were delivered on June 25, 2021. Two (2) awards will issue on July 6, 2021 to comply with the schedule set forth by Judge Dorsey for a timely resolution of this case.

**OWNER'S ISSUE:**

**Whether or not the property continues to be operated as a hotel, after the Operator ceased operations?**

**UNION'S ISSUE:**

**Whether, under the provisions of the Owner's Letter, upon the termination of Marriott as Operator on January 11, 2021, the Owner became contemporaneously bound to Marriott's Collective Bargaining Agreement with Unite Here, Local 25, and its respective terms and conditions as a successor?**

**PERTINENT PROVISIONS**

**ADDENDUM V**
**Owner's letter [INCLUDING REIT OPTIONS]**

_____, 2012

**John A. Boardman**
**Executive Secretary-Treasurer**
**UNITE HERE Local 25**
**901 K Street, N.W. – 2nd Floor**
**Washington, D.C. 20001**

**Re: [Name of Hotel]**

**Dear Mr. Boardman:**

**[NAME OF OWNER]** (the "Owner") is the owner of the hotel doing business as the _____(the "Hotel"). We acknowledge that UNITE HERE Local 25 (the "Union") has entered into a collective bargaining agreement dated _____ ("CBA") with **[NAME OF OPERATOR]** ( "Operator") and that OPERATOR operates the Hotel as "Employer" under agreement with Owner.

In consideration of the Union entering into the CBA with OPERATOR for the Hotel, Owner agrees to be bound by the Leases and Sales provision (currently Art. 1.12) of the CBA. Nothing herein shall limit the Leases and Sales provision.

In the event that Operator ceases to operate or manage the Hotel, in whole or in part, and the property continues to be operated as a hotel, or any use covered by the CBA, with or without hiatus, then any replacement operating entity (or, if there is no replacement operating entity, Owner,[1] shall contemporaneously be bound by the CBA and its terms and conditions as a successor under the CBA.

In such a case, the CBA shall be binding upon Owner, or the replacement operating entity, and no provisions, terms, or obligations contained in the CBA shall be affected, modified, altered, or changed in any respect whatsoever by the consolidation, merger, sale, transfer, or assignment or by any change of any kind in the legal status, ownership, or management. Owner or the replacement operating entity shall assume all of the obligations under the CBA of Operator to the employees, the Union and/or to any of the funds to which the Hotel is required to contribute under the CBA.[2]

Where a replacement operating entity assumes the CBA and Owner remains the same, Owner shall continue to be bound by this letter.

Owner shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel that the entity assuming such majority ownership, management or operational control ("Transferee") must assume and be bound in writing (a) to the CBA, if the Transferee is an operator or manager of the Hotel, or (b) to the terms of this letter agreement, if the Transferee obtains an ownership interest in the Hotel.

The parties agree that the obligations concerning notice of any transaction subject to this letter shall be provided as required in Article 1.12 (e) of the CBA, and that Owner is bound by those provisions.

Nothing herein shall in any way detract or modify the obligations of Operator under the CBA.

…

---

[1] "Owner, as a REIT, has no intention, given its current structure, of operating the Hotel."
[2] "Owner, as a REIT, has no intention, given its current structure, of operating the Hotel."

**Any dispute arising from this letter agreement shall be subject to final and binding arbitration under the CBA as of the date signed in accordance with the scope and rules for arbitration set forth under the CBA.**

**The obligations described in this letter shall survive expiration of the CBA, and shall continue in full force and effect until either (a) a new CBA covering the Hotel is reached, or (b) two (2) years following expiration of the CBA, whichever occurs sooner. The two (2) year period shall be extended by any agreed-upon extensions of the CBA. The parties to this letter agreement agree that any disputes arising from this letter agreement following expiration of the CBA shall remain subject to the grievance and arbitration procedures (Article XVII of the CBA), and specifically agree that Article XVII, and all of its provisions, shall remain in effect following expiration of this Agreement for the purpose of enforcing the provisions of this letter.**

**We trust that the above correctly sets forth our agreement with the Union. Kindly confirm our agreement by signing below and returning one copy to me, the original being for your files.**

**Thank you for your cooperation.**

**Very truly yours,**

**By:_____**

**Title:_____**

**Dated:_____**

**AGREED AND ACCEPTED**
**BY UNITE HERE LOCAL 25**
**By:_____**
   **John A. Boardman, Executive Secretary-Treasurer**

**Dated:_____**

**AGREEMENT between UNITE HERE LOCAL 25**
**and HOTEL ASSOCIATION OF WASHINGTON, DC**
**[September 16, 2010 – September 15, 2022]**
**(Local 25 Exhibit 3)**

**ARTICLE 1 – Union Representation and Membership**

**Section 12 – Leases and Sales:**

  (a) *Sales and Transfers:*  **In the event the Employer sells or by other contractual arrangement transfers all or part of his business to another party, the Employer shall require, as a condition of such transaction, that the other party be bound by**

the terms and provisions of this Agreement, or other satisfactory proof (in writing to the Employer and to the Union) that he has made an arrangement with the Union satisfactory to the Union.

(b)  *Leases and Other Transactions:*  In the event the Employer leases or by other contractual arrangement enters into a concession arrangement regarding all or part of his business to another party, the Employer shall require, as a condition of such arrangement, that the other party retain all existing employees and provide terms and conditions of employment no less favorable than those in effect prior to the transaction.

(c)  The Employer confirms that the owner(s) of the Hotel, as a condition of this Agreement, agree to be bound by all of the provisions of the Owner's Letter (attached hereto and incorporated by reference in this Agreement as Addendum V), and shall execute a copy of such Letter and deliver the same to the Union within five (5) business days following receipt by the owner(s) of a written request from the Union, delivered via certified mail or hand-delivery.  Failure by the owner(s) to adhere to the time period specified in this subsection shall be grounds for voiding the Union's obligation under Article XVIII of the Agreement to refrain from striking and engaging in other economic activity until the owner(s) executes and delivers such letter to the Union.

(d)  The parties expressly agree that the obligations described in this Section shall remain in effect following expiration of this Agreement, and shall continue until either (a) a new Agreement between the parties is reached, or (b) two (2) years following expiration of the Agreement, whichever occurs sooner.  The two (2) year period shall be extended by any agreed-upon extensions of the Agreement.  Further, the parties agree that any disputes arising under this Section shall remain subject to the grievance and arbitration procedures described in Article XVII of this Agreement, and specifically agree that Article XVII shall remain in effect following expiration of this Agreement for the sole purpose of enforcing the provisions of this Section.

(e)  Notice of any transaction subject to this Section or to the Owner's Letter shall be delivered to the Union, in writing, no later than thirty (30) calendar days prior to the closing of the transaction.  Such notice shall include the full and complete identity of the transferee, together with a duly executed copy of the pertinent provisions of the transaction agreement establishing that the obligations created by this Section have been met.  Said notice will be held by the Union in strict confidence and, upon request of the Employer, the Union will sign a nondisclosure agreement with terms mutually acceptable to the Employer and the Union, provided, however, that such nondisclosure agreement will be ineffective if either the Employer fails to strictly comply with all provisions of this

> Section, or the Owner(s) fail to strictly comply with its obligations under this Section and the Owner's Letter.

## POSITIONS OF THE PARTIES

It is the Owner's position that the Union bears the burden of establishing that it violated the Owner's Letter because the Union is the charging party. Moreover, the Owner points out that the Union must also support this burden by a preponderance of evidence that: (a) there is no replacement operation company to replace Marriott, and (b) the Owner continued to operate the property as a hotel upon the termination of the Operator. The Owner submits that the Union cannot meet this burden because the prerequisites that would require assumption of the Collective Bargaining Agreement (CBA) by the Owner have not been met. That is, both prerequisites must be met: the Operator ceased operating the property as well as the Owner continued to operate the property as a hotel. Thus, the Owner reasons that the plain meaning of the Owner's Letter precludes this assumption. The pivotal issue, the Owner asserts, is: whether or not the property continues to be operated as a hotel, after the Operator ceased operations? In other words, the Owner contends that a hotel is defined as "an establishment that provides lodging and usually meals, entertainment and various personal services to the public." Therefore, the Owner reasons that it cannot be bound by the Owner's Letter if it no longer conducts business or provides lodging, meals, entertainment or various personal services for the public or transient guests. Thus, it follows, the Owner contends, that the Owner's actions are consistent with not operating this property as a hotel. Most importantly, the Owner asserts that it decreased all functionality of the property to the

absolute minimum required by law and hired PDSI to secure and preserve the property pending the sale.  In sum, the Owner further asserts that it has no employees, does not plan to have any employees, has no revenue, has no forecasts to have any revenue, has not engaged in any hotel operations, and will sell this property as a real estate asset to the highest bidder.  Therefore, the Owner concludes that the Union cannot show, under the plain language of the Owner's Letter, it continued to operate this property as a hotel and its claim must fail.

In support of its position, the Owner points out that it is impermissible for an entity to recognize a union where it is not employing employees and engaged in normal operations under the National Labor Relations Act or NLRA (see Elmhurst Care Center, 345 NLRB 1176, 1177 (2005)).  Moreover, the Owner asserts that if an entity recognizes a union without having any employees or the entity is not yet engaged in normal operations, both the union and the entity could be in violation of federal labor law.  Thus, the Owner compares the assumption of a collective bargaining agreement with the assumption of obligations in the Owner's Letter.  Correspondingly, the Owner further asserts that a company that employs no bargaining unit employees cannot be compelled to assume a collective bargaining agreement for the operation of a business that it does not run.

In addition, the Owner also points out that no part of the Owner's Letter or the Collective Bargaining Agreement (CBA) would obligate a successor employer to hire bargaining unit employees.  This is because, the Owner maintains, there is no employment relationship between the Owner, and the Operator's former bargaining unit employees.

In regards to the Union's hiatus argument, the Owner retorts that there is not a shred of evidence.  Instead, the Owner counters that the property is a real estate asset being sold to the highest bidder to satisfy debts and will never be operated as a hotel again.  That is, the

Owner further asserts that there is no hiatus in the operation. Instead, the Owner reiterates that it has ceased all hotel activity.

In regards to the Union's discussion regarding issues after the sale, the Owner counters that the arbitrator's jurisdiction involves only the Owner's assumption of the Collective Bargaining Agreement (CBA), not what happens after the sale of property. Instead, the Owner still further explains that if another company buys the property, and the Union feels its rights under the Owner's Letter regarding successorship are not properly honored, then the Union can raise that separate issue using the same dispute resolution terms it used here.

In addition, the Owner reiterates that the Owner's Letter is separate and apart from the Collective Bargaining Agreement (CBA). Lastly, the Owner asserts that there is no hiatus based on bargaining history, as the Union asserts. Moreover, the Owner further contends that this argument is fatally flawed. For all the foregoing, the Owner concludes that the Marriott Wardman Park Hotel indeed no longer exists. No guests are served, no rooms occupied, all that remains is an empty facility on a valuable piece of real estate that will soon be auctioned for sale. Thus, the Owner closes with the Union failed to meet its burden, as required.

On the other hand, it is the position of Local 25 that the words and purpose of the Collective Bargaining Agreement (CBA) establish that the Owner became contemporaneously bound when it terminated Marriott. The Union asserts that the words are plain and clear. Moreover, the provision of the CBA should be read as collectively as a whole. The Owner's Letter, the Union further asserts, acknowledges that Local 25 has "entered into [the CBA] with" the operator, and executes the Owner's Letter "in consideration of the Union entering into the CBA with [the Operator]." The Owner's Letter, the Union

contends, makes clear that when the premise changes — when there is no longer an operator — then the Owner becomes "contemporaneously bound by the CBA and its terms and conditions as a successor under the CBA." The words of the CBA, the Union explains, were purposely planned to respond to every transition and transaction that could come about to ensure Local 25 bargaining unit employees of their contractual entitlement, a right that continues indefinitely and without regard to the present operating status of the hotel. Thus, the Union further contends that, the language of the Owner's Letter deliberately uses such words as "by any change of any kind in the legal status, ownership, or management" of the property.

In regards to the Owner's argument that it should not be bound because it does not itself intend to operate the property as a hotel, the Union retorts that it is completely irrelevant. The Union counters that the very purpose of the bankruptcy proceeding is to sell the property to a different owner. Most importantly, the Union strenuously argues that the current ownership is actively marketing the property for future hotel use. For example, the Union points to the "Confidential Offering Memorandum" that highlights the property's use as "revitalized lodging" as well as hotel-specific amenities of the property such as: a swimming pool, concierge, meeting spaces, and the number of hotel rooms. Moreover, this brochure entices investors, the Union further maintains, to purchase this lucrative property. Still further, Manager Decker testified, the Union asserts, that the Owner retains rights under approximately three hundred (300) contracts with groups seeking to hold conferences or other events in the future. This, in particular, the Union points out, represents two hundred million ($200,000,000) dollars the record shows in revenue. In sum, the Union contends that the property is clearly in "stasis," pending sale, but it is operational. The Union also notes that this analysis and assessment was testified to by Local 99's Representative Raymond Stack.

Moreover, Local 99's Representative also noted that maintenance tasks are currently being performed by non-union workers of PDSI rather than by Local 99 members. In summary, the Union argues that the hotel remains a hotel, but is simply in mothballs, pending sale.

Lastly solely by disclaiming intent to operate a hotel itself, the Union concludes, this Owner seeks to deprive unions and their members not only of their contractual and collective bargaining rights, but of the meaningful notice, information, and protections which flow from the collective bargaining rights under the Bankruptcy Code. The bottom line, the Union contends, is as follows: (a) fire its operator, (b) declare the hotel closed to guests, (c) refuse to assume the Collective Bargaining Agreement (CBA), (d) sell it free and clear, (e) then wait a respectable period of time, then reopen. Thus, the Union contends, this is the playbook to avoid the consequences of a collective bargaining relationship.

## FINDINGS AND DISCUSSION

After a careful review of this record in its entirety, and after having had the opportunity to weigh and evaluate the witnesses, this Arbitrator finds that, under the provisions of the Owner's Letter and upon the January 11, 2021 termination of the Marriott as Operator of the hotel, the Owner became contemporaneously bound to Marriott's Collective Bargaining Agreement (CBA) with Unite Here, Local 25 and its respective terms and conditions as a successor through Article 1.12, incorporated by reference in the Owner's Letter. Consequently, the Debtor is contractually required, pursuant to the precise

requirements of paragraph four (4) and paragraph five (5) of the Owner's Letter, to make a "written, material condition" of the approaching sale of the hotel that the buyer must assume and be bound by the Local 25's Collective Bargaining Agreement (Local 25, Exhibit 3) for the following reasons.

First, the Owner correctly points out that the Union is the charging party. As such, Local 25 has the burden of establishing that the Owner violated the Owner's letter by a preponderance of evidence (see Archer Daniels Midland, 111 BNA 518, November 20, 1998). That is, the Union must show: (a) there is no replacement operation company to replace the Marriott, and (b) the Owner continued to operate the property of the hotel upon the termination of the Operator. Both condition precedents are needed for the Owner (Debtor) to assume and be concurrently bound by the obligations of the Owner's Letter as well as the successorship provision of the Collective Bargaining Agreement (see Local 25, Exhibit 3 at 123 and pp. 6-7). Based upon the evidence presented in this case, the Arbitrator also finds that the Owner has continued an operational stasis in the property.

Second, the reason for this assessment is replete, in spite of the Owner's presentation that there are no employees and no revenue was generated. Eastdil Secured, who contracted with Manager Decker, produced a brochure which directly appealed to investors to purchase this property (Exhibit O-4, also see Decker, TR-62-72). The brochure entitled "Confidential Offering Memorandum" colorfully described the property of Wardman Park as "a rare 12.8 acre parcel" with "1,153-room structure firmly operated as a large scale convention hotel" (Exhibit O-4). This brochure further entices potential investors with a graphic depiction of its offering as an "unprecedented opportunity to reimage the future of a storied property in the District of Columbia as a transformational redevelopment or revitalized lodging facility"

(Exhibit O-4 at 2, 8). The record reflects, as testified to by Manager Decker, that the Owner retains rights on approximately three-hundred (300) contracts with groups seeking to hold conferences or other events in the future (Decker, TR-88-89). Such contracts represent about two hundred million ($200,000,000) dollars in revenue (Decker, TR-89).

In addition to such active and aggressive marketing, Manager Decker also contracted with PDSI (Exhibit O-2) where maintenance tasks, formerly performed by Local 99, are now maintained in "stasis" on this property by non-union employees (Stack, TR-253-254). The totality of evidence suggests to this Arbitrator that this property is in operational "stasis" status, awaiting a new owner who will quite likely use the property as another hotel (Decker, TR-85). Based on the foregoing, Local 25 has met its burden by a preponderance of evidence, as required.

Third, the language utilized in the Owner's Letter in Local 25, Exhibit 3, is clear and straight forward. It incorporates Article 1.12 into its verbiage twice. That is, it clearly states that the Owner is bound by its provisions. As to the Owner's obligations, it states that such obligations become operative "in the event [an] operator ceases to operate" [and] "the property continues to be operated as a hotel or any use covered by the CBA with or without hiatus." It is important to note that the successorship provisions, Article 1.12(c) and Article 1.12(e) also note that the Owner has agreed to be bound. In addition, this linkage is also important because it is enforceable under the grievance and arbitration machinery for two (2) years after the expiration of the Collective Bargaining Agreement (CBA). This continuity is crucial for job security (see Boardman, TR-191-198). As such, these protections also continue whether or not there is closure and protect employees as to layoffs and their seniority rights, as noted in Article 13.1(d) and Article 13.2(c) of the Collective Bargaining Agreement

(Local 25, Exhibit 3).  In sum, this document specifies in detail the assumption of the Owner's obligations.

Fourth, in response to the Owner's argument that the Owner's Letter is separate and apart from the Collective Bargaining Agreement (CBA), this is simply not true.  That is, they are purposely intertwined with the specific linkage of the successorship provisions, Articles 1.12(c) and 1.12(e), enumerated in the Owner's Letter.

Fifth, in regards to the Owner's argument that the subject matter of what happens after the sale is outside the jurisdiction of this Arbitrator, this Arbitrator disagrees.  The Owner's Letter specifically delineates in paragraphs four (4) and five (5) the requirements not only for the sale, but continues to describe the successor's (or Transferee's) obligations thereafter and is also bound by the CBA, as described earlier (see Boardman, TR-190-192).

Sixth, in support of its position, Local 25 points to several supportive cases; most utilize the prevailing text: whether or not there is a reasonable expectation that a company might resume operations?  The Union rightly notes that both courts and arbitrators generally reject the arguments of companies that there is in fact an absolute permanent closure because often there are long operational suspensions (or a hiatus), but ultimately operations resume after an extended shutdown (see Boardman, TR-214).  For instance, in <u>CF&I Fabricators v. Conners, 163 BR 858 (1994)</u>, both mines closed for sixteen (16) months.  In <u>Straight Creek Mining, Inc. v. NLRB, 164 F.3rd 292</u>, there was a fifty-four (54)-month hiatus in spite of the owner's claims to be going out of business.  Also in <u>NLRB v. Rockwood Energy and Mineral Corporation, F.2d 169 (3rd Cir. 1991)</u>, this case is directly analogous on the issue on successorship, where there was a five (5)-year hiatus.

Applying this prevailing test to our situation, there is a reasonable expectation that after the sale that another hotel shall operate (see Boardman, TR-212).  Should this occur, it is quite likely that the workforce could become non-union to the detriment of Local 25.  This could result in the detriment of Local 25's as well as Local 99's members because they would be deprived of their contractual and collective bargaining protections and within the Bankruptcy Code (Stack, TR-254).  In essence, this could result in the usage of this conduit to avoid the consequences of the collective bargaining relationship.  For all the foregoing reasons, this Arbitrator finds that under the provisions of the Owner's Letter and upon the January 11, 2021 termination of the Marriott as the Operator, the Debtor became bound to Marriott's Collective Bargaining Agreement with Local 25.

**AWARD**

> Based upon the provisions of the Owner's Letter and upon the January 11, 2021 termination of the Marriott, this Arbitrator finds that the Debtor became contemporaneously bound to Marriott's Collective Bargaining Agreement (CBA) with Local 25.  This Arbitrator further finds that the Debtor is contractually required to the specific requirements enumerated in paragraph four (4) and paragraph five (5) of the Owner's Letter, to make a "written, material condition" of the approaching sale of the hotel that the buyer must assume and be bound by the Local 25's CBA.

_____
**ARBITRATOR**

DATE OF AWARD: July 5, 2021

C:\AAA\AAA-Unite Here, Local 99 (DC) July 5,2021.docx