**EXHIBIT 1**

**Successful Bidder APA**

*Execution Version*

### PURCHASE AND SALE AGREEMENT

BETWEEN

WARDMAN HOTEL OWNER, L.L.C.,
A DELAWARE LIMITED LIABILITY COMPANY AND CHAPTER 11 DEBTOR
AND DEBTOR IN POSSESSION,

AS SELLER,

and

CARMEL PARTNERS REALTY VII, LLC,

AS BUYER

LIST OF SCHEDULES

1.1     Description of the Land

5.2     Schedule of Assumed Master Condominium Documents

**Error! Unknown document property name.**

## LIST OF EXHIBITS

Exhibit A    —    Title Commitment

Exhibit B    —    Form of Sale Order

Exhibit C    —    Quitclaim Deed

Exhibit D    —    Assignment and Assumption of Permits, Intangible Property and Warranties

Exhibit E    —    FIRPTA Affidavit

Exhibit F    —    Designation Agreement

**Error! Unknown document property name.**

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**"), dated for reference purposes as of July 14, 2021, is made by and between Wardman Hotel Owner, L.L.C., a Delaware limited liability company and Chapter 11 Debtor and Debtor in Possession (the "**Seller**"), on the one hand, and Carmel Partners Realty VII, LLC (the "**Buyer**"), on the other hand.  This Agreement shall not be effective until executed by both Buyer and Seller, and the date on which this Agreement is executed by Buyer or Seller, whichever is later, as indicated on the signature page hereto, shall be referred to herein as the "**Effective Date**."

## RECITALS

A.    **WHEREAS**, Seller filed a voluntary petition for relief, Case No. 21-10023 (JTD) (the "**Bankruptcy Case**"), commencing under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on or about January 11, 2021 (the "**Petition Date**");

B.    **WHEREAS**, on June 15, 2021, the Bankruptcy Court entered an order (the "**Procedures Order**") approving, *inter alia*, the bid procedures (the "**Bid Procedures**"), attached to the Procedures Order as Exhibit 1;

C.    **WHEREAS**, Buyer wishes to purchase the Property (as defined below) subject to the terms and conditions set forth herein and in accordance with sections 105, 363, and 365 of the Bankruptcy Code (such sale and purchase of the Property and such assignment and assumption of any assumed liabilities, if any, the "**Transaction**");

D.    **WHEREAS**, Buyer wishes to acquire Property and redevelop the Property for use as residential homes after Closing and not, for the avoidance of doubt, as a hotel;

E.    **WHEREAS**, the execution and delivery of this Agreement and the Seller's ability to consummate the Transaction set forth in this Agreement are subject to, among other things, entry of a Sale Order in form and substance acceptable to the Buyer and Seller;

F.    **NOW, THEREFORE**, in consideration of the foregoing and the respective representations, covenants, agreements, and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

# AGREEMENT

## 1.   PURCHASE AND SALE

Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, subject to the terms, covenants and conditions set forth herein, all of Seller's right, title and interest in and to the following property:

(a)      That certain real property located in Washington, D.C., commonly known as 2660 Woodley Road NW, Washington, D.C.  20008, and more particularly described in *Schedule 1.1* hereto (the "**Land**");

(b)      The buildings, structures and improvements erected or located on the Land (collectively, the "**Improvements**," and together with the Land, collectively, the **"Real Property"**);

(c)      Any rights and appurtenances pertaining to the Land, including minerals, oil and gas rights, air, water and development rights, roads, alleys, easements, streets and ways adjacent to the Land, rights of ingress and egress thereto, any strips and gores within or bounding the Land and in profits or rights or appurtenances pertaining to the Land (the "**Appurtenant Rights**");

(d)      All assignable permits and licenses to the extent the same pertain to the Real Property (collectively, the "**Permits**");

(e)      All assignable intangible property, if any, used exclusively in connection with the occupancy and operation of the Real Property, including any rights that the Seller has in the use of the name "Wardman" or "Wardman Park" (the "**Intangible Property**"); and

(f)      All assignable warranties of any contractor, manufacturer or materialman which relate to the Improvements (collectively, the "**Warranties**").

The Real Property, Appurtenant Rights, Permits, Intangible Property and Warranties are herein collectively referred to as the "**Property.**"  For the avoidance of all doubt, in no event shall the Property include (i) any rights, claims, causes of action, interests, remedies or recoveries to which Seller may be entitled which arise under or in connection with that certain action styled "Wardman Tower Residential Condominium Unit Owners Association, Plaintiff vs. JBG Smith Properties and JBG Smith Properties LP, JBG Smith Properties of Washington, D.C. Inc., Nash Wardman Tower Residential, L.L.C., Wardman Tower, L.L.C., Wardman Investor, L.L.C., JBG/Company Manager, L.L.C. et al, Defendants," pending in The Superior Court of the District of Columbia – Civil Division under Case No. 2020 CA 004807 B (the "Residential Condominium Association Litigation"), (ii) any tangible personal property owned by the Debtor or agreements affecting the Property, except as otherwise provided herein, and (iii) any rights, claims, causes of action, interests, remedies or recoveries to which Seller may be entitled which relate to or arise under or in connection with any pending proceedings involving Seller and Marriott Hotel Services, Inc. ("Marriott") or any proceedings that may hereafter be initiated involving Seller and Marriott.

2.    **PURCHASE PRICE; DEPOSIT; ESCROW**

(a)    The purchase price (the "**Purchase Price**") for the Property shall be one-hundred fifty-two million and two-hundred fifty thousand Dollars ($152,250,000.00), subject to adjustment as provided in Section 8 below, and shall be paid as set forth in subparagraphs (b) and (e) below.

(b)    As required by the Procedures Order, Buyer has deposited in escrow with Seller's counsel, Pachulski Stang Ziehl & Jones LLP ("**PSZJ**") to hold, maintain and disburse in accordance the Procedures Order, the sum of Five Million and No One-Hundredths Dollars ($5,000,000.00 (the "**Initial Deposit**"). Within two (2) business days following entry of the Sale Order (as defined below) approving the sale of the Property to Buyer, (i) Seller shall cause PSZJ to deliver the Initial Deposit to First American Title Insurance Company, Attn: Ms. Lyndsey Arthurs ("**Escrow Holder**") in Good Funds (as defined in subparagraph (c) below), and (ii) Buyer shall deposit with Escrow Holder in Good Funds an additional Five Million and No One-Hundredths Dollars ($5,000,000) (the "**Additional Deposit**," and, together with the Initial Deposit, and any interest from time to time accrued thereon while held by Escrow Holder, the "**Deposit**"). The Deposit shall be non-refundable and shall be deemed fully earned by Seller upon PSZJ's delivery of the Initial Deposit to Escrow Holder and Buyer's deposit of the Additional Deposit with Escrow Holder, subject only to Buyer's rights to obtain a refund of the Deposit (or the Initial Deposit, as applicable) to the extent Buyer is entitled thereto pursuant to the provisions of Sections 6.1, 6.2, 6.3, 9.2, or 10(b)(ii) hereof. The Deposit shall at all times while held by Escrow Holder be invested in the manner required by the Procedures Order. No later than its delivery of the Additional Deposit to Escrow Holder, Buyer shall provide the Escrow Holder with its taxpayer identification number, and any interest earned on the Deposit shall be reported to the appropriate taxing authorities using Buyer's taxpayer identification number.  Unless refunded to Buyer or delivered to Seller pursuant to the terms of this Agreement, at the Closing, the Deposit shall be credited and applied toward payment of the Purchase Price.

(c)    The balance of the Purchase Price (that is, the amount of the Purchase Price over and above the amount of the Deposit), subject to adjustment for any prorations, credits and reimbursements provided hereunder, shall be deposited with Escrow Holder by Buyer at Closing by wire transfer of immediately available good funds of the United States of America ("**Good Funds**"), for disbursement pursuant to the terms hereof, with the transfer of funds to Seller to be completed at Closing.

(d)    Upon mutual execution and delivery this Agreement, Seller shall deliver a copy of this Agreement to Escrow Holder.  This Agreement shall serve as the initial escrow instructions of the parties to the Escrow Holder.  Buyer and Seller shall execute any further escrow instructions contemplated by the Procedures Order or which are otherwise reasonably necessary or desirable, and not inconsistent with the terms hereof, in connection with the escrow established for this Transaction by Escrow Holder (the "**Escrow**").  Escrow Holder shall be the "**Reporting Person**" pursuant to Internal Revenue Code Section 6045(e) with respect to the Transaction.

**3.**    **BUYER'S ACKNOWLEDGMENT RE FULL INVESTIGATION**

Buyer hereby acknowledges that through, among other things, a virtual data room (the "**Data Room**") established and maintained by Seller's real estate broker and advisor, Eastdil Secured, LLC ("**Eastdil**") and such other diligence and investigations as Buyer determined to conduct, Buyer has had the opportunity to conduct and obtain, and has conducted and obtained, either directly or through its agents, consultants and representatives all inspections, investigations, reviews, analyses, studies, assessments, reports, appraisals, evaluations and other diligence (collectively, **"Diligence"**) that Buyer deemed necessary to conduct or obtain with respect to the Property and all aspects thereof, including, without limitation, such Diligence as Buyer deemed necessary to obtain or conduct with respect to the title of the Property and/or the physical and environmental condition of the Property.

**4.**    **AS-IS SALE; RELEASE AND INDEMNITY**

*4.1.    As-Is Sale*

(a)    Except with respect to any representations expressly made by Seller in this Agreement, Seller makes no representations or warranties whatsoever (i) concerning the Property, income derived therefrom or any matters pertaining thereto; or (ii) with respect to the physical condition or any other aspect of the Property, including, without limitation:  (A) the structural integrity of, or the quality of any labor and materials used in the construction of, any improvements on the Land; (B) the conformity of the Improvements to any plans or specifications for the Property (including any plans and specifications that may have been or which may be provided to Buyer by Seller); (C) the compliance of the Property with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity, including zoning or building code requirements; (D) the existence of soil instability, past soil repairs, soil additions or conditions of soil fill or susceptibility to landslides; (E) the sufficiency of any undershoring; (F) the sufficiency of any drainage; (G) whether the Land is located wholly or partially in any flood plain or flood hazard boundary or similar area; (H) the existence or non-existence of underground storage tanks; (I) any other matter affecting the stability or integrity of the Land or any buildings or improvements situated on or as part of the Improvements; (J) the availability, quality, nature, adequacy and physical condition of public utilities and services for the Property; (K) the habitability, merchantability, fitness, suitability, functionality, value or adequacy of the Property or any component or system thereof for any intended use; (L) the potential for redevelopment or further development of the Property; (M) the existence of vested land use, zoning or building entitlements affecting the Real Property; (N) the quality, nature, adequacy and physical condition of the Property, including the structural elements, foundations, roofs, appurtenances, access, landscaping, parking facilities and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances; (O) the quality and nature of any groundwater; (P) the zoning or other legal status of the Property or any other public or private restrictions on use of the Property; (Q)  the presence of any Hazardous Materials (as defined below) or mold or any mold-like substance on, in, under or about the Property or any nearby property; (R) the condition of title to the Property; (S) agreements affecting the Property; and (T) the economics of the operation or future operation of the Property.  Accordingly, Buyer expressly acknowledges that the Property is being sold and accepted "As Is, Where Is, and With

All Faults" and will be conveyed by Seller and accepted by Buyer at the Closing without any representation or warranty, including any representation or warranty by Seller or any agent, officer, employee or representative of Seller. Buyer agrees to rely solely upon its own investigation of such condition and not upon any statement of Seller except as may be expressly stated in this Agreement. Buyer further acknowledges, agrees and accepts that Seller hereby disclaims any (and makes no) implied warranty of any kind with respect to the Property (and all portions thereof), including, without limitation, any warranty of merchantability or suitability of any portion of the Property for any particular purpose.

As used herein, "**Hazardous Materials**" means any material, substance or waste designated as hazardous, toxic, radioactive, injurious or potentially injurious to human health or the environment, or as a pollutant or contaminant, or words of similar import, under any Hazardous Materials Law (as defined below), including, but not limited to, petroleum and petroleum products, asbestos, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive matter, medical waste, mold, and chemicals which may cause cancer or reproductive toxicity. As used herein, "**Hazardous Materials Law**" means any federal, state or local law, statute, regulation or ordinance now or hereafter in force, as amended from time to time, pertaining to materials, substances or wastes which are injurious or potentially injurious to human health or the environment or the release, disposal or transportation of which is otherwise regulated by any agency of the federal, state or any local government with jurisdiction over the Property or any such material, substance or waste removed therefrom, or in any way pertaining to pollution or contamination of the air, soil, surface water or groundwater, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Section 9601 *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 *et seq.*), the Clean Water Act (33 U.S.C. Section 1251 *et seq.*), the Safe Drinking Water Act (42 U.S.C. Section 300f *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 *et seq.*), and the Toxic Substance Control Act (15 U.S.C. Section 2601 *et seq.*).

### 4.2. *Release and Indemnity*

(a) Without limiting the provisions of Section 4.1, Buyer waives its right to recover from Seller, or any affiliates of Seller, any members, principals, managers, employees, agents, representatives, professionals, or contractors of Seller (collectively, the foregoing are referred to herein as "**Seller-Related Parties**"), and forever releases, covenants not to sue and discharges the Seller-Related Parties from, any and all damages, demands, claims, losses, liabilities, penalties, fines, liens, judgments, costs or expenses whatsoever, including attorneys' fees and costs, whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way be connected with the Property (or any element or component thereof) or any matter relating thereto, including, but not limited to, the presence of any Hazardous Materials on, in, under or about the Property or any other matter relating to the physical condition of the Property.

(b) In the event the Closing occurs, Buyer shall indemnify, defend (with counsel reasonably satisfactory to Seller), protect and save and hold harmless the Seller-Related Parties from and against any and all suits, actions, proceedings, investigations, demands, claims, liabilities, fines, penalties, liens, judgments, losses, injuries, damages, expenses or costs

whatsoever, including attorneys' and experts' fees and costs and investigation and remediation costs (collectively, "**Claims**"), asserted by the party originally identified as Buyer herein (the "**Original Buyer**"), or any assignee thereof to whom Buyer may assign this Agreement in accordance with the terms and provisions hereof, or the partners, members, trustees, shareholders, directors or officers of any party owning a direct or indirect interest in Original Buyer or any such assignee, or any affiliate of Original Buyer or any such assignee possessing at any time an ownership interest (whether direct or indirect) in the Property (including any party which may hereafter become an affiliate of Original Buyer or any such assignee), arising from, relating to, or occasioned in any way by the Property (or any element or component thereof) or any matter relating thereto, including, but not limited to, the presence of any Hazardous Materials on, in, under or about the Property or any other matter relating to the physical condition of the Property after the Closing Date.

(c)    The release set forth in Section 4.2(a) above, and the indemnification set forth in Section 4.2(b) above, includes claims, liabilities and other matters of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's willingness to enter into the release and indemnification of the Seller-Related Parties set forth in Sections 4.2(a) and 4.2(b).  In this connection and to the fullest extent permitted by law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, loses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants that the release and indemnification set forth in Sections 4.2(a) and 4.2(b) have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends to release, discharge and acquit the Seller-Related Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses.

(d)    The provisions of this Section 4.2 shall survive the Closing.

### 4.3.    *Representations and Warranties of Seller*

Seller hereby represents and warrants to Buyer as follows:

(a)    Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware.

(b)    Subject to entry of the Sale Order, Seller has the power and authority to enter into this Agreement and convey the Property to Buyer and to execute and deliver the other documents referred to herein and to perform hereunder and thereunder on behalf of Seller.

(c)    Subject to entry of the Sale Order, neither the execution and delivery of this Agreement, the consummation of the Transaction, nor the compliance with the terms and conditions hereof will violate, in any material respect, any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restrictions of any government, governmental agency or court to which Seller is subject.

### 4.4.    *Limitations on Seller's Representations and Warranties; No Survival*

All representations and warranties contained in Section 4.3 are qualified by any information contained in any documents or other material made available to Buyer in connection with its review of matters pertaining to the Property pursuant to Section 3 above, including any title report or survey made available to Buyer and any other materials or information obtained by Buyer or made available in the Data Room.  All representations and warranties of Seller set forth in Section 4.3 are made as of the Effective Date and shall lapse and cease to be of any further force or effect whatsoever upon the occurrence of the Closing.

### 4.5.    *Representations and Warranties of Buyer*

Buyer hereby represents and warrants to Seller as follows:

(a)    Buyer is a limited liability corporation, duly organized, validly existing and in good standing under the laws of Delaware**,** and qualified to transact business and in good standing in the District of Columbia.

(b)    Buyer has the power and authority to enter into this Agreement and to execute and deliver the other documents referred to herein and to perform hereunder and thereunder on behalf of Buyer.  This Agreement has been duly authorized, executed and delivered by Buyer.

(c)    Neither the execution and delivery of this Agreement, the consummation of the Transaction, nor the compliance with the terms and conditions hereof will violate, in any material respect, any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restrictions of any government, governmental agency or court to which Buyer is subject.

(d)    Buyer is not required to obtain the consent or approval of any government agency, department or other government body to enter into this Agreement or if required, any such required consents or approvals have been obtained.

(e)    There are no general assignments for the benefit of creditors, or voluntary or involuntary proceedings in bankruptcy, existing, pending or, to Buyer's knowledge, threatened against Buyer.

(f)    Buyer has sufficient cash resources on hand in an aggregate amount sufficient to pay in cash any and all amounts required to be paid by it pursuant to this Agreement, including the portion of the Purchase Price in excess of the Initial Deposit and all fees, charges, costs and expenses related to the transactions contemplated by this Agreement to be paid by Buyer.

## 5.    INTERIM OPERATION OF THE PROPERTY; BUYER'S ASSUMPTION OF CERTAIN LIABILITIES.

### 5.1    *Status of Property Pending Closing*

Buyer expressly acknowledges that the Real Property is not operating or occupied as of the execution of this Agreement and will not be operated by Seller pending the Closing.  Rather, pending the Closing, Seller shall use diligent and commercially reasonable efforts to maintain the

Property in its present, non-operating status and condition through the Closing, including keeping the Property secure.

Buyer and Seller agree that Buyer shall not operate or manage the Property as a hotel, in whole or in part, after Closing, including as a restaurant or a banquet hall.

5.2     ***Assumed Liability re Condo Association***

Effective as of the Closing, Buyer hereby assumes and agrees to perform and discharge in full all liabilities and obligations of Seller to Wardman Tower Master Condominium ("**Master Condominium**") to the extent relating to or arising during the period after the Closing, including, without limitation, all such liabilities and obligations of Seller under the documents and agreements described on Schedule 5.2 attached to this Agreement.  For the avoidance of doubt, Buyer does not assume any liabilities and obligations of Seller to Master Condominium to the extent relating to or arising during the period prior to or at Closing.  Buyer and Seller agree that there are no cure amounts due or owing arising from the documents and agreements described on Schedule 5.2, but to the extent any such amounts are outstanding or become due pre-Closing, Seller shall, subject to the provisions of Section 8.1(c) hereof, be responsible for and bear the same.

6.     **CONDITIONS TO CLOSING**

   **6.1.     *Conditions to Buyer's Obligations to Close***

The obligation of Buyer to consummate the purchase of the Property as contemplated by this Agreement is subject to the fulfillment of each of the following conditions (in addition to such other items as are set forth elsewhere in this Agreement as conditions to Buyer's obligations to close), any or all of which may be waived in whole or in part by Buyer to the extent permitted by applicable law:

(a)     ***Delivery of Documents***.  Seller shall have deposited into Escrow all instruments and documents to be delivered by Seller to Buyer at the Closing under the provisions of this Agreement.

(b)     ***Title Policy***.  First American Title Insurance Company (the "**Title Company**") shall be irrevocably committed to issuing to Buyer at the Closing an owner's title insurance policy, dated as of the Closing Date, in the full amount of the Purchase Price, showing title to the Real Property vested in the Buyer (the "**Title Policy**"), which Title Policy shall be in the form of an ALTA 2006 Standard Form B owner's policy of title insurance, with extended coverage.  The Title Policy shall include the exceptions listed or described in the Title Company's Title Commitment delivered by Seller to Buyer on July 21, 2021 with respect to the Real Property which is attached as <u>Exhibit A</u> hereto, other than exception nos. 4, 5, and 8 of Schedule B, Part II, of the Title Policy; provided that the Title Company shall issue an endorsement (in form and content reasonably satisfactory to Buyer) protecting Buyer against any claims, losses or liability in connection with the agreement referenced in exception no. 9 of Schedule B, Part II, of the Title Policy.

(c)     ***Bankruptcy Court Approval***.  Notwithstanding anything to the contrary in the Procedures Order or Sale Motion, the Bankruptcy Court shall have entered the Sale Order in form and substance substantially attached hereto as <u>Exhibit B</u>, or otherwise acceptable to Seller and Buyer, and the Sale Order shall be unstayed and in full force and effect.  Such Sale Order shall include, without limitation, a finding by the Bankruptcy Court that Buyer will not operate or manage the Property as a hotel post-Closing and shall not be obligated to assume or otherwise be bound by (i) any collective bargaining agreements entered into by Marriott and/or that may be binding upon the Debtor, or (ii) that certain Owner's Letter (collectively, the "**CBAs**") or be liable for any liabilities stemming from the CBAs (the "**CBA Liabilities**"), except as set forth in Section 15.19 herein, or the Buyer, in its sole discretion, accepts an alternative arrangement to protect the Buyer from CBA Liabilities.

(d)     ***Seller's Compliance***.  Seller shall have performed and satisfied all material covenants and material obligations of Seller under this Agreement to the extent such covenants and obligations are to be performed or satisfied as of the Closing Date.

(e)     ***Obtaining Access Information***.  Seller shall have asked and obtained from building managers and engineers (or others with access) all keys, combinations, security codes and devices used to obtain access to the Improvements.

The conditions set forth in this Section 6.1 are solely for the benefit of Buyer and may be waived only by Buyer.  Buyer shall at all times have the right to waive any condition.  Any such waiver or waivers shall be in writing and shall be delivered to Seller and Escrow Holder.  If any of the conditions in this Section 6.1 is not satisfied or has not been so waived by Buyer prior to the Closing Date, Buyer shall deliver written notice to Seller describing the condition that has not been satisfied or waived, and if such condition remains unsatisfied as of the Closing Date, then Buyer shall have the right to terminate this Agreement and the Escrow by written notice to Seller and Escrow Holder.  If Buyer terminates this Agreement in accordance with the foregoing, the Deposit (or, the portion thereof theretofore deposited by Buyer with Escrow Holder, if applicable) shall be refunded to Buyer, all documents deposited into Escrow shall be returned to the party depositing such documents, and neither party shall have any further rights or obligations under this Agreement, except for those rights or obligations which expressly survive the termination of this Agreement.  Further, if the failure of such condition also constitutes a default of Seller under this Agreement, then in lieu of terminating this Agreement, Buyer may elect to proceed under either of the options provided under Section 10(b).

### *6.2.     Conditions to Seller's Obligations to Close*

The obligation of Seller to consummate the sale of the Property as contemplated by this Agreement is subject to the fulfillment of each of the following conditions (in addition to such other items as are set forth elsewhere in this Agreement as conditions to Seller's obligations to close), any or all of which may be waived in whole or in part by Seller to the extent permitted by applicable law:

(a)     ***Deposit of Funds***.  Buyer shall have deposited into Escrow the cash portion of Purchase Price, subject to adjustment for any prorations and credits provided hereunder, and all other monies required to be deposited by Buyer hereunder.

(b)      ***Delivery of Closing Documents***.  Buyer shall have deposited into Escrow all instruments and documents to be delivered by Buyer to Seller at the Closing under the provisions of this Agreement.

(c)      ***Bankruptcy Court Approval***. The Bankruptcy Court shall have entered the Sale Order in form and substance substantially attached hereto as <u>Exhibit B</u>, or otherwise reasonably acceptable to Seller and Buyer, and the Sale Order shall be unstayed and in full force and effect.

(e)      ***Buyer's Compliance***.  Buyer shall have performed and satisfied all material covenants and material obligations of Buyer under this Agreement to the extent such covenants and obligations are to be performed or satisfied as of the Closing Date.

The conditions set forth in this Section 6.2 are solely for the benefit of Seller and may be waived only by Seller.  Seller shall at all times have the right to waive any condition.  Any such waiver or waivers shall be in writing and shall be delivered to Buyer and Escrow Holder.  If any of the conditions in this Section 6.2 is not satisfied or has not been so waived by Seller prior to the Closing Date, Seller shall deliver written notice to Buyer describing the condition that has not been satisfied or waived, and if such condition remains unsatisfied as of the Closing Date, then Seller shall have the right to terminate this Agreement and the Escrow by written notice to Buyer and Escrow Holder.  If Seller terminates this Agreement in accordance with the foregoing, the Deposit (or, the portion thereof theretofore deposited by Buyer with Escrow Holder, if applicable) shall be returned to Buyer or paid over to Seller, as required by the terms of this Agreement, all documents deposited into Escrow shall be returned to the party depositing such documents, and neither party shall have any further rights or obligations under this Agreement, except for those rights or obligations which expressly survive the termination of this Agreement; provided, however, if the failure of such condition also constitutes a default of Buyer under this Agreement, then the provisions of Section 10(a) shall apply, and the Deposit (or, the portion thereof theretofore deposited by Buyer with Escrow Holder, if applicable) shall be paid to Seller as liquidated damages, rather than being returned to Buyer.  Without limiting the foregoing, in the event of Buyer's default, Seller's termination of this Agreement pursuant to this Section 6.2 shall not constitute a waiver of Seller's right to recover liquidated damages from Buyer pursuant to Section 10(a).

### 6.3.    *Condition to Both Seller's and Buyer's Obligations; Procedures Order.*

(a)    Seller has heretofore filed a motion (the "**Sale Motion**") in the Bankruptcy Case for an order (the **"Sale Order"**) which approves the sale of the Property to Buyer on the terms and conditions set forth in this Agreement, which Sale Order shall be substantially in the form and content attached as <u>Exhibit B</u> hereto.  The Buyer does not intend that Seller assume or assign any executory contracts pursuant to Section 365 of the Bankruptcy Code, other than as explicitly provided for in Section 5.2, and Buyer shall not be liable for any cure costs or other liabilities arising from any contracts not listed in Schedule 5.2 including, for the avoidance of doubt, any CBA Liabilities, except as set forth in Section 15.19 herein.  Buyer shall provide adequate assurance of future performance (to the satisfaction of the Bankruptcy Court) of any agreement set forth on Schedule 5.2 to be assumed and assigned by Seller.  Both Buyer's and Seller's obligations to consummate this Transaction shall be conditioned upon the Bankruptcy Court's entry of the Sale Order in form and substance required by Sections 6.1(c) and 6.2(c).  Upon entry of the Sale Order in accordance with the provisions of this Section 6.3, the condition set forth in this Section 6.3 shall conclusively be deemed satisfied.

If the condition set forth in this Section 6.3(a) is not satisfied prior to the Closing Date, this Agreement shall terminate.  If this Agreement terminates in accordance with the foregoing, the Initial Deposit shall be returned to Buyer, all documents theretofore deposited with Escrow Holder shall be returned to the party depositing such documents, and neither party shall have any further rights or obligations under this Agreement, provided, however, if the failure of the condition set forth in this Section 6.3(a) also constitutes a default by Buyer under this Agreement, then the provisions of Section 10(a) shall apply, and the Initial Deposit shall be paid to Seller as liquidated damages, rather than being returned to Buyer.  Without limiting the foregoing, in the event of Buyer's default, Seller's termination of this Agreement pursuant to this Section 6.3 shall not constitute a waiver of Seller's right to recover liquidated damages from Buyer pursuant to Section 10(a).

(b)    The Transaction shall be conducted in all respects in accordance with the process and procedures established in and the provisions of the Procedures Order.  Buyer shall comply with all requirements of the Procedures Order.  Notwithstanding anything to the contrary in this Agreement, upon entry of the Sale Order, in the event of any inconsistency between the terms and provisions of this Agreement and those of the Procedures Order, the terms and provisions of this Agreement shall govern and control.

## 7.    CLOSING AND TRANSFER OF TITLE

### 7.1.    *Closing Date*

Provided that all of the other conditions precedent to the closing (the "**Closing**") have been satisfied or waived, the Closing shall be held, and delivery of all items to be made at the Closing under the terms of this Agreement shall be made, at the offices of Escrow Holder (or in such other manner and/or at such other place as the parties hereto may agree upon) on a date mutually agreeable between Buyer and Seller following entry of the Sale Order, but in no event later than sixty (60) days following entry of the Sale Order (the date of the Closing, "**Closing Date**"). At the Closing, or at such later date as may be indicated below for any specific item,

Seller shall deliver or cause to be delivered to Buyer through the Escrow or otherwise, each of the following instruments and documents (duly executed and acknowledged by Seller, as appropriate) and items and information, as applicable:

(a)    The entered Sale Order shall be unstayed and in full force and effect;

(b)    Quitclaim Deed in the form attached hereto as *Exhibit C* (the "**Deed**"), subject only to the Permitted Exceptions;

(c)    An Assignment and Assumption of Permits, Intangible Property and Warranties with respect thereto in the form attached hereto as *Exhibit D*;

(d)    Any required real estate transfer tax declarations or any other similar documentation required to evidence the payment of any tax imposed by the state, county and city on the Transaction contemplated hereby;

(e)    An affidavit pursuant to Section 1445(b)(2) of the United States Internal Revenue Code (the "**Federal Code**"), and on which Buyer is entitled to rely, from Seller that it is not a "foreign person" within the meaning of Section 1445(f)(3) of the Federal Code, in the form attached hereto as *Exhibit E* attached hereto (the "**FIRPTA Affidavit**");

(f)    The Designation Agreement in the form attached as *Exhibit F* hereto (the "**Designation Agreement**");

(g)    All keys, combinations, security codes and devices used to obtain access to the Improvements; and

(h)    Such other customary documents and instruments as may be required by any other provision of this Agreement or as may reasonably be required to carry out the terms and intent of this Agreement; provided that Seller shall not be obligated to cause the delivery of any such instrument or document that would materially increase or expand Seller's obligations or liability under this Agreement.

### 7.2.    *Buyer's Deliveries*

At the Closing, Buyer shall deliver or cause to be delivered to Seller the Deposit and the additional amounts Buyer is required to deliver to Sellers pursuant to Section 2(c) above, and each of the following instruments and documents, duly executed and acknowledged by Buyer, as appropriate:

(a)    Counterparts of the closing documents referenced in Sections 7.1(c), (e), and (f) above.

(b)    Such other documents and instruments as may be required by any other provision of this Agreement or as may reasonably be required to carry out the terms and intent of this Agreement; provided that Buyer shall not be obligated to cause the delivery of any such instrument or document that would materially increase or expand Buyer's obligations or liability under this Agreement.

### 7.3.   *Possession of the Property; Seller's Limited Right to Post-Closing Access*

(a)     At the Closing, possession of the Property shall be delivered to Buyer. Notwithstanding the foregoing, for ninety (90) days following the Closing Date unless otherwise agreed to in writing by the Parties (such period, the **"Removal Period"**), Buyer shall afford Seller and its employees, contractors, consultants, purchasers and representatives with reasonable access to the Real Property for the purposes of disposing of (including, without limitation, by on-site liquidation sale or similar sales) or removing from the Real Property all of Seller's furniture, fixtures, equipment, supplies and other tangible personal property not included in the Property (collectively, the "**Removal Personalty**") in accordance with the following provisions of this Section 7.3; provided that Buyer and Seller shall coordinate in advance on reasonable and appropriate access dates (taking into account length of the Removal Period and the manner in which Seller will be removing and/or disposing of the Removal Personalty). Not later than the Removal Period, Seller shall remove, or cause to be removed from the Real Property, at Seller's sole cost and expense, all Removal Personalty still located there. Seller shall use commercially reasonable efforts to cause such removal and/or disposition to be accomplished in such manner as will minimize any damage to the Real Property.  Seller shall, at Seller's sole cost and expense, promptly cause any damage to the Real Property to the extent resulting from Buyer's removal, handling, shipping, disposition or other activities at or in connection with the Real Property to be fully and completely repaired or restored.  As a condition to Seller's right to enter upon the Real Property to remove or cause the removal or disposition of the Removal Personalty, however, Seller shall provide to Buyer a certificate of insurance which evidences a general public liability insurance policy (issued by an insurer, in an amount and otherwise in form and content reasonably satisfactory to Buyer) which covers Buyer as an additional insured against any loss, damage or liability as Buyer may suffer or incur in connection with Seller's removal and/or disposition of the Removal Personalty as contemplated by this Section 7.3.  Seller shall indemnify, defend (with counsel satisfactory to Buyer) and protect and hold Buyer, harmless of, from and against any and all direct claims, demands, losses, damages, liabilities, obligations, actions, causes of action and costs and expenses (including, without limitation, all court costs and all attorneys' fees, costs and charges) as Buyer may suffer or incur in connection with Seller's or Seller's representatives', employees', agents', contractors', shippers' removal, disposition or handling of the Removal Personalty at or from the Real Property; provided, however, in no event shall Seller be liable to Buyer for any indirect damages, including consequential, incidental, exemplary, or punitive damages, or lost profits. It is expressly understood that Seller shall bear any and all costs and expenses of packing, shipping and handling the Removal Personalty.  For the avoidance of all doubt, this Section 7.3 shall survive the expiration of the Removal Period.

(b)     No later than 45 days after Closing, Seller shall obtain an order from the Bankruptcy Court approving any procedures governing any sale or liquidation of the Removal Personalty to be conducted at or from the Real Property (the "**Removal Order**").  The Removal Order and procedures contained therein must be satisfactory to Buyer in Buyer's reasonable discretion, and such order shall require any agent or purchaser of the Removal Personalty to have insurance that covers Buyer as an additional insured against any loss, damage or liability as Buyer may suffer or incur in connection with the conduct of the sale of the Removal Personalty and otherwise hold Buyer harmless from any losses incurred in connection with the conduct of sale of the Removal Personalty.

8.      **PRORATIONS AND ADJUSTMENTS**

*8.1.    General*

The following adjustments shall be made with respect to the Property, and the following procedures shall be followed:

(a)      ***Preparation of Prorations.***  At least five (5) days before the Closing Date, Seller shall prepare and deliver, or cause Escrow Holder to prepare and deliver, to Buyer an unaudited statement for the Property (the "**Preliminary Proration Statement**") showing prorations for the items set forth below, calculated as of 12:01 a.m. on the Closing Date, on the basis of a 365-day year.  Buyer and its representatives shall be afforded reasonable access to Seller's books and records with respect to the Property and Seller's work papers pertaining to the Preliminary Proration Statement to confirm the accuracy of the Preliminary Proration Statement.  Buyer and Seller shall agree upon any adjustments to be made to the Preliminary Proration Statement before the Closing, and at the Closing, Buyer or Seller, as applicable, shall receive a credit equal to the net amount due Buyer or Seller, as applicable, pursuant to the Preliminary Proration Statement as finally agreed upon by Buyer and Seller.  The items to be covered by the Preliminary Proration Statement are:

(i)      non-delinquent real property taxes and assessments; provided that if the real property tax assessment for the fiscal year in which the Closing occurs has not been issued as of the Closing Date, real property taxes shall be prorated based on the most recent assessed value of the Property, multiplied by the current tax rate, and such tax proration shall be subject to adjustment pursuant to subparagraph (d) of this Section 8.1;

(ii)      the current installment (only) on any improvement bonds which are a lien on the Property, to the extent shown on the Title Policy; Buyer shall take the Property subject to all future installments of any improvement bonds, to the extent shown on the Title Policy;

(iii)      water, sewer and utility charges;

(iv)      permits, licenses and/or inspection fees (calculated on the basis of the period covered), but only to the extent transferred to Buyer; and

(v)      any other expenses normal to the operation and maintenance of the Property.

(b)      ***Post-Closing Adjustments.***  Notwithstanding anything to the contrary contained in this Section 8, (i) if the amount of the real property taxes and assessments payable with respect to the Property for any period before Closing is determined to be more than the amount of such real property taxes and assessments that is prorated herein (in the case of the current year) or that was paid by Seller (in the case of any prior year), due to a reassessment of the value of the Property or otherwise, Seller and Buyer shall promptly adjust the proration of such real property taxes and assessments after the determination of such amounts, and Seller shall pay to Buyer any increase in the amount of such real property taxes and assessments applicable to any period before Closing; and (ii) if the amount of the real property taxes and assessments payable with respect to the Property for any period before Closing is determined to be less than the amount of

such real property taxes and assessments that is prorated herein (in the case of the current year) or that was paid by Seller (in the case of any prior year), due to an appeal of the taxes by Seller, a reassessment of the value of the Property or otherwise, Seller and Buyer shall promptly adjust the proration of such real property taxes and assessments after the determination of such amounts (net of any costs incurred by Seller in connection with pursuing any appeal thereof), and (A) Buyer shall pay to Seller any refund received by Buyer representing such a decrease in the amount of such real property taxes and assessments applicable to any period before Closing; and (B) Seller shall be entitled to retain any refund received by Seller representing such a decrease in the amount of such real property taxes and assessments applicable to any period before Closing. Each party shall give notice to the other party of any adjustment of the amount of the real property taxes and assessments payable with respect to the Property for any period before Closing within thirty (30) days after receiving written notice of any such adjustment.

(c)    *Seller's Obligations.*    For the avoidance of all doubt, nothing in this Section 8.1, 5.2 above or anything else to the contrary in this Agreement is intended to or shall impose upon Seller any obligation to pay any amounts to the extent that Seller can defend, discharge, satisfy or otherwise treat them in the Bankruptcy Case.

### 8.2.    Survival

The obligations of Seller and Buyer under this Section 8 shall survive the Closing.

## 9.    RISK OF LOSS AND INSURANCE PROCEEDS

### 9.1.    Minor Loss

Buyer shall be bound to purchase the Property for the full Purchase Price as required by the terms hereof, without regard to the occurrence or effect of any damage to the Property or destruction of any Improvements or condemnation of any portion of the Property, provided that: (a) the cost to repair any such damage or destruction does not exceed three percent (3%) of the Purchase Price or, in the case of a partial condemnation, the value of the portion taken does not exceed three percent (3%) of the Purchase Price of the Property; and (b) upon the Closing, there shall be a credit against the Purchase Price due hereunder equal to the amount of any insurance proceeds or condemnation awards collected by Seller as a result of any such damage or destruction or condemnation, plus the amount of any insurance deductible, less any sums expended by Seller toward the restoration or repair of the Property as a result of such casualty or condemnation.  If the proceeds or awards have not been collected as of the Closing, then such proceeds or awards shall be assigned to Buyer at Closing, and Buyer shall receive a credit from Seller at Closing equal to the amount of the deductible under any policy of insurance pursuant to which such assigned proceeds will be paid; provided that if Seller shall have expended any sums before the Closing to repair or restore the Property, the amount expended by Seller shall first be deducted from any credit due Buyer for the deductible under any insurance policy, and if the amount expended by Seller exceeds the total amount of such deductible(s), Seller shall reserve from the assignment of insurance proceeds to Buyer, the amount of such excess.

### 9.2.    Major Loss

If the cost to repair such damage or destruction to Property exceeds three percent (3%) of

the Purchase Price or, in the case of condemnation, if the value of the portion of the Property taken exceeds three percent (3%) of the Purchase Price of the Property, or in the case of damage due to an earthquake which, under the terms of Section 9.1 above, is to be governed by this Section 9.2, then Buyer may, at its option to be exercised by written notice to Seller within twenty (20) days after Seller's notice to Buyer of the occurrence of the damage or destruction or the commencement of condemnation proceedings, either (a) elect to terminate this Agreement, in which case the Deposit shall be refunded to Buyer, and neither party shall have any further obligations under this Agreement, except for obligations which expressly state that they shall survive termination of this Agreement, or (b) consummate the purchase of the Property for the full Purchase Price as required by the terms hereof, subject to the credits against the Purchase Price provided below.  If Buyer elects to proceed with the purchase of the Property, then, upon the Closing, Buyer shall be given a credit against the Purchase Price due hereunder equal to the amount of any insurance proceeds or condemnation awards collected by Seller as a result of any damage or destruction or condemnation, plus the amount of any insurance deductible, less any sums expended by Seller toward the restoration or repair of the Property as a result of such casualty or condemnation.  If the proceeds or awards have not been collected as of the Closing, then such proceeds or awards shall be assigned to Buyer at Closing, and Buyer shall receive a credit from Seller at Closing equal to the amount of the deductible under any policy of insurance pursuant to which such assigned proceeds will be paid; provided that if Seller shall have expended any sums before the Closing to repair or restore the Property, the amount expended by Seller shall first be deducted from any credit due Buyer for the deductible under any insurance policy, and if the amount expended by Seller exceeds the total amount of such deductible(s), Seller shall reserve from the assignment of insurance proceeds to Buyer, the amount of such excess.  If Buyer fails to give Seller notice within such 20-day period, then Buyer will be deemed to have elected to proceed in accordance with clause (b) above.

10.    **DEFAULT**

(a)    ***Buyer's Default***.  If the Closing does not occur as a result of Buyer's default hereunder (whether such default occurs prior to the Closing or at the time of the Closing), Seller's sole and exclusive remedy shall be to terminate this Agreement by giving written notice thereof to Buyer, whereupon the Deposit shall be paid to Seller as liquidated damages, as Seller's sole and exclusive remedy on account of such default hereunder by Buyer; provided, however, that this provision will not waive or affect any provisions of this Agreement which expressly state that they shall survive the termination of this Agreement and neither party shall have any further liability or obligation to the other hereunder, except for provisions of this Agreement which expressly state that they shall survive the termination of this Agreement. For the avoidance of all doubt, nothing in this Section 10(a) or any other provision hereof shall be deemed to limit or affect Seller's rights pursuant to Section 15.18 with respect to recovery of attorneys' fees and other amounts set forth therein in the event of a dispute about payment or delivery of the Deposit to Seller as liquidated damages.  The parties acknowledge and agree that Seller's actual damages in the event of Buyer's default would be extremely difficult or impracticable to determine.  After negotiation, the parties have agreed that, considering all the circumstances existing on the date of this Agreement, the amount of the Deposit is a reasonable estimate of the damages that Seller would incur in such event.  The payment of the Deposit to Seller as liquidated damages under the circumstances provided for herein is not intended as a forfeiture or penalty, but is intended to constitute liquidated damages to Seller.  By placing their

initials below, each party specifically confirms the accuracy of the statements made above, the reasonableness of the amount of liquidated damages agreed upon, and the fact that each party was represented by counsel who explained, at the time this agreement was made, the consequences of this liquidated damages provision.

Initials: _____    _____
*Seller*                *Buyer*

(b)    ***Seller's Default***.  If the Closing does not occur as a result of Seller's default hereunder (which, for the avoidance of doubt, shall specifically exclude any delays by the Bankruptcy Court in hearing Seller's sale motion or entering the Sale Order), then, provided Buyer is not in default hereunder, Buyer may, at its sole election, proceed with one of the following mutually exclusive alternatives:

(i)    waive such default and proceed with the Closing with no reduction in the Purchase Price; provided, however, that this provision will not waive or affect any of Seller's other obligations under this Agreement to be performed after the Closing with respect to any matter other than such default; or

(ii)    terminate this Agreement, whereupon the Deposit (or, the portion thereof theretofore deposited by Buyer with Escrow Holder, if applicable) shall be returned and paid to Buyer, and neither party shall have any further liability or obligation to the other hereunder, except for provisions of this Agreement which expressly state that they shall survive the termination of this Agreement.

## 11.    EXPENSES

(a)    Except in the event Seller is entitled to the exemption from transfer and recordation taxes and city and county and other transfer taxes by virtue of compliance with Section 1146(a) of the Bankruptcy Code, the same shall be borne and paid by Seller.

(b)    All Escrow and Closing costs charged by Escrow Holder, any investment charges or escrow fees incurred with respect to the Escrow, and all recording fees shall be borne and paid one-half by Seller and one-half by Buyer.

(c)     The cost of the Title Policy (including the cost of ALTA extended coverage and the cost of all endorsements) shall be borne and paid by Buyer.

(d)    Each party shall pay its own attorneys' fees in connection with the negotiation, documentation and consummation of the Transaction contemplated hereunder.  Each party shall pay its own costs of preparing and/or reviewing the Preliminary Prorations Statement and any Supplemental Prorations Statement in connection with this Agreement.  The provisions of this Section 11(d) shall survive any termination of this Agreement.

(e)    Other costs, charges, and expenses shall be borne and paid as provided in this Agreement.

## 12.    BROKERS

(a)      Seller represents to Buyer, and Buyer represents to Seller that (except for Eastdil (the "**Broker**"), whose commission will be paid by Seller pursuant to the terms of a separate agreement, between Broker and Seller), there is no broker, finder, or intermediary of any kind with whom Seller has dealt in connection with this Transaction.

(b)      Seller agrees to indemnify and hold harmless Buyer, the partners, members, trustees, shareholders, directors and officers of Buyer, any party owning a direct or indirect interest in Buyer, the affiliates of Buyer, and the partners, members, trustees, shareholders, directors, officers, employees and agents of each of the foregoing parties (the "**Buyer-Related Parties**"), from and against all claims, demands, causes of action, judgments, and liabilities which may be asserted or recovered for brokerage or finders fees, commissions, or other compensation in connection with this Transaction claimed by any party other than Broker to be owing to such party due to any dealings between Seller and the party claiming such fee, commission or compensation, including costs and reasonable attorneys' fees incident thereto. Buyer agrees to indemnify and hold harmless the Seller-Related Parties, from and against all claims, demands, causes of action, judgments, and liabilities which may be asserted or recovered for brokerage or finders fees, commissions, or other compensation in connection with this Transaction contemplated under this Agreement claimed by any party other than Broker to be owing to such party due to any dealings between Buyer and the party claiming such fee, commission or compensation, including costs and reasonable attorneys' fees incident thereto. The parties hereto agree that the foregoing obligations of indemnification shall survive the Closing hereunder or the expiration or termination of this Agreement, however caused.

## 13.    NO ASSIGNMENT WITHOUT WRITTEN CONSENT

Buyer may not assign this Agreement to any other party without Seller's prior written consent, which consent may be granted, conditioned or denied in Seller's sole and absolute discretion; provided, however, Buyer shall have the right to assign this Agreement to one or more affiliated entities which are owned or controlled by the same persons who control Buyer before the Closing Date and whose identity shall be disclosed to the Seller prior to the Closing Date.  Notwithstanding anything herein to the contrary, Buyer shall not in any event be released from any of its obligations or liabilities hereunder in the event of any assignment by Buyer, including, but not limited to, any obligations which survive the Closing, whether contained in this Agreement or any document to be delivered by Buyer at the Closing, even if such document is signed by the assignee of Buyer only.  Subject to the limitations described herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors and assigns.

## 14.    NOTICES

Any and all notices or other communications required or permitted to be given under this Agreement shall be in writing and either (i) personally delivered, in which case notice shall be deemed delivered upon receipt, (ii) sent by facsimile, in which case notice shall be deemed delivered upon the sender's receipt of confirmation of transmission of such facsimile notice produced by the sender's facsimile machine, (iii) sent by electronic mail, (iv) sent by any nationally recognized overnight courier service with provisions for proof of delivery, in which case notice shall be deemed delivered on the next business day after the sender deposits the same

with such delivery service, or (v) sent by United States Mail, postage prepaid, certified mail, return receipt requested, in which case notice shall be deemed delivered on the date of delivery as shown on the return receipt or the date of the addressee's refusal to accept delivery as indicated by the United States Postal Service, and in any case such notices or other communication shall be addressed to the following addresses:

|  |  |
|---|---|
| *Buyer:* | Carmel Partners Realty VII, LLC<br>Attention: Matthew Golden, Lee Bloch<br>Telephone: (212) 355-0795<br>Email: mgolden@carmelpartners.com,<br>lbloch@carmelpartners.com |
| *With a copy to:* | Cooley LLP<br>Attention: Michael Klein<br>Telephone:  (212) 479-6461<br>Facsimile:  (212) 479-6275<br>Email: mklein@cooley.com |
| *Seller:* | Wardman Hotel Owner L.L.C.<br>c/o J Decker & Company<br>5035 Riverview Road NW<br>Atlanta, GA 30327<br>Attention: Mr. James Decker<br>Telephone: (404) 229-8907<br>Facsimile:  (___) ___-____<br>Email: jim@jdeckerco.com |
| *With a copy to:* | Pachulski Stang Ziehl & Jones LLP<br>919 N. Market Street, 17th Floor<br>Wilmington, DE   19801<br>Attention:  Laura Davis Jones, Esq.<br>Telephone:  (302) 778-640<br>Facsimile:  (302) 652-4400<br>Email:  ljones@pszjlaw.com |

Either party may change its address for notice from time to time by notice to the other party in writing to the other in the manner aforesaid; provided that any such notice of change of address shall only be effective upon actual receipt by the other party.

**15.  MISCELLANEOUS**

**15.1.  *Attorneys' Fees; Exclusive Jurisdiction***

BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND/OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE

PROPERTY, AND BUYER HEREBY EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST IN ANY WAY SUCH EXCLUSIVE JURISDICTION.

### 15.2.  Gender

Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

### 15.3.  Captions

The captions in this Agreement are inserted only for the purpose of convenient reference and in no way define, limit or prescribe the scope or intent of this Agreement or any part hereof.

### 15.4.  Construction

(a)      No provision of this Agreement shall be construed by any Court or other judicial authority against any party hereto by reason of such party's being deemed to have drafted or structured such provisions.

(b)      As used herein, the terms "include", "including" and similar terms shall be construed as if followed by the phrase "but not limited to".  The terms "hereof", "herein" and "hereunder", and words of similar import, shall be construed to refer to this Agreement as a whole, and not to any particular article or provision, except as expressly so stated.

(c)      It is the intent of the parties that all indemnification obligations of the either party set forth in this Agreement shall apply without regard to whether or not (i) the indemnifying party is negligent or otherwise at fault in any respect with regard to the existence or occurrence of any of the matters covered by any such indemnification obligation, or (ii) the indemnifying party otherwise caused or created, or is claimed to have caused or created, the existence or occurrence of any of the matters covered by any such indemnification obligation, whether through its own acts or omissions or otherwise.

### 15.5.  Business Days; Deadlines

As used in this Agreement and any document executed by any party hereto to another party hereto at the Closing, the term "business days" means all days of the year except Saturdays, Sundays, and holidays recognized by the Federal Reserve Bank of San Francisco.  If a deadline provided in this Agreement or any document executed by any party hereto to another party hereto at the Closing falls on a day other than a business day, such deadline shall be extended until the first business day thereafter.

### 15.6.  Entire Agreement

This written Agreement, including all Schedules and Exhibits attached hereto (including, but not limited to, the Access Agreement) and documents to be delivered pursuant hereto, and the Confidentiality Agreement, dated January 2021, by and between Seller and Carmel Partners, LLC shall together constitute the entire agreement and understanding of the parties, and there are

no other prior or contemporaneous written or oral agreements, undertakings, promises, warranties, or covenants not contained or merged herein.  The Schedules and Exhibits attached hereto are hereby incorporated in and made part of this Agreement.

### 15.7.  Recording

The parties agree that this Agreement shall not be recorded.  If Buyer causes this Agreement or any notice or memorandum thereof to be recorded, this Agreement shall be null and void at the option of Seller.

### 15.8.  No Continuance

Buyer acknowledges that there shall be no assignment, transfer or continuance of Seller's insurance coverage after the Closing.

### 15.9.  Time of Essence

Time is of the essence of this Agreement.  In the computation of any period of time provided for in this Agreement or by law, the day of the act or event from which said period of time runs shall be excluded, and the last day of such period shall be included, unless it is not a business day, in which case the period shall be deemed to run until the next day which is a business day.

### 15.10.  Original Document

This Agreement may be executed in counterparts and such counterparts may be delivered in electronic format (including by email).  Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby and each such counterpart and copies produced therefrom shall have the same effect as an original.  To the extent applicable, the foregoing constitutes the election of the Parties to invoke any law authorizing electronic signatures.

### 15.11.  Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, except to the extent that the local real property laws of the District of Columbia shall govern and apply to the transfer and conveyance of the Real Property at Closing.

### 15.12.  Amendment

This Agreement may be amended or modified only by a written agreement subsequently executed by Buyer and Seller.

### 15.13.  Waiver

No waiver of any provision or condition of this Agreement by any party shall be valid unless in writing signed by such party.  No such waiver shall be taken as a waiver of any other or similar provision or of any future event, act, or default.

### *15.16   Third Party Beneficiaries.*

Except for the Seller-Related Parties and Buyer-Related Parties who are not signatories to this Agreement (each of whom shall be deemed third party beneficiaries of this Agreement with respect to the provisions hereof relating to them), this Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

### *15.17   Reasonable Access to Records and Certain Personnel*

For as long as the Bankruptcy Case is pending, the Buyer shall permit Seller's counsel and other professionals and counsel for any successor to Seller and their respective professionals (collectively, **"Permitted Access Parties"**) reasonable access to any books and records relating to the Property (to the extent conveyed hereunder) to facilitate Seller's administration and winding down of the Bankruptcy Case, which access shall include (i) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (ii) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Buyer for the reasonable costs and expenses thereof, and (ii) Buyer shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to Buyer's personnel during regular business hours to assist Seller and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of tax returns), provided that such access does not unreasonably interfere with the Buyer's business operations.

After the entry of the Sale Order and prior to Closing, Seller shall permit Buyer and its professionals reasonable access to any books and records relating to the Property.

### *15.18   Attorneys' Fees.*

In the event of any litigation between the parties with respect to the Property, this Agreement, the Escrow, the performance of their obligations hereunder or the effect of a termination under this Agreement, the losing party shall pay all costs and expenses incurred by the prevailing party in connection with such litigation including, without limitation, reasonable attorneys' fees and disbursements. Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Agreement shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment. Notwithstanding any provisions of this Agreement to the contrary, the obligations of the parties under this Section 15.1 shall survive any termination of this Agreement and the Closing.

### *15.19   Collective Bargaining Agreements.*

Notwithstanding anything to the contrary in the CBAs, the Buyer shall not be bound by the CBAs or be subject to any liabilities set forth therein, and UNITE HERE Local 25 and Local 99, International Union of Operating Engineers shall be barred from asserting any costs or liabilities against the Buyer, except if any of the following conditions are met: (a) if the Real Property is immediately operated as a hotel, then the Buyer shall assume the applicable CBA and shall be bound by the terms and conditions of such CBA, (b) if the Real Property is not immediately operated as a hotel, but is later converted to hotel operation prior to September 15, 2024, then the Buyer shall assume the applicable CBA as of the date such hotel operations commence (the "Commencement Date"), whereupon the Buyer shall be bound by the terms and conditions of such CBA for the period following the Commencement Date until the expiration of the CBA as set forth therein, and (c) if the Real Property is transferred to a successor owner (the "Successor Owner"), then the Buyer shall make as a condition of such transfer that the Successor Owner assume the same obligations as the Buyer, as set forth in this section, for the balance of the period prior to September 15, 2024.  There are no amounts due or owing arising from the CBAs, and none are assumed by the Buyer.

*[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]*

In Witness Whereof, the parties have executed this Agreement as of the date first above written.

*BUYER:*

           Carmel Partners Realty VII, LLC,
           a Delaware limited liability company


           By: _____
           Name: _____
           Title: _____

           Date signed:  July ___, 2021

*SELLER:*


           Wardman Hotel Owner, L.L.C., a
           Delaware limited liability company and
           Debtor and Debtor in Possession


           By: _____
           Name:  James Decker
           Title:  Manager

           Date signed: July ___, 2021

## SCHEDULE 1.1

### DESCRIPTION OF THE LAND

The following described real property in Washington, District of Columbia:

[to be attached]

**Error! Unknown document property name.**

Schedule 5.2

**SCHEDULE OF ASSUMED CONDOMINIUM DOCUMENTS**

1.      That certain *The Declaration of the Wardman Tower Master Condominium* dated November 21, 2013 and recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2013130685 and the *Bylaws* thereto recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2013130686, each as affected by that certain *Assignment and Assumption of Declarant's Rights* dated January 19, 2018 recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2018008244.

2.      That certain *Declaration of Easements and Cost-Sharing Agreement* dated December 3, 2010 recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2010107555, as amended by that certain *First Amendment to and Reaffirmation of Declaration of Easements and Cost-Sharing Agreement* dated January 31, 2014 recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2014010253.

3.      That certain *Single Recorded Lot Covenant* dated as of June 27, 2012 recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2012072263 as amended by that certain *First Amendment to Single Recorded Lot Covenant* dated as of June 19, 2014 recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2014055025 and re-recorded as Instrument No. 2018027539.

4.      That certain *Amended and Restated Declaration of Easements and Cost-Sharing Agreement* dated as of January 9, 2009 recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2010107556 as amended by the *First Amendment to Amended and restated Declaration of Easements and Cost-Sharing Agreement recorded* in the Office of the Recorder of Deeds for the District of Columbia as Instrument No.2014055024.

5.      That certain *Declaration* for Wardman Tower Residential Condominium dated October 24, 2016 recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2016110918 and the *Bylaws* thereto recorded in the Office of the Recorder of Deeds for the District of Columbia as Instrument No. 2016110919.

Exhibit A

Form of Title Commitment

[Attached]

EXHIBIT B

FORM OF SALE ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WARDMAN HOTEL OWNER, L.L.C.,[1] | ) | Case No. 21-10023 (JTD) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) | Docket Ref. No. 262 |

### ORDER (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF DEBTOR'S ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(b), 363(f), 363(m), AND 1146; (C) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF

This matter coming before the Court on the motion (the "Sale Motion")[2] of the above-captioned debtor and debtor in possession (the "Debtor") for the entry of an order pursuant to sections 105(a), 363, 365, 503, 1107, 1108, and 1146 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court for the District of Delaware (the "Local Rules") (a) authorizing the sale (the "Sale") of such

---

[1] The last four digits of the Debtor's U.S. tax identification number are 9717.  The Debtor's mailing address is 5035 Riverview Road, NW, Atlanta, GA 30327.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in either the Successful Bidder APA or the *Order (A) Approving Bid Procedures for the Sale of the Assets of Debtor; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Costs; (D) Approving Breakup Fee; and (E) Granting Other Related Relief* (the "Bid Procedures Order") [D.I. 250], as applicable.

assets free and clear of liens, claims, encumbrances, and other interests, except as provided in the asset purchase agreement (the "Successful Bidder APA") by and between the Debtor and Carmel Partners Realty VII, LLC (the "Successful Bidder"), a copy of which is attached hereto as **Exhibit 1**, and (b) approving the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases related thereto to the Successful Bidder; and (c) granting relief related; and the Court having reviewed the Sale Motion; and the Debtor having conducted the Auction on July 20, 2021, at the conclusion of which the Successful Bidder was determined to have provided the highest and best offer for the Assets pursuant to the terms of the Successful Bidder APA and 2660 Woodley Road NW (DC) Owner, LLC ("2660 Woodley Road") was named as the Back-Up Bidder in accordance with the terms of the Bid Procedures Order; and the Court having found that (i) the Court has jurisdiction to consider the Sale Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iv) notice of the Sale Motion was sufficient under the circumstances; and after due deliberation the Court having determined that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate and its creditors; and good and sufficient cause having been shown;

**AND IT IS FURTHER FOUND AND DETERMINED THAT**:

A.      The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014.

B.      The Debtor's notice of the Bid Procedures, the Cure Costs, the Auction and the

hearing to approve any Sale of the Assets (the "Sale Hearing") was in accordance with the Bid

Procedures Order and appropriate and reasonably calculated to provide all interested parties with

timely and proper notice and no other or further notice is required.  Such notice was proper under

the Bankruptcy Code, Bankruptcy Rules and Local Rules.

C.      As set forth in the Successful Bidder APA, the Successful Bidder shall not operate

or manage the Property as a hotel post-Closing, including as a restaurant or banquet hall.  The

Successful Bidder is not a successor to the Debtor or this bankruptcy estate nor shall be deemed

to be a mere continuation of any of the Debtor's operations by any reason or theory of law or

equity, and the Successful Bidder shall not be subject to successor liability for any assets sold or

claims asserted prior to closing of the Sale of the Assets (the "Closing"), including, for the

avoidance of doubt, any liabilities arising from (i) any collective bargaining agreements entered

into by Marriott and/or that may be binding upon the Debtor, or (ii) that certain Owner's Letter

(collectively, the "CBAs"), except as set forth herein.

D.      Notwithstanding anything to the contrary in the CBAs, the Successful Bidder

shall not be bound by the CBAs or be subject to any liabilities set forth therein, and UNITE

HERE Local 25, and Local 99, International Union of Operating Engineers (the "Unions") shall

be barred from asserting any costs or liabilities against the Successful Bidder, except if any of

the following conditions are met: (a) if the Real Property is immediately operated as a hotel, then

the Successful Bidder shall assume the applicable CBA and shall be bound by the terms and

conditions of such CBA, (b) if the Real Property is not immediately operated as a hotel, but is

later converted to hotel operation prior to September 15, 2024, then the Successful Bidder shall

assume the applicable CBA as of the date such hotel operations commence (the

"Commencement Date"), whereupon the Successful Bidder shall be bound by the terms and

conditions of such CBA for the period following the Commencement Date until the expiration of

the CBA as set forth therein, and (c) if the Real Property is transferred to a successor owner (the

"Successor Owner"), then the Successful Bidder shall make as a condition of such transfer that

the Successor Owner assume the same obligations as the Successful Bidder, as set forth in this

paragraph, for the balance of the period prior to September 15, 2024.  There are no amounts due

or owing arising from the CBAs, and none are assumed by the Successful Bidder.

E.      The Purchase Price was negotiated at arms' length, without collusion, in good

faith, and constitutes fair consideration for the Assets.  The Successful Bidder is a good faith

purchaser of the Assets pursuant to section 363(m) of the Bankruptcy Code and the provisions of

section 363(n) of the Bankruptcy Code have not been violated.

F.      The Debtor has full corporate power and authority to execute the Successful

Bidder APA (including all ancillary documents executed in connection therewith), and the Sale

of the Assets has been duly and validity authorized by all necessary corporate authority by the

Debtor to consummate the Transaction contemplated by the Successful Bidder APA.  No

consents or approvals, other than as may be expressly provided for in the Successful Bidder

APA, are required by the Debtor to consummate such Transaction.

G.      The Real Property, Appurtenant Rights, Permits, Intangible Property, and

Warranties each constitute property of the Debtor's estate and title thereto is vested in the

Debtor's estate within the meaning of section 541(a) with respect thereto.  The Debtor is the sole

and lawful owner of the Assets.

H.      Pursuant to section 1146(a) of the Bankruptcy Code, the Sale (including the

transfers and other transactions contemplated thereunder) is not subject to any document

recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real

estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental

assessment. The Sale (including the transfers and other transactions contemplated thereunder) is

in contemplation of a plan consistent with the requirements of section 1146(a) of the Bankruptcy

Code.

I.      To the extent any of the following findings of fact constitute conclusions of law,

they are adopted as such.

## IT IS HEREBY ORDERED THAT:

1.      The Sale Motion is **GRANTED** as set forth herein.  The Sale of the Assets to the

Successful Bidder on the terms and conditions set forth in the Successful Bidder APA is

approved.  The Debtor is authorized to consummate the transactions under the Successful Bidder

APA in accordance with this Order.

2.      All objections and responses to the Sale Motion that have not been overruled, withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied.

3.      The Successful Bidder's offer for the Assets, as embodied in the Successful Bidder APA, is the highest and best offer for the Assets under the Successful Bidder APA and is hereby approved.

4.      The Successful Bidder APA annexed hereto as **<u>Exhibit 1</u>** is hereby approved pursuant to section 363(b) of the Bankruptcy Code, and the Debtor is authorized to consummate and perform all of its obligations under the Successful Bidder APA and to execute such other documents and take such other actions as are necessary or appropriate to effectuate the Successful Bidder APA.

5.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full.  Therefore, the Debtor may sell the Assets free and clear of any interest in the Assets other than as otherwise provided in the Successful Bidder APA or herein.

6.      Pursuant to sections 105, 363(b), 363(f) and 363(m) of the Bankruptcy Code, the Assets shall be sold and transferred free and clear of all liens, claims, rights, encumbrances or other interests (collectively, "<u>Liens</u>"), except as otherwise provided in the Successful Bidder APA or herein, with any and all such Liens to attach to proceeds of the Sale with the same validity (or invalidity), priority, force and effect such Liens had on the Assets immediately prior to the Sale and subject to the rights, claims, defenses, and objections, if any, of the Debtor and all interested parties with respect to any such asserted Liens.  The allowed secured claim of Pacific

Life shall be paid at any time after the Closing, less amounts to pay anticipated allowed administrative expenses, if any, to which Pacific Life agrees or as to which the Court orders a reserve at the Sale Hearing.

7.      The Successful Bidder is not a successor to the Debtor or this bankruptcy estate nor shall the Successful Bidder be deemed to be a mere continuation of any of the Debtor's operations by any reason or theory of law or equity.  The Successful Bidder shall not be subject to successor or vicarious liabilities of any kind or character including, but not limited to, under any theory of antitrust, environmental, or transferee liability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, and any claims for taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to or arising from the Assets prior to or on the Closing Date, the Debtor's operation or ownership of the Assets, or the transfer of the Debtor's Assets to the Successful Bidder.  All creditors or other persons are hereby barred from bringing any claim or asserting any Liens against the Successful Bidder or the Assets, except as related to any liabilities expressly assumed as set forth in the Successful Bidder APA (which liabilities include only the liabilities and obligations associated with the Condominium Agreements (defined below) as provided in section 5.2 of the Successful Bidder APA and paragraph 8 herein).

8.      Notwithstanding anything to the contrary in this Order, the Successful Bidder APA, and any other document related to any of the foregoing (including, without limitation, any

provision that purports to be preemptory or supervening), after the Closing, (i) the Successful Bidder shall perform all rights and obligations of the Debtor under all agreements and documents between, among or binding on the Debtor, the Wardman Tower Residential Condominium Association (the "Residential Condominium Association") and/or the Wardman Tower Master Association (the "Master Association"), and (ii) the Successful Bidder, the Residential Condominium Association and the Master Association shall continue to be bound by and shall perform and discharge in full their respective rights and obligations under all agreements and documents between, among or binding on the Debtor, the Residential Condominium Association and/or the Master Association including, without limitation, the rights and obligations under the documents and agreements set forth or described in Schedule 5.2 of the Successful Bidder APA (collectively, the "Condominium Agreements").  Furthermore, as of the Closing, no monetary cure costs have been asserted by the Residential Condominium Association or the Master Association.

9.      Furthermore, nothing in this Order, the Successful Bidder APA, and any other document related to any of the foregoing (including, without limitation, any provision that purports to be preemptory or supervening) shall constitute a finding by the Court, or an admission by any party, that any of the Condominium Agreements are executory contracts which may be assumed or rejected by the Debtor.  Additionally, the retention by the Seller of any rights, claims, causes of action, interests, or recoveries in the Residential Condominium Association Litigation (as defined in the Successful Bidder APA) does not constitute any

alteration, waiver, amendment, modification, set off, or diminishment of the rights and obligations of any party under the Condominium Agreements.

10.    The sale of the Assets shall be free and clear of any right, title, interest, or claim of Marriott as against the Successful Bidder under or relating to that certain Subordination, Non-Disturbance and Attornment Agreement dated as of January 19, 2018 (the "SNDA") between Marriott Hotel Services Inc. ("Marriott") and Pacific Life, including any right to enforce provisions of the SNDA that purport to be binding upon the Successful Bidder as a "Successor Owner," as defined therein. For the avoidance of doubt, nothing in this Order, including the successor liability provisions herein, is intended to, or shall, impair or otherwise affect the rights of Marriott against Pacific Life Insurance Company, if any, under the SNDA.

11.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Assets to the Successful Bidder, or the ability of the Successful Bidder to utilize such Assets, in accordance with the terms of the Successful Bidder APA and this Order.

12.    To the extent applicable, pursuant to section 365 of the Bankruptcy Code, the assignment and assumption of any contracts by the Successful Bidder, as identified in the Successful Bidder APA, is hereby authorized and approved in all respects. For the avoidance of doubt, the Successful Bidder is not seeking to assign or assume any contracts, except the Condominium Agreements. Any provision in an assumed contract that purports to prohibit the assignment of such contract or that purports to allow the counterparty to terminate, recapture, or impose penalties upon assignment constitute unenforceable anti-assignment provisions and are

void and of no force or effect. Upon the Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Successful Bidder shall be fully and irrevocably vested with all right, title and interest of the Debtor under the assumed contract and the assumed contracts shall remain in full force and effect for the benefit of the Successful Bidder. The Successful Bidder has provided adequate assurance of future performance under the assumed contracts within the meaning of Section 365 of the Bankruptcy Code. The assignment by the Debtor to the Successful Bidder shall relieve the Debtor and the estate from all liabilities on account of any assumed contracts occurring after the date of such assignment pursuant to section 365(k) of the Bankruptcy Code.

13.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Sale by the Debtor to the Successful Bidder of the Assets and transactions related thereto, upon the Closing under the Successful Bidder APA, are authorized and approved in all respects.

14.     Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor and Successful Bidder are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale pursuant to and in accordance with the terms and conditions of the Successful Bidder APA, together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Successful Bidder APA, (b) close the Sale as contemplated in the Successful Bidder APA and this Order, and (c) execute and deliver, perform under, consummate, implement, and fully close the Successful Bidder APA, including the assumption and assignment to the Successful

Bidder of any assumed contracts, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Successful Bidder APA and the Sale.

15.     This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  The stays provided in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Order shall be effective immediately upon its entry.

16.     The terms of this Order shall be binding on the Successful Bidder and its successors, the Debtor, creditors of the Debtor, and all other parties in interest in this bankruptcy case, and any successors of the Debtor, including any trustee or examiner appointed in this case or upon a conversion of this case to chapter 7 of the Bankruptcy Code.

17.     The Successful Bidder is a good faith purchaser entitled to the benefits, protections and immunities afforded by section 363(m) of the Bankruptcy Code and the provisions of section 363(n) of the Bankruptcy Code have not been violated.  No reversal or modification of this Order on appeal will affect the validity of the Successful Bidder APA or the Transaction contemplated thereby.  The Successful Bidder is not an "insider" as defined by Section 101 of the Bankruptcy Code.  Neither the Debtor nor the Successful Bidder is or will be entering into the Successful Bidder APA fraudulently, or for the purposes of hindering, delaying or defrauding any of the Debtor's creditors, and the purchase price constitutes reasonably equivalent and fair value (as those terms or their equivalents are defined by the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and Section 548 of the Bankruptcy Code) for the Assets.

18.     With respect to the transactions consummated pursuant to this Order, this Order shall be sole and sufficient evidence of the transfer of title to any particular purchaser, and the sale transaction consummated pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the property sold pursuant to this Order, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state, and local officials, and each of such persons and entities is hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

19.     Effective as of the Closing, the Sale of the Real Property, Appurtenant Rights, Permits, Intangible Property, and Warranties by the Debtor to the Successful Bidder shall constitute a legal, valid and effective transfer of the Assets notwithstanding any requirement for approval or consent by any person and vests the Successful Bidder with all right, title and interest of the Debtor's estate in the Real Property, Appurtenant Rights, Permits, Intangible Property, and Warranties, free and clear of all Liens, Claims and Encumbrances, pursuant to section 363(f) of the Bankruptcy Code except with respect to any liabilities assumed by the Successful Bidder under the Successful Bidder APA or this Sale Order.  All of the Debtor's interests in the Real Property, Appurtenant Rights, Permits, Intangible Property, and Warranties

to be acquired by the Successful Bidder under the Successful Bidder APA shall be, as of the

Closing Date and upon the occurrence of the Closing, transferred to and vested in the Successful

Bidder.  Upon the occurrence of the Closing, this Order shall be considered and constitute for

any and all purposes a full and complete general assignment, conveyance, and transfer of the

acquired by the Successful Bidder under the Successful Bidder APA and/or an assignment

transferring indefeasible title and interest in the Real Property, Appurtenant Rights, Permits,

Intangible Property, and Warranties to the Successful Bidder.

20.    The filing of a copy of this Order in the District of Columbia may be relied upon

by all title insurers in order to issue title insurance policies on the Real Property.

21.    Any title insurer, escrow agent, or other intermediary participating in a Closing of

a Sale of the Assets after the Petition Date is authorized to disburse all funds at the Closing of the

Sale pursuant to the applicable settlement statement or escrow instructions provided by the

parties to such Sale.

22.    The Sale of the Assets and the transactions contemplated thereby shall be exempt

from any document recording tax, stamp tax, conveyance fee, intangibles or similar tax,

mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other

similar tax or governmental assessment as a transfer of assets under a plan subject to the tax

exemptions under section 1146(a) of the Bankruptcy Code.

23.    This Court retains jurisdiction to interpret, implement and enforce the provisions

of, and resolve any disputes arising under or related to, this Order and the Successful Bidder

APA, each Back-up Bidder APA, all amendments thereto, any waivers and consents thereunder and each of the agreements executed in connection therewith.

24.    Notwithstanding paragraph 23 of this Order, any dispute concerning the interpretation or application of paragraph D of this Order shall be resolved in accordance with the Labor Arbitration Rules (the "Rules") of the American Arbitration Association.  Any dispute must be submitted to the American Arbitration Association in accordance with such Rules no later than thirty (30) days after notice of the occurrence giving rise to the dispute is received or should have been known by the party initiating the arbitration.  Any arbitrator shall have no authority to add to, subtract from, modify, or amend the language in paragraph D.  The costs of any arbitrator will be shared equally by the parties to the arbitration.

25.    In the event that the Successful Bidder fails to consummate the Sale in accordance with the Successful Bidder APA because of a breach by the Successful Bidder or failure to perform on the part of the Successful Bidder, the Debtor shall provide five (5) business days' prior notice to the Unions.  Absent objection by the Unions, the Back-up Bidder must immediately proceed with the closing of the transaction contemplated under the Back-up Bidder APA, but subject to the terms and conditions of the Back-up Bidder APA (as defined below), except as such terms and conditions may relate to any requirement with respect to the form of the sale order.  Absent any such objection, the Debtor is authorized, but not required, without any other or further order or authorization from the Court, to consummate the sale with 2660 Woodley Road, who is the Back-up Bidder pursuant to the Auction, pursuant to the terms of the asset purchase agreement with the Back-up Bidder (the "Back-up Bidder APA"), a copy of

which shall be provided to the Unions and filed with the Bankruptcy Court concurrently with the notice given in the first sentence of this paragraph.  In the event of any such objection, the Court will convene a hearing at its earliest availability to rule on the objections.  The bids of the Successful Bidder and the Back-up Bidder shall be irrevocable as provided on the record of the Auction.  In the event the Debtor consummates the transaction with the Back-up Bidder, such Back-up Bidder shall have all of the rights, privileges and obligations of the Successful Bidder for purposes of this Order, and shall be treated in all respects as the Successful Bidder under the terms of this Order.

26.     Nothing in this Order is intended to, or shall, accomplish the assignment, transfer or sale of any license agreement, including all associated hardware and equipment, licensed by Oracle America Inc., successor to MICROS Systems, Inc.

27.     The failure to specifically include any particular provisions of the Successful Bidder APA or any of the documents, agreements, or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, agreement, or instrument, it being the intent of the Court that the Successful Bidder APA and each document, agreement, or instrument executed in connection therewith be authorized and approved in its entirety.

*28.*     The Successful Bidder APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification,

amendment, or supplement is not material and substantially conforms to the Successful Bidder

APA.

EXHIBIT C

FORM OF QUITCLAIM DEED

AFTER RECORDING
PLEASE MAIL TO:

First American Title Insurance Company
National Commercial Services
1850 K Street, NW, Suite 20006
Washington, D.C. 20006
Attention:  Ms. Lyndsey A. Arthurs

## QUITCLAIM DEED

THIS QUITCLAIM DEED is made, entered into and deeded as of [_____] 2021, by Wardman Hotel Owner, L.L.C. ("Grantor"), a Delaware limited liability company and Chapter 11 Debtor and Debtor in Possession in Case No. 21-10023-JTD (jointly administered) pending in the United States Bankruptcy Court for the District of Delaware, Grantor having an address at c/o James Decker, Independent Manager, 5035 Riverview Road NW, Atlanta, GA 30327, and [_____] ("Grantee"), a [_____], Grantee having an address at c/o [_____], [_____].

## W I T N E S S E T H:

That for and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration paid by the Grantee, the receipt and sufficiency of which are hereby acknowledged by the Grantor, the Grantor does hereby quitclaim, remise and release unto Grantee, its successors and assigns, any right, title or interest of Grantor in or to: (i) those parcels of land (or interests in such land) situate, lying and being in the District of Columbia, in each case as more particularly described in **Exhibit A** attached hereto and incorporated herein by reference, (ii) all buildings, fixtures and other improvements located in or on such parcels of land, and (iii) all rights and privileges and advantages thereunto belonging or appertaining (collectively, the "Real Property").

*[Balance of Page Intentionally Left Blank]*

**Error! Unknown document property name.**

**IN WITNESS WHEREOF**, the Grantor has caused these presents to be signed by its duly authorized representative as of the day and year first written above, the same to acknowledge and deliver these presents as the act and deed of the Grantor.

Wardman Hotel Owner, L.L.C., a
Delaware limited liability company and
Debtor and Debtor in Possession

By: _____
Name: James Decker
Title:  Manager

I, the undersigned, a Notary Public in and for the jurisdiction aforesaid, do hereby certify that _____, in his/her capacity as _____ of _____, _____ of _____, whose name is signed to the foregoing Quitclaim Deed and who is known to me to be the person named therein in such capacity on behalf of Grantor, did personally appear before me this day and acknowledged the same to be his act and deed in such capacity and on behalf of such limited liability company, for the purpose therein contained.

Given under my hand and seal this ___ day of _____, 2021**.**

[SEAL]            _____
                              Notary Public

My commission expires: _____

Signature page to
Quitclaim Deed

EXHIBIT A

LEGAL DESCRIPTION

TO BE ATTACHED

EXHIBIT D

### ASSIGNMENT AND ASSUMPTION OF
### PERMITS, INTANGIBLE PROPERTY AND WARRANTIES

This Assignment and Assumption of Permits, Intangible Property and Warranties (this "**Assignment**") is made as of this _____ day of _____, 2021, by Wardman Hotel Owner, L.L.C., a Delaware limited liability company and Chapter 11 Debtor and Debtor in Possession (the "**Assignor**"), and _____, a _____ ("**Assignee**").

### R E C I T A L S :

A.    Assignor and Assignee entered into that certain Purchase and Sale Agreement dated _____, 2021 (the "**Agreement**"), pursuant to which Assignor has agreed to sell to Assignee that certain building commonly known as 2660 Woodley Road NW, Washington, D.C. 20008, and situated on the land legally described in *Exhibit A* attached hereto (the "**Real Property**").

B.    Assignor and Assignee are delivering this Assignment pursuant to the terms of the Agreement.

Now, Therefore, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, covenant and agree as follows:

1.    Effective on the date of the conveyance of the Real Property by Assignor to Assignee (the "**Conveyance Date**"), Assignor hereby transfers, assigns and sets over unto Assignee, without warranty as to transferability or as to Assignee's rights to use the same, all of Assignor's right, title and interest, if any, in and to:

(a)    all assignable permits and licenses to extent the same pertain to the Real Property  (collectively, the "**Permits**");

(b)    all assignable trademarks and trade names, if any, and other intangible property used exclusively in connection with the occupancy and operation of the Real Property (the "**Intangible Property**"); and

(c)    all assignable warranties of any contractor, manufacturer or materialman which relate to the Improvements (as such terms are defined in the Agreement) (the "**Warranties**").

2.    Assignee hereby accepts the foregoing assignment of the Permits, Intangible Property, and Warranties.  Assignee does hereby assume and become responsible for and agree to perform, discharge, fulfill and observe all of the obligations, covenants and conditions of Assignor with respect to the Permits as of the Conveyance Date and shall have no obligation or liability for the performance, discharge, fulfillment or observation of the same as required before the Conveyance Date.

Error! Unknown document property name.

3.        The provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4.        In the event of any litigation between Assignor and Assignee arising out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay all costs and expenses incurred by the prevailing party in connection with such litigation including, without limitation, reasonable attorneys' fees and disbursements.  Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Assignment shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Assignment and to survive and not be merged into any such judgment.

5.        This Assignment may be executed in counterparts, each of which shall be deemed an original, and all of which shall taken together be deemed one document.  Assignor and Assignee agree that the delivery of an executed copy of this Assignment by facsimile shall be legal and binding and shall have the same full force and effect as if an original executed copy of this Assignment had been delivered.

In Witness Whereof, Assignor and Assignee have caused this Assignment to be duly executed as of the day and year first above written.

*ASSIGNOR:*

Wardman Hotel Owner, L.L.C,
a Delaware limited liability
company and Debtor and Debtor
in Possession

By:  _____
Name:  James Decker
Title:  Manager

*ASSIGNEE:*

_____,
a _____

By:  _____
Name:  _____
Title:  _____

**Error! Unknown document property name.**

EXHIBIT E

**FIRPTA AFFIDAVIT**

**CERTIFICATE OF TRANSFEROR OTHER
THAN AN INDIVIDUAL**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform _____, a _____ ("**Transferee**"), the transferee of certain real property commonly known as 2660 Woodley Road NW, Washington, D.C.  20008 that withholding of tax is not required upon the disposition of such U.S. real property interest by Wardman Property Owner, L.L.C., a Delaware limited liability company and Debtor and Debtor in Possession ("**Transferor**"), the undersigned hereby certifies the following on behalf of Transferor:

1.	Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.	Transferor is not a disregarded entity as defined in Income Tax Regulations §1.1445-2(b)(2)(iii);

3.	Transferor's U.S. employer identification number is _____; and

4.	Transferor's office address is _____..

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

**Error! Unknown document property name.**

Under penalty of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Dated as of _____, 2021.

TRANSFEROR:    Wardman Hotel Owner, L.L.C.,
a Delaware limited liability company and
Debtor and Debtor in Possession

By: _____
Name: James Decker
Title:  Sole Manager

NOTICE TO TRANSFEREE (BUYER):  You are required by law to retain this Certificate until the end of the fifth tax year following the tax year in which the transfer takes place and make the Certificate available to the Internal Revenue Service if requested to do so during that period.

Error! Unknown document property name.

Exhibit F

**Designation Agreement**

This Designation Agreement (this "**Agreement**") is entered into as of _____, 20\_\_\_ by and among _____, _____, _____ and _____ (collectively, "**Seller**"), _____, a _____ ("**Buyer**"), and _____, a _____ ("**Escrow Holder**").

## I.  RECITALS

A.      Pursuant to that certain Purchase and Sale Agreement entered into by and between Seller and Buyer, dated as of _____, 2021 (the "**Purchase Agreement**"), Seller has agreed to sell to Buyer, and Buyer has agreed to buy from Seller, certain real property commonly known as 2660 Woodley Road NW, Washington, D.C.  20008, and described more fully on *Exhibit A* attached hereto (the "**Property**") (The purchase and sale of the Property pursuant to the Purchase Agreement is sometimes referred to below as the "**Transaction**").

B.      Section 6045(e) of the United States Internal Revenue Code and the regulations promulgated thereunder (collectively, the "**Reporting Requirements**") require an information return to be made to the United States Internal Revenue Service, and a statement to be furnished to Seller, in connection with the Transaction.

C.      Pursuant to Section 2 of the Purchase Agreement, an escrow has been opened with Escrow Holder Escrow No. \_\_\_\_\_ through which the Transaction will be or is being accomplished.  Escrow Holder is either (i) the person responsible for closing the Transaction (as described in the Reporting Requirements) or (ii) the disbursing title or escrow company that is most significant in terms of gross proceeds disbursed in connection with the Transaction (as described in the Reporting Requirements).

D.      Seller, Buyer and Escrow Holder desire to designate Escrow Holder as the "Reporting Person" (as defined in the Reporting Requirements) with respect to the Transaction.

## II.  AGREEMENT

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller, Buyer and Escrow Holder agree as follows:

1.      Escrow Holder is hereby designated as the Reporting Person for the Transaction. Escrow Holder shall perform all duties that are required by the Reporting Requirements to be performed by the Reporting Person for the Transaction.

2.      Seller and Buyer shall furnish to Escrow Holder, in a timely manner, any information requested by Escrow Holder and necessary for Escrow Holder to perform its duties as Reporting Person for the Transaction.

Page 1

3.      Escrow Holder hereby requests Seller to furnish to Escrow Holder Seller's correct taxpayer identification number.  Seller acknowledges that any failure by Seller to provide Escrow Holder with Seller's correct taxpayer identification number may subject Seller to civil or criminal penalties imposed by law.  Accordingly, Seller hereby certifies to Escrow Holder, under penalties of perjury, that Seller's correct taxpayer identification number is _____.

4.      The names and addresses of the parties hereto are as follows:

:      *BUYER:*

_____
_____
_____
_____
Attention:  _____
Telephone:  _____
Facsimile:  _____
Email:  _____

*SELLER:*

_____
_____
_____
Attention: _____
Facsimile: _____
Email: _____

:      *ESCROW HOLDER:*

_____
_____
_____
_____
Attention:  _____
Telephone:  _____
Facsimile:  _____
Email:  _____

5.      Each of the parties hereto shall retain this Agreement for a period of four years following the calendar year during which the date of closing of the Transaction occurs.

6.      This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement.

Error! Unknown document property name.

7.      This Agreement shall be governed by and construed in accordance with the laws of [_____].

In Witness Whereof, the parties have entered into this Agreement as of the date and year first above written.

*BUYER:* _____,

a _____

By: _____
Name: _____
Title: _____

*SELLER:* Wardman Hotel Owner, L.L.C,
a Delaware limited liability company
and Debtor and Debtor in Possession

By: _____
Name: James Decker
Title: Manager

*ESCROW HOLDER:* [**Add signature block**]

By: _____
Name: _____
Title: _____

Error! Unknown document property name.

EXHIBIT A
TO DESIGNATION AGREEMENT

[TO BE ATTACHED]

**Error! Unknown document property name.**