**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------X
In re:                                              :
                                                    :    Case No. 21-10023 (JTD)
WARDMAN HOTEL OWNER, L.L.C., [1]   :
                                                    :    Chapter 11
                      Debtor.              :
--------------------------------------------------------X
WARDMAN HOTEL OWNER, L.L.C.,   :
                                                    :
                      Plaintiff,           :
              v.                                    :    Adv. Proc. No. 21-_____ (JTD)
                                                    :
MARRIOTT HOTEL SERVICES, INC.,   :
                                                    :
                      Defendant.        :
--------------------------------------------------------X

**DEBTOR'S COMPLAINT AGAINST MARRIOTT HOTEL SERVICES, INC.
FOR (I) AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFER;
(II) TURNOVER OF FF&E RESERVE FUNDS TO ESTATE; (III) DECLARATORY
JUDGMENT REGARDING FF&E RESERVE FUNDS; (IV) BREACH OF CONTRACT;
(V) BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; (VI) BREACH
OF FIDUCIARY DUTY; AND (VII) DISALLOWANCE OF FILED CLAIM**

Debtor Wardman Hotel Owner, L.L.C. ("Debtor" or "Plaintiff"), by and through its

undersigned counsel, as and for its complaint against Defendant Marriott Hotel Services, Inc.

("Marriott" or "Defendant"), states and asserts as follows:

**NATURE OF DEBTOR'S CLAIMS**

1.      Marriott grossly mismanaged the former Marriott Wardman Park Hotel (the

"Property" or "Hotel") both pre- and post-Covid.  The evidence is overwhelming and still being

discovered.

---

[1]  The last four digits of Debtor's U.S. tax identification number are 9717.  Debtor's mailing address is 5035 Riverview
Road, NW, Atlanta, GA 30327.

2.      Over the past decade of Marriott Hotel Services, Inc.'s ("Marriott" or "Defendant") stewardship, the net operating income of the Hotel plummeted from $24.77 million in 2010 to $5.02 million in 2018, **an 80% drop**.

3.      The reasons for this precipitous decline were the subject of constant complaints from Debtor, the owner of the Property.

4.      Although the Property had long been positioned as a convention hotel, deriving substantial revenue from group business such as large conference and conventions, Marriott funneled premium group bookings to its other more recently opened Marriott-managed and owned properties in the D.C. area, while using the Property as a dumping ground for far less profitable budget-oriented groups.

5.      At the same time, Marriott was unwilling or unable to replace these lost group revenues with traditional overnight, or "transient" bookings, instead over-relying on online travel agencies such as Expedia or booking.com, which charge high commissions for each reservation, significantly reducing profitability.

6.      Even with these depressed revenues, Marriott let costs at the Property spiral out of control.  The Property's expenses significantly exceeded those of its competitors, including inflated labor costs well in excess of those set forth in a collective bargaining agreement ("CBA") with Marriott's union employees.

7.      By all measures, Marriott's management of the Property was an abject failure, as the Property suffered from consistent and substantial declines in revenue, while enduring ever-increasing operational costs.

8.      Then, at the outset of the COVID-19 pandemic, Marriott exacerbated its failures by attempting to take advantage of the pandemic to shore up its own corporate accounts – baselessly

2

demanding that Debtor fund tens of millions of dollars in working capital and initially refusing to suspend hotel operations at the Property, all in disregard for both the health and safety of the employees and guests as well as the financial stability of the Property.

9.      After the hotel operations were suspended in late March 2020, Marriott failed to enact basic cost controls to reduce expenses while the Property remained shuttered.  Marriott also commenced suit against Debtor and obtained an injunction in December 2020 that allowed Marriott to collect (with Debtor's consent, but during the preference period) $2.0 million through an avoidable transfer from an FF&E Reserve (as defined below) that had been dedicated by Debtor for the payment of capital improvements for the Property.  Marriott used such funds to pay asserted accrued working capital expenses.  Marriott also now asserts a dubious "secured" claim to the remaining funds in such FF&E Reserve totaling approximately $4.7 million.  All such funds should be turned over to Debtor's estate and the Court should determine that Marriott has no ownership or security interest in these funds.

10.      In light of Marriott's material breaches of the Second Amended and Restated Management Agreement, dated as of July 1, 2005 (the "HMA"), Debtor served Marriott with a notice of default dated June 11, 2020 (the "Notice of Default").  Thereafter, on January 11, 2021, Debtor served Marriott with a notice of termination, terminated the HMA, and assumed control of the Property (the "Notice of Termination").  Debtor is entitled to a declaration that the Notice of Termination was proper and justified based on Marriott's defaults under the HMA and failure to timely cure such defaults.  Further, Marriott is not entitled to any damages under the HMA against Debtor because Debtor properly terminated the HMA.

11.      Upon assuming control of the Property, Debtor uncovered further examples of Marriott's total failure to meet its required standards of performance and to fulfill its contractual

3

obligations during the Property's pandemic-related suspension of operations.

12.    Despite maintaining a bloated full-time staff, Marriott failed to properly maintain critical mechanical equipment, and made little to no effort to reduce carrying costs for the Property. Debtor discovered water running in showers and toilet fill valves, approximately twenty-one rooms with open windows, televisions plugged in (and consuming electricity) in every guest room, lights on in empty hallways and guest rooms, and the boilers running 24/7 in a shuttered Property. Debtor also discovered that Marriott had kept expired food and beverages stored in active refrigerators, with the monthly utility expense incurred in storing these items exceeding the value of the inventory itself.

13.    Since taking over operation of the Property and enacting basic cost mitigation measures, Debtor has reduced operating costs by approximately $115,000 per month, of which approximately $40,000 is attributable to reduced utility costs alone.  This amounts to annualized savings of approximately $1,400,000.

14.    Marriott's material failures and contractual breaches have cost Debtor dearly. Debtor is therefore entitled to recover millions of dollars in damages from Marriott, plus the recovery of an avoidable transfer in the amount of $2.0 million from the FF&E Reserve and the turnover of the estate's interests in the remaining funds in the FF&E Reserve totaling approximately $4.7 million.

## **PARTIES**

15.    Debtor is a limited liability company organized under the laws of Delaware with its principal place of business at c/o JDecker & Company, 5035 Riverview Road, NW, Atlanta, Georgia.  Debtor owns the Property located in Woodley Park, Washington, D.C., formerly known as the Washington Marriott Wardman Park.

16.     Upon information and belief, Marriott is a corporation organized under the laws of Delaware with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland.  Upon information and belief, Marriott is engaged in the business of managing and operating hotels.

## JURISDICTION AND VENUE

17.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

18.     This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because this is a civil proceeding relating to Debtor's underlying case arising under title 11 of the United States Code (the "Bankruptcy Code").

19.     This adversary proceeding is a core proceeding that the Court may hear and determine pursuant to 28 U.S.C. § 157(b).

20.     This Court has personal jurisdiction over Defendant pursuant to Bankruptcy Rule 7004.  Marriott has also submitted to the jurisdiction of this Court through Marriott's frequent appearances in Debtor's bankruptcy case and the filing of the Marriott Claim (as defined below).

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

22.     Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Local Rules for the U.S. Bankruptcy Court District of Delaware, Plaintiff consents to entry of final orders or judgment by this Court in this adversary proceeding.

## FACTUAL ALLEGATIONS

### A.     The Property and the HMA

23.     Debtor is the owner of the property formerly known as the Washington Marriott Wardman Park, which operated as a convention hotel in Woodley Park, Washington, D.C.  On January 11, 2021 (the "Petition Date"), Debtor commenced its voluntary chapter 11 case in this

DOCS_SF:105759.5

Court.

24.     When a predecessor of Debtor acquired the Property in 2005, such predecessor and Marriott entered into the HMA, dated as of July 1, 2005.  Debtor was organized in January 2018 and succeeded to the rights of "Owner" under the HMA at that time.  Pursuant to the HMA, Debtor entrusted Marriott with the management and operation of the Property.

25.     Pursuant to the negotiated terms of the HMA, Marriott had broad discretion "in all matters relating to the management and operation of the Hotel," including all employment decisions, account, marketing and promoting the Property.  (HMA § 1.02(A).)

26.     At the same time, Marriott agreed to "act as a reasonable and prudent operator of the Hotel" and "be responsible for the proper and efficient operation of the Hotel."  (HMA § 1.02(B).)

27.     Pursuant to the HMA, Marriott was required to, among other things and subject to the aforementioned performance standard, "[a]rrange for and supervise public relations and advertising, prepare marketing plans, and make available to the Hotel the benefits of various marketing programs in use in the Marriott System as they may exist from time to time[.]" (HMA § 1.02(A)(5).)

28.     Marriott's compensation was calculated from gross revenues before costs and expenses are deducted.  (HMA §§ 3.01; 12.01.).

29.     While the parties contemplated that revenues from bookings would cover the operational expenses of the Property, the HMA provides that Debtor was required to "advance any additional funds necessary to maintain Working Capital at levels determined by Manager to be reasonably necessary to satisfy the needs of the Hotel as its operation may from time to time require consistent with the Annual Operating Projection or as a result of 'unforeseen circumstances'[.]"

DOCS_SF:105759.5

(HMA § 4.05.).

30.    According to the terms of the HMA, any request by Marriott for working capital from Debtor had to be (1) "reasonably necessary" to satisfy the Property's needs, (2) consistent with the annual budget, and (3) consistent with Marriott's standard of performance.  (HMA §§ 1.02(B), 4.04, 4.05.).

31.    In an Event of Default, as defined in the HMA, the non-defaulting party was permitted to exercise prescribed remedies, including, but not limited to, terminating the HMA and instituting a legal proceeding.  (HMA §§ 9.02, 9.03.).

32.    In relevant part, one such "Event of Default" includes:

> The failure of either party to perform, keep or fulfill any of the [] covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of such default for a period of thirty (30) days after the defaulting party's receipt of written notice from the non-defaulting party of said failure.  Upon the occurrence of any Default by either party as described under this Section 9.01.E, said Default shall be deemed an 'Event of Default' under this Agreement if the defaulting party fails to cure the Default within thirty (30) days after receipt of written notice from the non-defaulting party demanding such cure, or, if the Default is such that it cannot reasonably be cured within said thirty (30) day period of time, if the defaulting party fails to commence the cure of such Default within said thirty (30) day period of time or thereafter fails to diligently pursue such efforts to completion.

(HMA § 9.01(E).)

### B.    Marriott's Pre-Pandemic Breaches of Its Contractual Obligations

33.    Over the last decade, well before the COVID-19 pandemic upended the Property's hotel operations and the hospitality industry more broadly, under Marriott's management, the Property languished relative to its peers.

34.    From 2010 to 2018 alone, the Property's net operating income plunged from $24.77 million to $5.02 million, an 80% drop.

7

35.     In fact, in 2018, the Property's net operating income was less than the debt service owed under the mortgage for the Property.

36.     Alarmingly, this decline is not correlated to a similar decline in Gross Revenues, which remained largely flat since 2013 until the pandemic-necessitated closure of the Property.

37.     As explained below, Marriott repeatedly failed to live up to its required standards of performance and to fulfill its contractual obligations as set forth in the HMA, causing this consistent and material decline in the Property's performance.

38.     The Property was designed to cater to and attract group business, and historically derived the substantial portion of its revenue from large group events.

39.     However, since 2011, the Property attracted less and less group business, and, prior to closure, the group mix significantly trailed its competitors.  At peak, the Property had 225,000 group room nights annually; in recent years, the Property routinely failed to achieve 200,000 group room nights.

40.     The Property not only attracted less group business, but the groups that Marriott booked were less profitable.  For instance, from 2013 to closure, the Group Revenue Per Available Room Index declined by over 15% as a result of the groups booked at the Property by Marriott spending less than other "premium" groups on other items, such as food and beverage (F&B) and/or catering.

41.     The central reason for this decline was that Marriott was no longer booking premium groups for the Property.  Instead, Marriott directed premium groups to other Marriott-managed and owned properties in the D.C. area.

42.     In 2012, Marriott's affiliate acquired the Gaylord Hotels brand and began to manage the 2000-room Gaylord National Resort & Convention Center in Washington, D.C.'s

National Harbor.

43.     In 2014, Marriott's affiliate opened the 1100-room Marriott Marquis Washington, D.C., which has since been labeled as Marriott's "flagship" in D.C.

44.     Upon information and belief, an affiliate of Marriott is a part owner of the Marriott Marquis.

45.     Following these two events, Marriott actively promoted these two hotels for premium group events and conventions over, and at the expense of, the Property.

46.     Not only did this lead to less total group room nights on an annualized basis, including valuable "in the year for the year" bookings, but as illustrated by a comparison of the Property's performance against its direct competitors, Marriott's decision to move away from premium groups severely impacted the Property's food and beverage, banquet, and catering performance as well.

47.     For example, in 2018, a direct competitor with virtually the same product and group-focused business model achieved $41.5 million in F&B revenues (and F&B departmental profit of nearly $13 million), while the Property achieved only $36.1 million in F&B revenues (and departmental profit of $2 million) over the same period.

48.     The bottom line is that the Property's direct competitors earned more F&B revenues, and spent less to obtain those revenues, than the Property.  This is because premium groups spend significantly on banquet/catering, while the lower quality groups Marriott relegated to the Property do not.

49.     Marriott's failure to secure premium groups was further exacerbated by its other management failures.  Marriott was unable (or unwilling) to replace these group bookings with traditional overnight bookings.  Instead of securing either group or traditional overnight

reservations through its own efforts, Marriott over-relied on online travel agencies such as Expedia or booking.com, which charge a high commission for each reservation, further hurting profitability.

50.     In other words, Marriott was unable to do its own job, and then forced Debtor to pay both Marriott and a third-party travel agent for a reservation that will not make the Property profitable.

51.     While revenues continued to decline, Marriott failed to reasonably enact cost controls to ensure the proper and efficient operation of the Property and account for the change in the nature of the business being booked at the Property.  The Property's operational costs, most notably the labor and F&B expenses, were completely out of line with the revenue generated by the Property.

52.     For example, the Property's labor structure plagued its profitability for years.  The Property experienced problems with overstaffing that Marriott scarcely ever attempted to address in discussions with the employees' union.

53.     Specifically, the union footprint (staffing levels, work rules, past practices) at the Property were significantly above market.   Though Debtor identified CBA-related savings opportunities of $5.5-$7.5 million annually, Marriott was unwilling to engage with the union out of concerns, upon information and belief, that it may negatively impact Marriott's broader union relations.

54.     This misalignment of interests violated Marriott's obligation to act as a reasonable and prudent operator, as well as its fiduciary obligations to Debtor, and seriously negatively impacted the Property.

55.     Marriott has also failed to reasonably and prudently monitor compliance with the CBAs.  For example, Marriott permitted employees to gain benefits well in excess of the agreed CBA benefit levels, including some employees attaining accrued vacation time of more than a year – far in excess of the maximum accrual allotment provided for under the union's own bargained-for package.  The impact of these failures led to significant additional, reasonably avoidable costs to Debtor.

56.     In addition to staffing problems, costs that could more easily be controlled were not addressed.  When compared to its direct competitors, the Property's expenses exceeded its competitors on virtually every measure (including A&G expenses, operations, and utilities).

57.     Ironically, the Property trailed its competitors in marketing spend, one of the only expense line items for which there is a directly traceable return on investment.

58.     Separately, as detailed above, F&B profit significantly declined, but Marriott did little to stem this troubling trend.

59.     Marriott offered no sensible solutions to the Property's declining performance.  In response to a discussion where Debtor identified a number of key performance failures by Marriott responsible for the Property's underperformance, Marriott unreasonably proposed that Debtor fund an additional capital investment of **$82 million**, projecting that doing so would increase the Property's net operating income to $15-16 million annually, an incremental performance increase that not only failed to provide a justifiable return on such an investment, but in any event was overly optimistic and unrealistic.

60.     Marriott's failure to address its own performance failures in its proposal evidenced that Marriott had no intention of addressing the root causes of the Property's underperformance.

61.     Marriott's indifference to the bottom-line performance of the Property resulted in

numerous avoidable expenses, which were to Debtor's sole detriment, as Marriott is paid based upon top-line gross revenues.

    **C.**    **Marriott Serves Unreasonable Working Capital Demands Amid the Pandemic and Receives $2.0 Million of Debtor's FF&E Reserve Funds During the Preference Period**

62.    The COVID-19 pandemic halted global travel and resulted in the closure of countless travel and hospitality-related businesses.

63.    The Property, which derived the substantial portion of its revenue from large group events, was severely impacted by the COVID-19 pandemic.  By late March 2020, the Property suspended operations.

64.    On or about March 16, 2020, just as large parts of the country were shutting down as a result of the COVID-19 pandemic, Marriott served the first of several working capital demands.

65.    Without any legitimate basis, explanation or justification, Marriott demanded that Debtor immediately fund $10 million of working capital.

66.    This figure was not only many times more than what was historically necessary to operate the Property, it was contradicted by Marriott's own on-property employees who admitted the actual amount needed was no more $2.5 million.

67.    In support of its demand for $10 million, Marriott prepared a forecast for the financial performance of the Property.  According to the forecast, Marriott would keep the Property open during the raging pandemic, despite government travel bans and the danger that maintaining operations would pose to the Property's staff, and notwithstanding that revenues had been completely decimated.

DOCS_SF:105759.5

68.    According to Marriott's forecast, remaining open would cause the Property to lose over $19.5 million in 2020 alone, while Marriott would earn approximately $1.5 million in management fees.

69.    Upon information and belief, the forecast accompanying the March 16 request was the first of its kind – Marriott had never prepared a working capital forecast for the Property.

70.    After Debtor raised serious concerns with the forecast, including Marriott's apparent intention to keep the Property open during the pandemic over Debtor's objections, on or about March 18, 2020, Marriott prepared and submitted a revised cash flow forecast.

71.    Under the revised forecast, Marriott projected the Property would need approximately $6.3 million in working capital through the entirety of year 2020.

72.    Despite this revised forecast, Marriott did not revise its request for $10 million.

73.    A few days later, on or about March 22, 2020, Marriott prepared and provided to Debtor yet another revised cash flow forecast.  Under that revised forecast, Marriott projected the Property would need approximately $5.26 million in working capital through the entirety of year 2020.

74.    Marriott still did not revise its request for $10 million in funding from Debtor.

75.    On or about March 19, 2020, Debtor informed Marriott that it would not fund $10 million as Marriott did not show such amount was "reasonably necessary to satisfy the needs of the Hotel" as required by the HMA.

76.    Despite repeated requests for information as to the basis for the call for working capital, Marriott provided none.  For example, the working capital requests did not identify the projected uses of the requested funding, such as (a) the vendors to be paid and the reasons for same, (b) the group deposits and advanced deposits to be refunded and the reasons for same, and

13

(c) all projected payroll and other expenses and the reasons for same.

77.     Nevertheless, Debtor agreed that Marriott could divert $5.0 million out of the Property's Furniture, Fixtures and Equipment Reserve (the "FF&E Reserve") under the HMA to address working capital needs.  Marriott withdrew this amount from the FF&E Reserve near the end of March 2020.  The FF&E Reserve contained approximately $11.7 million at the time and had been funded by Debtor for the purpose of satisfying certain capital expenditures for the Property.  Despite having no ownership or security interest in the FF&E Reserve, Marriott now asserts a secured claim against the remaining funds in FF&E Reserve, which currently total approximately $4.7 million after Marriott withdrew another $2.0 million during the preference period from the FF&E Reserve in December 2020 (as addressed further below).

78.     Additionally, towards the end of March 2020, Debtor agreed – as initially suggested to Marriott – that the Property should be closed due to the raging pandemic and asked that the closure be promptly effectuated.

79.     Instead of closing the Property as agreed, Marriott held Debtor hostage by conditioning closure of the Property on Debtor's funding of Marriott's full $10 million working capital request.

80.     This tactic caused the Property to continue to incur unnecessary expenses and needlessly risked exposing the Property's employees and guests to the COVID-19 virus.

81.     The parties thereafter agreed that the Property would close, and Debtor authorized the release of $5 million of the FF&E Reserve to be used as working capital.

82.     The Property was finally closed on March 25, 2020, and two days later, the Property ceased all operations and furloughed all Property personnel save for a reduced staff Marriott claimed to still be necessary to handle building maintenance and other basic functions.

DOCS_SF:105759.5

83.    During this time, the parties also engaged in a series of discussions about terminating the HMA.

84.    Yet, Marriott's demands for "working capital" payments from Debtor were far from over.

85.    As the market for travel evaporated and hotels shuttered, Marriott engaged in a continuing pattern of making unnecessary, unreasonable and capricious demands for funds to "operate" the Property.

86.    Marriott issued additional working capital demands in May 2020 (for $1 million), May 26, 2020 (for $1.5 million), June 25, 2020 (for $1.3 million), July 24, 2020 (for $2.7 million) and September 4, 2020 (for $2.2 million).

87.    Debtor rejected each demand because they were sent expressly in furtherance of Marriott's baseless March 16, 2020 demand for $10 million, they were procedurally improper under the HMA, and/or because Marriott failed to demonstrate that the funds were reasonably necessary for the operation of Debtor's shuttered, inoperative Property.

88.    Upon information and belief, the purpose of Marriott's working capital demands was not to provide for the maintenance of the Property during the global COVID-19 pandemic, but was rather to shore up Marriott's own cash reserves.

89.    Upon information and belief, Marriott sent identical "working capital" demands to many of its managed hotel owners.  Those demands were contained in virtually identical form letters with only the addressee and amount demanded changing from letter to letter.  Similarly, each demand Marriott sent to Debtor is identical, save for the amount demanded.  Instead of individually assessing the differing needs at each of its owners' hotels, Marriott reflexively demanded money from hotel owners under the guise of "working capital" payments using the same

carbon copy form letter.

90.    On or about December 4, 2020, Marriott issued an additional working capital demand of $2.0 million to Debtor.  Within the ninety (90) days prior to the Petition Date, Marriott withdrew (with Debtor's consent) an additional $2.0 million from the FF&E Reserve to satisfy certain asserted accrued working capital expenses of the Property.  Pacific Life (as defined below) also consented to such transfer.

### D.    Debtor Serves a Default Notice on Marriott

91.    On June 11, 2020, Debtor served Marriott with a Notice of Default.

92.    As set forth in the Notice of Default, Marriott breached the HMA not only by making repeated improper demands for working capital payments, but also due to its chronic, fundamental management failures.

93.    Marriott's breaches include, *inter alia*, (a) its failure to act as a reasonable and prudent operator and having regard for the status of the Property in, among other things, establishing sales and marketing strategies; (b) its failure to be responsible for the proper and efficient operation of the Property through its labor practices; and (c) its imposition of unnecessary and unproductive costs on Debtor in non-labor expenses which, when compared to the Property's direct competitors, exceed competitors on virtually every measure (save for marketing spend, where the Property trails in spending).

94.    As set forth in the Notice of Default, Marriott was required to cure its defaults on or before July 14, 2020.

95.    Marriott denied that it was in default and failed to cure the defaults set forth in the Notice of Default.

E.     **Marriott Sues Debtor and Its Lender for Breach of the HMA and Tortious Interference and Seeks Injunctive Relief**

96.     On September 8, 2020, Marriott sued Debtor and the mortgage lender on the Property, Pacific Life Insurance Company ("Pacific Life"), in the Circuit Court for Montgomery County, Maryland (the "Maryland Court") for breach of contract and tortious interference (the "Maryland Action").  Marriott's complaint alleged that Debtor's failure to fund the Property's working capital breached the HMA, and further alleged that Pacific Life's failure to fund the same obligations breached a Subordination, Non-Disturbance and Attornment Agreement between Pacific Life and Marriott.

97.     Marriott's lawsuit sought, among other things, specific performance requiring Debtor to make the demanded working capital payments, or damages in the same amount. On September 23, 2020, Marriott also filed a motion seeking mandatory preliminary injunctive relief to force Debtor to make working capital payments immediately, even though Marriott requested the same relief through its original complaint.

98.     On December 8, 2020, the Maryland Court entered an order preliminarily and mandatorily compelling Debtor to pay money to Marriott upon Marriott's issuance of unilateral, future capital call notices (the "Mandatory Injunction").  Before the Mandatory Injunction was even entered, Marriott noticed a $2.0 million capital call to Debtor.  Debtor appealed the Mandatory Injunction and filed counterclaims against Marriott in response to the complaint in the Maryland Court.

99.     As addressed earlier, following entry of the Mandatory Injunction in December 2020, within the ninety (90) days prior to the Petition Date, Marriott withdrew (with Debtor's consent) an additional $2.0 million from the FF&E Reserve to fund asserted accrued expenses under the HMA.

100.    Following the Petition Date, the Maryland Action was removed to this Court, but the claims against Pacific Life were later remanded to the Maryland Court.

**F.    Debtor Properly Terminates the HMA and, Upon Taking Control of the Property's Operations, Discovers Significant Additional Operational Failures**

101.    On January 11, 2021, Debtor served Marriott with a Notice of Termination, terminating the HMA due to Marriott's failure to timely cure the defaults set forth in the Notice of Default.  Debtor's termination of the HMA was proper and justified at that time and, as a result thereof, Marriott is not entitled to any damages against Debtor under the HMA.

102.    Following service of the Notice of Termination, Debtor took over operation of the Property and then filed for bankruptcy.

103.    Upon assuming control of the Property, Debtor uncovered further examples of Marriott's wholesale failure to meet its required standards of performance and to fulfill its contractual obligations during the Property's pandemic-related suspension of operations, including a complete abdication of its responsibility for the proper and efficient operation of the Property.

104.    First, despite maintaining an excessive number of engineering personnel, Marriott allowed the boiler room to fall into disrepair, with leaks in the mechanical equipment requiring repairs to five separate units.  These leaks also caused water waste and increased utility expenses.

105.    Second, Marriott failed to enact cost controls to rein in expenses while the Property remained shuttered, including keeping an unnecessary and excessive number of staff on payroll (such as a sales team for a hotel operation that was closed indefinitely).

106.    Third, Marriott failed to perform any regular maintenance of the Property, resulting in excess utility and other expenses that were completely avoidable, such as:

a.    At least one shower was found running, causing an estimated water waste of 2.8 gallons per minute;

b.      Approximately 27 rooms were discovered with toilet fill valves running continuously, leading to excessive water waste;

c.      Approximately 21 rooms were found with open windows, and other ground-floor areas were not property sealed, unnecessarily leading to additional heating to offset the infiltration of cold air;

d.      Television sets were plugged into the walls in every guest room, many guest rooms had clock radios plugged in, and lights were left on in hallways and guest rooms, materially increasing electricity usage;

e.      Numerous air handling units had dirty filters, impairing airflow and decreasing efficiency of the units;

f.      Boilers for the unoccupied Property were left running twenty-four hours per day, seven days a week, causing excessive utility bills, as well as requiring the Property to employ additional full-time engineering staff to monitor, maintain and operate the boilers; and

g.      Expired frozen and refrigerated food and drinks were kept in freezers and refrigerators, leading to utility expense well in excess of the value of the inventory on hand, and unnecessarily wasted inventory including approximately $15,000 in beer inventory that could have been returned to the vendor for a credit.

107.    Marriott's failure to enact basic measures to reduce utility consumption while the Property was closed—such as turning lights off, ensuring water was not actively running, unplugging appliances, and closing windows—caused the Property to incur hundreds of thousands of dollars in easily avoidable costs.

108.    After Debtor took over the Property, Debtor was able to reduce utility costs by approximately $40,000 per month.  Debtor was also able to successfully reduce the full-time staff

nearly in half, from fifteen to eight personnel, while operating the Property more efficiently.

109.   Fourth, Marriott made no effort to reduce or eliminate unnecessary vendor contracts, needlessly allowing them to continue during the suspension of hotel operations and/or failing to negotiate easily attainable cost reductions.  This included, for example:

    a.   A contract with Enseo, the in-room TV entertainment provider, which was charging the Property $19,415.30 per month despite the Property being closed to guests;

    b.   An elevator maintenance contract with Schindler Elevator, which Debtor was able to negotiate down for savings of $10,000 per month after assuming control of the Property's operations;

    c.   A contract with BluIP, a phone vendor, which Debtor was able to negotiate down for savings of $1,000 per month after assuming control of the Property's operations;

    d.   A contract for fire alarm services, which Debtor was able to negotiate down for savings of $1,500 per month (a 50% reduction) after assuming control of the Property's operations;

    e.   A contract with an internet provider, which Debtor eliminated for savings of $3,100 per month after assuming control of the Property's operations; and

    f.   Cell phone contracts for all staff, which Marriott let continue despite only having a handful of staff on payroll, at an expense to the Property of approximately $9,500 per month.

110.   In total, since assuming control of the Property's operations, Debtor has been able to reduce operating costs by approximately $115,000 per month.

### G.    Marriott Files Its Proof of Claim Against Debtor

111.    As noted above, Debtor commenced its voluntary chapter 11 case on the Petition Date.  Debtor subsequently obtained approval of this Court to reject the HMA by order dated February 9, 2021 [Docket No. 127].

112.    On June 30, 2021, Marriott filed its proof of claim against Debtor asserting $87.5 million of damages (the "Marriott Claim").  The Marriott Claim consists of:  (a) $70 million, plus interest and attorneys' fees, in rejection damages under the HMA (discounted to present value) for lost management fees projected to be earned by Marriott over the 38 remaining years of the agreement; (b) $6.4 million, plus interest, of unreimbursed working capital advances by Marriott in connection with the Property; and (c) $10.2 million of severance costs incurred by Marriott in terminating the Property's employees.  Marriott also reserved rights to assert additional claims against Debtor for unliquidated and unspecified damages.  Finally, through the Marriott Claim, Marriott asserted a secured claim in the remaining funds in the FF&E Reserve totaling approximately $4.7 million on the basis of possession, setoff, and recoupment.  As addressed below, all such funds should be turned over to Debtor's estate.

### COUNT I
### (Avoidance of Preferential Transfer)
### 11 U.S.C. § 547(b)

113.    Debtor repeats and realleges the foregoing paragraphs as if fully set forth herein.

114.    During the ninety days prior to the Petition Date (the "Preference Period"), Marriott was a creditor of Debtor.

115.    During the Preference Period, Marriott withdrew the sum of $2.0 million from the FF&E Reserve Account (the "Transfer") for the benefit of Marriott.

116.     The Transfer constitutes a transfer of an interest in the property of Debtor. Specifically, Debtor funded the FF&E Reserve for the purpose of funding capital improvements to the Property pursuant to the HMA and the funds in the FF&E Reserve continued at all times to beneficially belong to Debtor.  Marriott had no ownership or security interest in the FF&E Reserve.

117.     The Transfer was made by Marriott on account of an antecedent debt owed by Debtor to Marriott (*i.e.*, outstanding asserted obligations due and owing by Debtor to Marriott under the HMA).

118.     The Transfer was made when Debtor was insolvent.

119.     Unless avoided, the Transfer will enable Marriott to receive more than it would have received if (a) Debtor's chapter 11 case was instead a case under chapter 7 of the Bankruptcy Code; (b) the Transfer had not been made; and (c) Marriott received payment on account of any outstanding debt to the extent provided by the Bankruptcy Code.

120.     The Transfer constitutes an avoidable preference pursuant to section 547(b) of the Bankruptcy Code.

## COUNT II
### (Recovery of Preferential Transfer)
### 11 U.S.C. § 550 & 551

121.     Debtor repeats and realleges the foregoing paragraphs as if fully set forth herein.

122.     Marriott was the entity that benefitted from the Transfer.

123.     To the extent that the Transfer is avoided under section 547(b) of the Bankruptcy Code, the value of the Transfer is recoverable pursuant to section 550 of the Bankruptcy Code.

124.     Debtor is entitled to recover and preserve, for the benefit of its estate, the value of the Transfer pursuant to sections 550 and 551 of the Bankruptcy Code.

DOCS_SF:105759.5

## COUNT III
### (Turnover of Estate Assets)
### 11 U.S.C. § 542

125.    Debtor repeats and realleges the foregoing paragraphs as if fully set forth herein.

126.    Marriott is in possession, custody, or control of the FF&E Reserve as of the date hereof, which currently contains funds totaling approximately $4.7 million.

127.    The remaining funds in the FF&E Reserve that are in the possession, custody, or control of Marriott constitute property of Debtor's bankruptcy estate pursuant to section 541(a) of the Bankruptcy Code.  Specifically, Debtor funded the FF&E Reserve for the purpose of funding capital improvements to the Property pursuant to the HMA and the funds in the FF&E Reserve continue to beneficially belong to Debtor.  Marriott has no ownership or security interest in the FF&E Reserve.

128.    Debtor, as the debtor in possession, has the power and authority to take possession, custody, or control of the remaining funds in the FF&E Reserve.

129.    Debtor has made demand for turnover of the remaining funds in the FF&E Reserve. As of the date hereof, Marriott has not turned over the remaining funds in the FF&E Reserve to Debtor.

130.    Pursuant to sections 105(a) and 542(a) of the Bankruptcy Code, Marriott must deliver the remaining funds in the FF&E Reserve to Debtor.

## COUNT IV
### (Declaratory Judgment)
### 28 U.S.C. §§ 2201, 2202, 11 U.S.C. § 544

131.    Debtor repeats and realleges the foregoing paragraphs as if fully set forth herein.

132.    Marriott contends that is has a secured claim against the remaining funds in the F&E Reserve on the basis of possession, setoff, and/or recoupment.

DOCS_SF:105759.5

133.    Debtor contends that such funds were set aside for specific purposes under the HMA and Marriott does not have any liens or rights on such assets, particularly given Marriott's breaches of the HMA.

134.    Thus, an actual, substantial, and justiciable controversy exists between the parties concerning whether Marriott's asserted liens and rights on the remaining funds in the FF&E Reserve are valid and enforceable.

135.    Further, Marriott contends that Debtor's delivery of the Notice of Termination was improper and unjustified.

136.    Debtor submits that Marriott was in default under the HMA, did not timely cure its default, and Debtor therefore was entitled to terminate the HMA prior to filing for bankruptcy. As a result of such proper termination of the HMA by Debtor, Marriott is not entitled to any damages against Debtor under the HMA.

137.    The foregoing controversies are sufficient to warrant the issuance of a declaratory judgment that: (a) the remaining funds in the FF&E Reserve are not encumbered by, or subject to, the asserted liens or rights of Marriott and (b) Debtor was within its rights to terminate the HMA prepetition.

## COUNT V
### (Breach of Contract)

138.    Debtor repeats and realleges the foregoing paragraphs as if fully set forth herein.

139.    Debtor and Marriott were parties to the HMA.

140.    Debtor fulfilled its obligations under the HMA, and all conditions precedent had been satisfied.

141.    Marriott breached the HMA by, among other things: (a) failing to act as a reasonable and prudent operator of the Property, having regard for the status of the Property and

24

maintaining the System Standards; (b) issuing to Debtor improper and willfully exaggerated demands for capital; (c) failing to establish reasonable and prudent sales and marketing strategies; (d) imposing unnecessary and unproductive costs, including, but not limited to, labor costs; (e) failing and refusing to enact measures to achieve attainable carry cost reductions during the pandemic-related suspension of hotel operations; (f) failing to exercise the discretion afforded to Marriott under the HMA in good faith; and (g) favoring Marriott's own interests over the interests of Debtor.

142.   As a direct and proximate result of Marriott's breaches, Debtor has sustained injuries for which compensation is sought in the form of: (a) compensatory damages in an amount to be proven at trial, plus damages continuing into the future; (b) disgorgement of all profits earned by Marriott by virtue of its many breaches; and (c) disgorgement of all fees paid by Debtor to Marriott during the period that Marriott has been in flagrant breach of its contractual duties.

143.   In addition, Debtor is entitled to recover its reasonable attorneys' fees, court costs, and pre- and post-judgment interest.

## COUNT VI
### (Breach of Covenant of Good Faith and Fair Dealing)

144.   Debtor repeats and realleges the foregoing paragraphs as if fully set forth herein.

145.   Debtor and Marriott were parties to the HMA.

146.   Based on the acts of Marriott set forth above, Marriott breached the duty of good faith and fair dealing imposed by the HMA.

147.   The actions of Marriott evidenced a lack of good faith, including, but not limited to, issuing improper and willfully exaggerated demands for working capital, keeping the Property open as a tactic to force Debtor to fund the improper demands for working capital failing, and refusing to enact measures to achieve attainable carry cost reductions during the pandemic-related

suspension of hotel operations at the Property, and abusing the discretion granted to Marriott under the HMA.

148.    As a direct and proximate result of Marriott's breaches, Debtor has sustained injuries for which compensation is sought in the form of: (a) compensatory damages in an amount to be proven at trial, plus damages continuing into the future; (b) disgorgement of all profits earned by Marriott by virtue of its many breaches; and (c) disgorgement of all fees paid by Debtor to Marriott during the period that Marriott has been in flagrant breach of its contractual and fiduciary duties.

149.    In addition, Debtor is entitled to recover its reasonable attorneys' fees, court costs, and pre- and post-judgment interest.

## COUNT VII
### (Breach of Fiduciary Duty)

150.    Debtor repeats and realleges the foregoing paragraphs as if fully set forth herein.

151.    By virtue of Debtor's entrustment of the management of the Property and the handling of revenues, operating funds, and process related thereto, a fiduciary relationship was created and existed between the parties.

152.    Marriott owed Debtor the highest fiduciary obligations and utmost duties of loyalty, good faith, fair dealing, and full disclosure by virtue of the fiduciary relationship between the parties.  Marriott was obliged as a fiduciary not to promote its interests at the expense of and to the detriment of Debtor.

153.    By reason of Marriott's intentional, knowing, and wrongful acts, including but not limited to promoting its own interests to the detriment of Debtor, Marriott breached its fiduciary duties to Debtor.

DOCS_SF:105759.5

154.     As a direct and proximate result of Marriott's breaches, Debtor has sustained injuries for which compensation is sought in the form of: (a) compensatory damages in an amount to be proven at trial, plus damages continuing into the future; (b) punitive damages in the amount of at least three times the amount of compensatory damages; (c) disgorgement of all profits earned by Marriott by virtue of its many breaches; and (d) disgorgement of all fees paid by Debtor to Marriott during the period that Marriott has been in flagrant breach of its fiduciary duties.

155.     In addition, Debtor is entitled to recover its reasonable attorneys' fees, court costs, and pre- and post-judgment interest.

## COUNT VIII
### (Claim for Attorneys' Fees and Costs)

156.     Debtor repeats and realleges the foregoing paragraphs as if fully set forth herein.

157.     In the event that Debtor prevails in this action, Debtor also seeks an award of reasonable attorneys' fees and costs pursuant to Section 11.24 of the HMA.

158.     Section 11.24 of the HMA provides:

In any litigation, action, claim, suit, arbitration, or proceeding brought by the parties with respect to this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party expenses (including reasonable attorneys' fees) incurred at the pretrial, trial or appellate level.

159.     Debtor has incurred, and will continue to incur, substantial attorneys' fees, costs, and expenses in prosecuting its claims set forth herein, and defending the claims asserted in the Marriott Claim, all resulting from Marriott's breaches of the HMA, which will be supported by evidence at the appropriate time.

## COUNT IX
### (Disallowance of Claim)
### 11 U.S.C. §§ 502(b), (d)

160.     Debtor repeats and realleges the foregoing paragraphs as if fully set forth herein.

DOCS_SF:105759.5

161.     As alleged above, the Transfer constitutes an avoidable preference pursuant to section 547(b) of the Bankruptcy Code, the value of which is recoverable by Debtor, on behalf of its estate, pursuant to section 550 of the Bankruptcy Code.

162.     As alleged above, Debtor is entitled to turnover of the remaining funds in the FF&E Reserve pursuant to section 542 of the Bankruptcy Code.

163.     Accordingly, pursuant to section 502(d) of the Bankruptcy Code, the Marriott Claim against Debtor must be disallowed until Marriott has paid the amount, or turned over the property, for which it is liable under sections 542, 550, and 551 of the Bankruptcy Code.

164.     Further, Debtor objects to the Marriott Claim for all the reasons set forth in Counts IV through VIII of this Complaint.  Debtor also objects to the amount and calculation of the Marriott Claim, particularly Marriott's unsupported assertion of a lost profits claim under the HMA totaling not less than $70 million.  Pursuant to section 502(b) of the Bankruptcy Code, Debtor seeks to have the Marriott Claim disallowed in full.

## **PRAYER FOR RELIEF**

**WHEREFORE**, by reason of the foregoing, Debtor requests that this Court enter judgment:

(1)     avoiding the Transfer pursuant to section 547(b) of the Bankruptcy Code;

(2)     recovering for the benefit of Debtor's estate the value of the Transfer pursuant to sections 550 and 551 of the Bankruptcy Code;

(3)     requiring Marriott to turn over to Debtor the remaining funds in the FF&E Reserve in the approximate amount of $4.7 million pursuant to section 542 of the Bankruptcy Code;

DOCS_SF:105759.5

(4)     declaring that (a) Marriott's asserted liens and rights on the remaining funds in the FF&E Reserve are invalid and unenforceable against Debtor and (b) Debtor properly terminated the HMA prepetition and Marriott is not entitled to any damages against Debtor as a result thereof;

(5)     awarding damages in favor of Debtor and against Marriott for breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty in an amount as determined to be reasonable, plus attorneys' fees and costs incurred by Debtor in this action as permitted by the HMA;

(6)     disallowing the Marriott Claim against Debtor pursuant to sections 502(b) and (d) of the Bankruptcy Code until Marriott has paid the amount, or turned over the property, for which Marriott is liable under sections 542, 550, and 551 of the Bankruptcy Code and for the other reasons set forth in this Complaint; and

(7)     granting Debtor such other and further relief as the Court deems just, proper, and equitable, including the costs and expenses of this action.

DOCS_SF:105759.5

Dated: July 23, 2021

**PRYOR CASHMAN LLP**

*/s/ Todd E. Soloway*

Todd E. Soloway
Bryan T. Mohler
Itai Y. Raz
Pryor Cashman LLP
7 Times Square
New York, New York 11036
Telephone:  (212) 421-4100
tsoloway@pryorcashman.com
bmohler@pryorcashman.com

*Special Litigation Counsel to Plaintiff,*
*Debtor and Debtor in Possession*

-and-

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Timothy P. Cairns*

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:   302-652-4400
ljones@pszjlaw.com
dbertenthal@pszjlaw.com
tcairns@pszjlaw.com

*Counsel to Plaintiff,*
*Debtor and Debtor in Possession*